Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Athanasios E. Agelakopoulos, Esq.
Nevada Bar. No. 14339
aagelakopoulos@nvfirm.com
Jason Thomas, Esq.
Nevada Bar No. 16148
jthomas@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, Nevada  89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

*Attorneys for N9 Advisors, LLC*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 23-12378-NMC |
| BANQ INC., | Chapter 11 |
| Debtor. | Subchapter V |

### OBJECTION OF N9 ADVISORS, LLC TO CONFIRMATION OF DEBTOR'S
### FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION (SUBCHAPTER V)

Creditor N9 Advisors, LLC ("**N9 Advisors**") hereby submits its objection (the "**Objection**") to *Debtor's First Amended Chapter 11 Plan of Reorganization (Subchapter V)* [ECF No. 47] (the "**Plan**")[1] for the reasons stated below:

### <u>INTRODUCTION</u>

1.    Jon Jiles is the controlling shareholder and chairperson of the board of directors of Banq, Inc. ("**Banq**" or the "**Debtor**"). Jiles is also the managing member of Prime Trust, LLC ("**Prime Trust**"). In the last two years of Debtor's pre-bankruptcy operations Jiles sabotaged Banq's business operations through various means, including orchestrating a pretext for Prime Trust to terminate its relationship with Banq at a time when Banq was wholly reliant on Prime Trust's financial

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

infrastructure to operate its business as a neobank. Jiles's actions led Banq's entire management team, including CEO Scott Purcell, to resign in late 2021. At Jiles's behest, Banq later sued the former management team in United States District Court for the District of Nevada, in the case of *Banq, Inc. v. Purcell*, No. 22-cv-773 (the "**Nevada Case**"). The case was dismissed without prejudice, to allow for those claims instead to be arbitrated pursuant to the parties' agreed-upon and applicable arbitration clause. Upon information and belief, Banq has not pursued those claims in arbitration but instead appealed the dismissal to the Ninth Circuit.

2.      N9 Advisors became an investor in Banq when Banq and N9 Advisors executed a Convertible Promissory Note (the "**Note**") and concurrent letter agreement dated July 14, 2021 (the "**Side Letter**").[2] Jiles's actions led N9 Advisors to file suit against him in the circuit court for Broward County, Florida, Case No. 22-013341 (the "**Florida Case**"). The Florida Case includes claims brought by N9 Advisors, on behalf of Banq, against Jiles, for breach of fiduciary duty, and against Prime Trust, for aiding and abetting breach of fiduciary duty. N9 Advisors also sued Banq for breach of contract based on Banq materially changing the nature of its business in breach of the Note and Side Letter. The claim against Jiles was dismissed, not based on the merits, but rather on a finding that N9 Advisors purportedly did not have standing to bring the claims, despite the fact that it held a convertible note and numerous additional rights akin to shareholders pursuant to the Side Letter. The dismissal of the claims against Jiles is currently on appeal.

3.      It is against this backdrop that Debtor filed for bankruptcy and submitted its Plan. The only supposed secured creditor of Banq (in "Class 1" under the Plan by itself) is an entity named NVF, LLC ("**NVF**"). According to the Nevada Secretary of State's website, Jiles is listed as the Manager of NVF. The Plan includes a release by the Debtor of any and all claims against all current officers and

---

[2]      Under the Note, Banq promised to pay N9 Advisors $3,000,000 with an interest of 10% per annum, compounding annually. The Note matured in 2026, and it gave N9 Advisors the option of either receiving payment in dollars or converting the outstanding amount to shares of stock in Banq. Though the Note matured in 2026, it allowed N9 Advisors to accelerate payment if Banq defaulted under certain events, including any material change in the nature of Banq's business. Concurrently with the execution of the Note, Banq issued N9 Advisors a Side Letter agreement which gave N9 Advisors many rights consummate with an ownership interest in Banq, like broad observer rights and the right to receive information, including confidential information from Banq.

directors of the Debtor and NVF. Equity holders will receive "New Equity Interests consisting of shares of stock in the Reorganized Debtor in the same amount and same class of shares" that each held pre-bankruptcy.

4. The Plan does not contemplate any future business operations for Banq. Rather, the entire purpose of the entity will be to serve as a shell to pursue the claims against Banq's former management team which were brought in the Nevada Case, identified in the Plan as the "Purcell Litigation Claims." The highly speculative potential judgment in favor of Banq in the Purcell Litigation serves as the sole means for recovery for creditors. Class 2 and Class 3 creditors (including N9 Advisor's "Class 2" claim for approximately $3,600,000, the largest claim against the Debtor by a wide margin) will only be paid by "the net proceeds, if any, of any recovery realized by the Debtor or Reorganized Debtor on account of the Purcell Litigation Claims remaining after payment of all attorney fees, including contingency fees, and litigation costs relating to the pursuit of the Purcell Litigation Claims and after payment of the New Secured Loan [to NVF] and all other indebtedness secured by the Purcell Litigation Claims." The claim against Jiles in the Florida Case for breach of fiduciary duty, by contrast, will not be pursued by the Debtor and, instead, will likewise be released; no coherent explanation has been provided for the differing treatment of the claims.

5. The initial 341 meeting of creditors took place on July 13, 2023. Investigation done by counsel for N9 Advisors in the lead up to the 341 meeting and questioning of Debtor's representative, Joshua Sroge, the current CEO, during the meeting revealed a number of things:

- Consistent with information disclosed on the Nevada Secretary of State's website, Jiles is the manager/principal of NVF.
- The NVF debt was incurred in contemplation of the bankruptcy filing and went to pay legal counsel for the bankruptcy.
- NVF was formed the day before the loan was made to Banq and at a time when Banq's balance in its bank account was approximately $4,486.
- Remarkably, Sroge could provide no details as to who reviewed the NVF loan documents on behalf of Banq or who negotiated the deal on behalf of Banq.

6. After the 341 meeting, an amended statement of financial affairs was filed by Debtor

which listed NVF as an insider. [ECF No. 73 at Page 15]. Similarly, following questioning during the 341 meeting about the absence of unused net operating losses in the schedules, Debtor filed an amended Schedule A/B on July 20, 2023 which identified, for the first time, over eleven million dollars in unused net operating losses. [ECF No. 72 at Page 8].

7. It is now clear that an insider has manufactured the NVF claim. Jiles is attempting to use the bankruptcy process as a sword and a shield. The Plan is Jiles's attempt to surreptitiously gain a release from the breach of fiduciary duty claim he is facing while simultaneously leaving N9 Advisors and other unsecured creditors with less than they are entitled to and conveniently putting himself in position, as New Equity, to reap the significant tax benefits of over eleven million dollars in unused net operating losses. Moreover, the Plan, by its own terms, is wholly infeasible. It concedes that there is insufficient funding to undertake the years-long pursuit of the "Purcell Litigation Claims" which is the entire basis for the plan.

8. The current Plan is being proposed for the benefit of Jiles, not for the benefit of creditors. The Plan does not serve any valid bankruptcy purpose, rather, it seeks to bury a viable breach of fiduciary duty claim against Jiles while artificially elevating his disguised insider loan (an infusion that should have otherwise taken the form of risk capital rather than the Jiles's orchestrated substitution of alleged debt funding to Banq as an undercapitalized entity) to Banq as a "Class 1" claim. The Plan has not been proposed in good faith and should not be confirmed.

## **BACKGROUND**

### A. **The claim against Jiles[3]**

9. Banq operated as an online "neobank" offering services including peer-to-peer payments and cryptocurrency transactions.

10. Jon Jiles was the chairperson of Banq's board of directors. Jiles was simultaneously the managing member of Prime Trust, a Nevada limited liability company that provides "fintech" and "digitalasset" innovators with financial infrastructure.

---

[3]    The contemporaneously filed Declaration of Petamber Pahuja in support of the Objection and the verified complaint attached to it as an exhibit which is wholly incorporated into the declaration, is the supporting document for all statements made in Background section A, "The claim against Jiles".

11.     Banq solely relied on the infrastructure of its parent entity, Prime Trust, in order to function as a neobank.

12.     In July 2021, Jiles threatened to use his family's controlling interest in Banq to terminate Banq's board of directors, assume control of the company and leave it with only a few months' worth of working capital. Jiles openly admitted that he wanted to undertake these actions so that Prime Trust would have leverage over Banq.

13.     Jiles then tried to get Banq's then-CEO Scott Purcell to sign a non-compete agreement that would have barred Purcell from competing *with Prime Trust*. Jiles's insistence that Purcell sign the non-compete exacerbated conflict between Jiles and Banq's management team, including Purcell, Banq's general counsel and Banq's CTO.

14.     From July to December of 2021, Jiles made no effort to resolve the increasing tension with Banq's management team. Instead, he sought to increase his influence over Banq's other directors and undermine the influence of Banq's management team. The result was that the relationship between Jiles and Banq's management became increasingly dysfunctional at the same time that Banq's hopes of becoming a viable, sustainable business were declining.

15.     On or about August 2021, Prime Trust suddenly established new "compliance requirements" for Banq for use of its infrastructure and sent an "on-boarding manual" to Banq, even though Banq already used Prime Trust's services.

16.     The new requirements would take a large effort for an early-stage company with limited resources, like Banq, to integrate to its code and Application Programming Interface (**"API"**). Banq would have to blueprint the necessary changes, write new code, amend the old code, undertake quality control, and integrate the various components.

17.     Given the breadth of Prime Trust's newly imposed requirements, it would have likely taken Banq a month or two to fully comply. On or about October 2021, Banq's chief technology officer spoke with Prime Trust's chief compliance officer and chief information and security officer to request that Prime Trust prioritize the various new requirements made on Banq so that Banq could comply in a workable manner and timeframe. Prime Trust's chief compliance officer and chief information and security officer informed Banq that Prime Trust's Board of Managers (on which Jiles served as

Chairman) demanded that Banq make all the necessary changes *in a few days* and stated that the failure to make all the changes would be deemed noncompliance resulting in immediate termination of Prime Trust and Banq's relationship.

18.    As Prime Trust (and Jiles) surely knew, it was impossible for Banq to comply with all of the new requirements in the timeframe demanded by Prime Trust. It would take more than ten business days just to blueprint or architect all the requested changes. Banq told Prime Trust at the October 2021 meeting that the deadline was impossible to comply with. Three days later, Banq received a letter from Prime Trust's general counsel terminating its relationship with Prime Trust.

19.    Upon information and belief, Prime Trust and its Board of Managers, led by Jiles, imposed the new requirements with a deadline for compliance that they knew could not be met for the specific purpose of ruining Banq's business.

20.    At or around the same time, upon information and belief, Jiles had Prime Trust send Banq a demand letter asserting that Banq owed Prime Trust $300,000 – a wildly inflated amount. The demand letter was another improper attempt by Jiles and Prime Trust to derail Banq's business.

21.    Having recognized the growing conflict of interest of Jiles and other Banq board members with interests and positions with Prime Trust, Banq's management team lined up an alternative banking partner to provide financial infrastructure in lieu of Prime Trust. When Banq's management reported to Banq's board of directors that Banq would continue its business with an alternative banking partner, Jiles was surprised and angered.

22.    On information and belief, a few days after management informed the Banq board that Banq would survive thanks to its new banking and financial infrastructure partner, someone contacted that new partner and informed it that Prime Trust had terminated its relationship with Banq because of compliance issues. On information and belief, this contact was from someone on behalf of Prime Trust and was caused by the management team's revelation of Banq's alternative to Prime Trust during Banq's board meeting, meaning sensitive information from Banq's board meeting was provided to Prime Trust for the benefit of Prime Trust and to the detriment of Banq.

23.    On information and belief, this interference directly led to the alternative banking partner terminating its relationship with Banq, leaving Banq without a viable alternative to Prime

Trust.

24.    Jiles has admitted to previously disclosing to Prime Trust directors and agents confidential Banq information he obtained during Banq board meetings. This interference is another in the litany of Jiles's breaches of fiduciary duties owed to Banq and his insistence on using Banq to personally benefit through his interest in Prime Trust.

25.    By October 2021, Banq was left without time or capital to pursue another infrastructure provider, which effectively destroyed Banq's business as a neobank.

26.    To diffuse Jiles's fights with management and stop his use of Prime Trust to destroy Banq, N9 Advisors sought to purchase Jiles's shares in Banq. Jiles refused to sell unless, in part, Banq released him from any and all claims of any nature whatsoever, including, specifically, for breach of fiduciary duties.

27.    Left with no viable business with which to move forward, eventually, Banq's entire management team resigned and Jiles appointed an acting CEO, Mr. Sroge. The new CEO was given six weeks to create a new plan and goals for Banq.

28.    In February 2022, Banq hosted a board meeting, attended by N9 Advisors. As a significant investor in the company attending a board meeting shortly after the entire management team had just resigned, N9 Advisors reasonably expected a business plan with new goals for Banq's business to be set out at the meeting. Instead, Jiles brought a lawyer to the meeting and pressured the board with repeated assertions that the board had a fiduciary duty to investigate the former management team with an eye toward future litigation. The lawyer at that meeting failed to provide any substantiation that the former management team appropriated any trade secrets or other confidential information from Banq.

29.    Notably, after being strong-armed by Jiles, the board decided that no meaningful action would be taken against Prime Trust despite its blatant interference with Banq's business operations.

30.    At no point during the February 2022 board meeting did Jiles or anyone else present a plan for the continuation of Banq as a viable business.

31.    At Jiles's behest, Banq later sued the former management team in the Nevada Case. The case was dismissed without prejudice, allowing Banq to pursue its claims in arbitration. Upon

information and belief, Banq has not commenced any arbitration proceeding. It instead filed a notice of appeal.

32.     On September 7, 2022, N9 Advisors[4] filed its complaint in the Florida Case against Banq, Jiles, and Prime Trust. The Florida Case includes claims brought by N9 Advisors on behalf of Banq against Jiles, for breach of fiduciary duty, and against Prime Trust, for aiding and abetting breach of fiduciary duty, as well as direct claims by N9 Advisors for breach of contract. The claims against Jiles and Prime Trust were dismissed and an Agreed Final Judgment entered in favor of Jiles and Prime Trust on May 11, 2023. N9 Advisors thereafter filed an appeal of the trial court's dismissal of the claims against Jiles.

33.     As discussed further below, under the proposed Plan, the estate will not pursue the claim against Jiles for breach of his fiduciary duties to Banq. On July 27, 2023, counsel for N9 Advisors sent a letter to counsel for Debtor demanding that the claims against Jiles be pursued. **Exhibit 1**. On August 4, 2023, counsel for Debtor informed counsel for N9 Advisors that the estate will not be pursuing the claim against Jiles.

**B.    The NVF loan**

34.     NVF was formed as a Nevada limited liability company on March 14, 2023. Jon Jiles is its manager. Nevada Business Portal page regarding "NVF, LLC", accessed August 2, 2023, **Exhibit 2**.

35.     The NVF debt was incurred by Banq on March 15, 2023. The NVF debt is $225,000 and, according to Debtor, is purportedly secured by a UCC-1 lien on all Debtor's personal property. [ECF No. 1 at Page 22].

36.     Again, according to Sroge's testimony at the initial meeting of creditors on July 13,

---

[4]     In the interests of the candid and full disclosure with which N9 Advisors would like this bankruptcy to proceed, N9 Advisors would like to apprise the Court, though it is not relevant to the present Objection, that it is an investor in Fortress NFT Group, Inc. ("**Fortress**"), the company formed by the former management team of Banq after their departure from that company. N9 Advisors is a founder-focused company that invests in innovative, founder-led technology teams. N9 invested in Fortress, an enterprise facing company that holds Trust Licenses and whose revenue stream, unlike that of Banq's whose business was consumer-facing, comes from enterprise contracts. N9 Advisor's investment in Fortress is its third investment in the same founding team, which launched Fortress only after Prime Trust revoked Banq's license.

2023, Sroge could not testify to critical details surrounding NVF's alleged loan to Banq, including who purportedly negotiated the transaction on Debtor's behalf.

### C. The Bankruptcy and the Plan

37.    On June 13, 2023 (the "**Petition Date**"), Debtor filed a voluntary petition for relief under chapter 11 (subchapter V) of the Bankruptcy Code.

38.    The initial statement of financial affairs glaringly failed to identify NVF as an insider [ECF No. 1 at Page 31]. Similarly, Schedule A/B as initially filed did not list any unused net operating losses [ECF No. 1 at Page 19].

39.    On June 29, 2023, Debtor filed the Plan [ECF No. 47]. The Plan places NVF in "Class 1" for voting purposes as the only, supposedly, secured lender. [ECF No. 47 at Pages 21-24].

40.    The Plan includes a release by the Debtor of any and all claims against all current officers and directors of the Debtor and NVF. [ECF No. 47 at Pages 36-37].

41.    Under the Plan, Equity holders will receive "New Equity Interests consisting of shares of stock in the Reorganized Debtor in the same amount and same class of shares" that each held pre-bankruptcy. [ECF No. 47 at Page 24].

42.    The Plan does not contemplate any ongoing business operations for Banq. Rather, the entire purpose of the entity under the Plan will be to pursue the Purcell Litigation Claims. [ECF No. 47 at Pages 18-20]. The only realistic means of recovery for creditors outlined in the Plan is any potential recovery on the Purcell Litigation Claims. Class 2 and Class 3 creditors (including N9 Advisor's "Class 2" claim for approximately $3,600,000) will only be paid by "the net proceeds, if any, of any recovery realized by the Debtor or Reorganized Debtor on account of the Purcell Litigation Claims remaining after payment of all attorney fees, including contingency fees, and litigation costs relating to the pursuit of the Purcel Litigation Claims and after payment of the New Secured Loan [to NVF] and all other indebtedness secured by the Purcell Litigation Claims." [ECF No. 47 at Pages 22-24].

43.    The Plan contemplates that a "New Secured Loan" from NVF will be used: (i) to pay Administrative Claims and Priority Claims, (ii) to fund Debtor's business operations during the term of the Plan, including the costs of pursuing the Purcell Litigation Claims, and (iii) to create a reserve

to provide for payment of the $45,000 "Guaranteed Distribution" to unsecured creditors at the conclusion of the three-year term of the Plan. The Plan projections estimate the amount of the New Secured Loan that will be needed to cover these costs over the three-year term of the Plan at $1,500,000. The Plan states, however, that NVF has only agreed "to advance up to $350,000 in new secured financing," ***leaving a shortfall of $925,000***. [ECF No. 47 at Pages 18-20].

44.    Joshua Sroge, the current CEO of Banq, appeared as the Debtor representative at the 341 meeting of creditors which took place on July 13, 2023. Sroge testified that he did not know that NVF was formed the day before the loan was made from NVF to Banq or that Jiles was the manager of NVF although he conceded that would "not surprise" him. July 13, 2023 341 meeting, page 60, attached as **Exhibit 3.**

45.    Sroge was the CEO when the debt was incurred and there were a total of four officers or directors of Banq at the time, including Sroge and Jiles. Though he was the company's top officer, Sroge does not know who negotiated the transaction on behalf of Banq and does not know who, if anyone, reviewed the loan documents on behalf of Banq. **Exhibit 3** at pages 58, 63. He was able to testify that the NVF debt was incurred in contemplation of the bankruptcy filing and went to pay legal counsel for the bankruptcy. **Exhibit 3** at pages 58-59, 67.

46.    Sroge (and Debtor's counsel) were also asked about the absence of unused net operating losses — losses with potential value as tax deductions in the future — in the schedules. **Exhibit 3** at pages 90-91.

47.    An amended statement of financial affairs listing NVF as an insider was filed after the initial 341 meeting. [ECF No. 73 at Page 15]. Debtor filed an amended Schedule A/B on July 20, 2023 which identified, for the first time, *over eleven million dollars* in unused net operating losses. [ECF No. 72 at Page 8].

48.    N9 Advisors timely submitted its Class 2 ballot rejecting the Plan on August 4, 2023. Executed Class 2 Ballot for N9 Advisors, **Exhibit 4**.

/ / /

/ / /

/ / /

49.    The 341 meeting was continued on August 7, 2023.[5] CEO Joshua Sroge again appeared as Debtor's representative. Questioning during the continued meeting established that the demand from N9 Advisors to pursue claims against Jiles was rejected without a board meeting taking place. In other words, the demand was never properly considered.

50.    As the supporting documents demonstrate, N9 Advisors holds an allowed general unsecured claim in the amount of $3,603,753.43 against Debtor's bankruptcy estate.

**OBJECTION**

51.    A court shall confirm a plan only if all of the requirements of Section 1129(a) are met. 11 U.S.C. § 1129(a). A debtor bears the burden of proof with respect to the confirmation requirements by a preponderance of the evidence. *In re Lavilla*, 425 B.R. 572, 576 (Bankr. E.D. Cal. 2010).

52.    The Debtor fails to carry this burden as to numerous requirements: (i) the Plan's classification scheme is improper; (ii) Debtor's disclosures regarding the Plan have been inadequate and misleading; (iii) the Plan has not been submitted in good faith; (iv) the identity and affiliations of individuals proposed to serve as directors and officers after confirmation of the Plan have not been disclosed; (v) the Plan does not pass the "best interests test" of Section 1129(a)(7); and (vi) the Plan does not satisfy the "feasibility" requirement of Section 1129(a)(11).

**A.  The Plan's classification scheme is improper**

53.    Section 1129(a)(1) requires that a plan comply "with the applicable provisions of this title." The "legislative history suggests that the applicable provisions are those governing the plan's internal structure and drafting: Paragraph (1) requires that the plan comply with the applicable provisions of chapter 11, such as section 1122 and 1123, governing classification and contents of a plan." Collier on Bankruptcy ¶ 1129.01[1] (16th rev'd ed.) (citing S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978))(internal quotations omitted).

54.    Under Section 1123(a), a proposed plan must designate classes of claims and specify the treatment of "any class of claims or interests that is impaired under the plan." Section 1122(a)

---

[5]    The transcript of the August 7, 2023 continued meeting has been ordered but is not yet available as of the filing of this Objection.

11

provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

55.    Here, the NVF loan is an avoidable transfer by an insider that was manufactured on the eve of bankruptcy to create a secured creditor. The NVF claim is subject to equitable subrogation. If nothing else, the NVF vote should be designated and N9 Advisors intends to move the court to do so.

**1. The NVF vote should be designated, its claim should be equitably subordinated under 11 U.S.C. § 510(c)(1), and NVF's purported lien should be surrendered to the bankruptcy estate under 11 U.S.C. § 510(c)(2).**

56.    Section 1126(e) authorizes the bankruptcy court to designate, or disqualify, the ballot of "any entity whose acceptance or rejection . . . was not in good faith or was not solicited or procured in good faith . . . ." If a person seeks to secure some untoward advantage over other creditors for an ulterior motive, that will indicate bad faith. *See In re Marin Town Ctr.*, 142 B.R. 374, 378-79 (N.D. Cal. 1992); *see also In re Allegheny Int'l, Inc.,* 118 B.R. 282, 290 (W.D. Pa. 1990)("Votes must be designated when the court determines that the creditor has cast his vote with an ulterior purpose aimed at gaining some advantage to which he would not otherwise be entitled in his position.")(internal quotations omitted).

57.    Here, the artifice of "NVF" and the NVF loan is being used by Jiles, a Banq insider, to obtain an improper release, via the Plan, for the meritorious breach of fiduciary duty claim he is facing as a Banq insider, not as an NVF officer or director. Moreover, Jiles has not provided any consideration himself for obtaining such broad, unlimited release as an officer and director of Banq, as provided for in the Plan. Indeed, the Plan, if approved, would also put Jiles in position to utilize lucrative unused net operating losses for Banq. NVF, formed on the eve of Banq's bankruptcy apparently for the sole purpose of becoming a secured creditor of Banq and completely controlled by Jiles, has ulterior motives for voting for Plan approval. Jiles seeks, through NVF, to gain advantages over N9 Advisors and other creditors which we would not otherwise have. The NVF vote should be designated under Section 1126(e).

58.    Jiles's position with Debtor undoubtedly renders him a statutory insider of Debtor. *See, e.g.,* 11 U.S.C. § 101(31)(B)(i) and (b)(iii). Debtor now admits that NVF also qualifies as an insider of Debtor. (ECF No. 73, pg. 15). As such, Debtor's dealings with both Jiles and NVF must be thoroughly

12

and rigorously scrutinized. *See, e.g., Schubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009). Heightened scrutiny of insider dealings with a bankrupt debtor is a well-established practice that extends far back into bankruptcy practice. *See, e.g., Pepper v. Litton*, 308 U.S. 295 (1939). The disguised and concealed nature of Jiles's and NVF's efforts to effectuate third-party releases for the benefit of Jiles and NVF is manifestly unfair and prejudicial to creditors, like N9 Advisors.

59.    "The subordination of claims based on equitable considerations generally requires three findings: '(1) that the claimant engaged in some type of inequitable conduct, (2) that the conduct injured creditors or conferred unfair advantage on the claimant, and (3) that subordination would not be inconsistent with the Bankruptcy Code." *See, e.g., Henry v. Lehman Commer. Paper, Inc. (In re First Alliance Mortg. Co.)*, 471 F.3d 977, 1006 (9th Cir. 2006); *Feder v. Lazar (In re Lazar)*, 83 F.3d 306, 309 (9th Cir. 1996); *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977).

60.    Here, Sroge's testimony at both the initial and continued meetings of creditors demonstrates that the Debtor is under the complete domination and control of Jiles. For instance, Sroge initially testified at the continued meeting of creditors held on August 7, 2023 to the effect that Debtor intended to decline the invitation of N9 Advisors that it be granted derivative standing to pursue claims against Jiles in the Florida litigation, even before a board meeting to even discuss the matter had been held. When Sroge was asked what efforts Debtor had undertaken to investigate the claims it was purportedly releasing against Jiles, he initially answered obliquely and evasively to the effect that Debtor had not allegedly investigated all potential claims against Jiles. After follow-up questioning, however, Sroge finally admitted that Debtor had, effectively, refrained from undertaking any investigation of the claims it was purportedly releasing against Jiles. Sroge's testimony lays bare the sheer, total, and utter domination and control Jiles has exerted and continues to exert over Debtor for his own benefit and to the detriment of Debtor's creditors, like N9 Advisors.

61.    What Jiles effectively seeks to accomplish through the artifice of the alleged loan from NVF is continued control over Debtor's litigation claims that may be asserted against Jiles and those he favors while, at the same time, obtaining a blocking position in Debtor's capital structure for voting

purposes under 11 U.S.C. §§ 1129(b)(2)(A) and 1191(c)(1). The fact that N9 Advisors had to discover for itself Jiles's role in NVF without being able to rely on Debtor's disclosures in the Plan itself is testament to the covert and disguised nature of the efforts and Jiles and NVF to lever the bankruptcy and Plan confirmation processes for the benefit of themselves and those they favor.

62.    Jiles's election to substitute alleged secured debt through the artifice of the purported NVF secured loan in place of risk capital only brings into sharper relief the inequitable nature of his conduct. *See, e.g., Goldie v. Cox*, 130 F.2d 695 (8th Cir. 1942). That this transaction was consummated at a time when Debtor's main bank account held approximately $4,486 also demonstrates the Debtor's undercapitalization and exposure to being dominated and controlled by Jiles for his own benefit.

63.    N9 Advisors respectfully submits that all of these actions by Jiles, Sroge, and NVF work to the collective detriment and injury of Debtor's creditors, including N9 Advisors as a Class 2 creditor, and confer unfair advantages upon both Jiles and NVF. Subordination of the alleged NVF secured claim under 11 U.S.C. § 510(c)(1) is therefore not inconsistent with the operative provisions of the Bankruptcy Code. NVF's purported lien, therefore, should be surrendered to the estate under 11 U.S.C. § 510(c)(2). Finally, it is for these reasons that Debtor's classification scheme in the Plan contravenes the requirements of 11 U.S.C. §§ 1122 and 1129(a)(1). *See* 11 U.S.C. § 1181. Confirmation of Debtor's Plan should, therefore, be denied on this basis, as well.

**B.  Debtor's disclosures regarding the Plan have been inadequate and misleading**

64.    Section 1129(a)(2) mandates that the "proponent of the plan complies with the applicable provisions of this title." The section's "primary purpose is to assure that the plan proponents have complied with the disclosure and solicitation requirements of §§ 1125 and 1126." *Todeschi v. Juarez (In re Juarez)*, 603 B.R. 610, 626 (B.A.P. 9th Cir. 2019); *see also Official Committee of Unsecured Creditors v. Michelson,* 141 B.R. 715, 719-720 (E.D. Cal. 1992)("Whatever else may be swept into section 1129(a)(2), it is beyond cavil that the plan proponent must prove, as an essential element to confirmation of a plan of reorganization, that adequate information was disclosed.").

65.    As further explained by the court in *Michelson*: "The doctrine of *caveat emptor* has no application to reorganizations. The corollary is that the risk of defective disclosure is on the discloser. This creates an incentive for the plan proponent to make full, candid, and complete disclosure. The

14

proponent should be biased towards more disclosure than less." *Michelson, supra* at 720. "Inquiry notice is antithetical to reorganization procedure. It is inappropriate to require that others presume that they are being misled, disregard a disclosure statement and, in the case of a debtor's plan, disregard the schedules and statement of financial affairs executed under penalty of perjury. The purpose of the disclosure process is to obviate, not necessitate, independent investigation before agreeing to a reorganization." *Id.* at 719.

66.    Here, Debtor's initial statement of financial affairs failed to identify NVF as an insider and initial Schedule A/B did not list any unused net operating losses [ECF No. 1 at Pages 19 and 31]. The Plan includes a release by the Debtor of any and all claims against all current officers and directors of the Debtor and NVF, again without identifying NVF as an insider-controlled entity. [ECF No. 47 at Pages 36-37]. Equity holders will receive "New Equity Interests consisting of shares of stock in the Reorganized Debtor in the same amount and same class of shares" that each held pre-bankruptcy under the terms of the Plan. [ECF No. 47 at Page 24].

67.    It was not until an independent investigation by N9 Advisors' counsel that it was learned that NVF was formed the day before the loan was made from NVF to Banq and that Jiles was the manager of NVF. **Exhibit 2**. Joshua Sroge, Debtor's CEO and representative at the 341 meeting, does not know who negotiated the transaction with NVF on behalf of Banq and does not know who, if anyone, reviewed the loan documents on behalf of Banq. **Exhibit 3** at pages 58, 63. Sroge (and Debtor's counsel) were also asked about the absence of unused net operating losses in the schedules at the 341 meeting. **Exhibit 3** at pages 90-91.

68.    An amended statement of financial affairs listing NVF as an insider was filed *after* the 341 meeting. [ECF No. 73 at Page 15]. Also after the 341 meeting, Debtor filed an amended Schedule A/B which identified, for the first time, over eleven million dollars in unused net operating losses — net operating losses which Jiles stands to benefit from under the terms of the plan. [ECF No. 72 at Page 8].

69.    Debtor's disclosures have been anything but "full, candid, and complete." Rather, information had to be ferreted out by N9 Advisors' counsel and only then did Debtor, belatedly, put that information in its schedules. Debtor has not complied with the mandate of Section 1192(a)(2).

### C. __The Plan has not been submitted in good faith__

70.    Section 1129(a)(3) requires that the "plan has been proposed in good faith and not by any means forbidden by law." "Good faith in proposing a plan of reorganization" is "viewed under the totality of the circumstances." *Todeschi, supra* at 626. "Good faith requires that a plan will achieve a result consistent with the objectives and purposes of the Code [and] also requires a fundamental fairness in dealing with one's creditors." *Id.* The two "recognized policies, or objectives" of Chapter 11 are "preserving going concerns and maximizing property available to satisfy creditors." *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012)(internal quotations omitted). The candid disclosures required by Section 1192(a)(2) are "related[]" to the good faith analysis. *Todeschi, supra* at 626.

71.    The Plan in this case will not achieve a "result consistent with the objectives and purposes of the Code" and does not display a "fundamental fairness" towards Banq's creditors for a number of reasons.

72.    The Plan makes no attempt to preserve Banq as a "going concern." The entire purpose of the Plan is to use Banq as a shell to pursue the Purcell Litigation Claims. This post-bankruptcy purpose bears no resemblance to the innovative neobank business that investors like N9 Advisors invested in.

73.    At the same time that the Plan seeks to pursue the Purcell Litigation Claims, it seeks to release Jiles from the breach of fiduciary duty claim he is facing. The proposed insider release for Jiles is clearly not included with an eye toward "maximizing property available to satisfy creditors." Rather, the Plan seeks to bury the valid claim against Jiles so that Jiles and company can pursue their preferred litigation against Banq's former management. Such a release can only be approved if it represent a valid exercise of the debtor's business judgment and satisfies the fair, reasonable and adequate standard set forth in *Martin v. Kane (In re A & C Props.),* 784 F.2d 1377, 1381 (9th Cir. 1986). *See In re PG & E Corp.,* 617 B.R. 671, 683 (Bankr. N.D. Cal. 2020). The factors courts consider in determining whether that standard has been met include:

   a)   The probability of success in the litigation;

   b)   The difficulties, if any, to be encountered in the matter of collection;

   c)   The complexity of the litigation involved, and the expense, inconvenience and delay

16

necessarily attending it; and

    d)   The paramount interest of the creditors and a proper deference to their reasonably views in the premises.

*Martin, supra* at 1381. Debtor has the burden of proving that the insider release for Jiles is fair and equitable. *Id.* Debtor has put forth no evidence that the insider release for Jiles is appropriate. As discussed above, there is a colorable estate claim against Jiles for breach of fiduciary duty that could provide meaningfully enhanced value for unsecured creditors. Rather than allow an estate representative to pursue the claim, the Debtor, through the proposed plan, has unilaterally agreed to dispose of it without fair consideration. Current Banq CEO Joshua Sroge testified at the 341 meeting on August 7, 2023 that the demand from N9 Advisors to Debtor to pursue the breach of fiduciary duty claim against Jiles was rejected without a board meeting taking place to discuss. In other words, the demand was dead on arrival and never properly considered.

74.    The Plan and Debtor's schedules, as initially filed, failed to disclose NVF as a Jiles-controlled entity and omitted the unused net operating losses for Banq in excess of eleven million dollars which Jiles, as controlling shareholder of Banq, stands to benefit from. The Plan also does not make plain that Jiles will receive a complete release from all claims under its terms. Rather, N9 Advisors was forced to uncover this information on its own and then connect the dots. This is far from treating a creditor with "fundamental fairness."

75.    NVF was formed by Jiles the day before Banq's indebtedness to it was incurred. The NVF insider loan was made in contemplation of a bankruptcy filing for the sole purpose of creating a secured creditor who could approve the Plan. The designation of NVF as a secured creditor in "Class 1" by itself under the Plan was not done in good faith.

76.    In the end, it is clear Jiles caused Banq to file for bankruptcy as a sword and a shield: Jiles would be allowed to pursue the Purcell Litigation Claims while improperly attempting to insulate Jiles from liability from his own significant culpable conduct in undermining Banq's ability to operate as a going concern, and being the true cause of its financial distress. The Court should not countenance such an abuse of the bankruptcy process.

/ / /

**D.  The identity and affiliations of individuals proposed to serve as directors and officers after confirmation of the Plan have not been disclosed**

77.    Under Section 1129(a)(5)(A), the proponent of a plan must (i) disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director [or] officer … of the debtor" and (ii) "the appointment to, or continuance in, such office of such individual [must be] consistent with the interests of creditors[.]"

78.    Section 1123(a)(7), meanwhile, states that a plan shall "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee[.]"

79.    Here, the Plan is silent as to who will serve as directors and officers of the Reorganized Debtor and as to the manner in which directors and officers will be selected. Section 1129(a)(5)(A)(i) and Section 1123(a)(7) have not been complied with.

80.    Further, CEO Joshua Sroge testified at the August 7, 2023 continued 341 meeting of creditors that Jiles will continue in his director role in the Reorganized Debtor. This intention to keep Jiles on in his director role is: a) not disclosed in the Plan in contravention of Section 1129(a)(5)(A)(i); b) being done, apparently, outside of any approved "manner of selection" as required by Section 1123(a)(7); and c) is not in conformance with Section 1129(a)(5)(A)(ii) or Section 1123(a)(7) because the continuance of Jiles in his role as director is not in the best interests of creditors. Rather, as outlined above, Jiles has repeatedly breached his fiduciary duties to Debtor and is now trying to use this bankruptcy to block pursuit of claim against him. It is in the best interests of creditors that someone without the obvious conflicts which Jiles has come in to replace him in his director role.

**E.  The Plan does not pass the "best interests test" of Section 1129(a)(7)**

81.    Section 1129(a)(7) requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the plan effective date, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. This is commonly referred to as the "best interests test."

82.     Here, Debtor provides no reasoning for why the Purcell Litigation Claims are to be pursued under the Plan while the claim against Jiles is to be abandoned. The claim against Jiles is an estate asset which is being thrown away without explanation. In the event of a chapter 7 liquidation, there is a substantial likelihood that a chapter 7 trustee would assert claims against Jiles similar to those advanced in the Florida Case. The absence of the claim against Jiles from the Plan means that the Plan does not pass the best interests test.

**F.    The Plan does not satisfy the "feasibility" requirement of Section 1129(a)(11)**

83.     Section 1129(a)(11) provides that a court may confirm a plan of reorganization only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This is commonly referred to as the "feasibility" requirement. *In re Am. Capital Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012). Section 1129(a)(11) does not require a guarantee of success but the plan must propose "a realistic and workable framework." *Id.* at 156. A plan is not feasible "if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely." *Id.* Similarly, if a Plan depends for its success on anticipated refinancing, "the plan proponent has to produce some credible evidence about the likelihood of that refinancing." *In re Las Vegas Monorail Co.*, 462 B.R. 795, 800 (Bankr. D. Nev. 2011). For this reason, "courts have refused to confirm plans whose feasibility turned on … future refinancings, absent an adequate showing that such … refinancings would be likely to occur." *Id.*

84.     The entire basis for the Plan is pursuit of the Purcell Litigation Claims, claims which are, at best, uncertain and speculative. Indeed, the Purcell Litigation Claims have already been dismissed from Debtor's chosen forum, the United States District Court for the District of Nevada, and ordered into arbitration if they are to be pursued. The claims are anything but simple and straightforward, the debtor has cited no concrete evidence to support its allegations that any trade secrets or confidential information were taken by former Banq management, and the litigation will take three-years to pursue to finality, even under the optimistic projections of the Plan.

85.     The order compelling arbitration of the Purcell Litigation Claims means there will be significant arbitration costs associated with pursuit of the Purcell Litigation Claims which highlights

19

another way in which the Plan is not feasible: there is no concrete showing of how the costs of litigation are to be financed. The Plan contemplates that a "New Secured Loan" from NVF will be used: (i) to pay Administrative Claims and Priority Claims, (ii) to fund Debtor's business operations during the term of the Plan, including the costs of pursuing the Purcell Litigation Claims, and (iii) to create a reserve to provide for payment of the $45,000 "Guaranteed Distribution" to unsecured creditors at the conclusion of the three-year term of the Plan. According to the Plan projections, $1,500,000 is the estimated amount of the New Secured Loan needed to cover these costs over the three-year term of the Plan. The Plan states, however, that NVF has only agreed "to advance up to $350,000 in new secured financing," ***leaving a shortfall of $925,000***. [ECF No. 47 at Pages 18-20].

86.     The Plan offers little more than wishful thinking to explain how this shortfall of nearly a million dollars will be overcome: "The above projections also assume the Reorganized Debtor will be able to reach an agreement with the Secured Lender following confirmation of the Plan, if necessary, to increase the amount of the Secured Loan to pay litigation expenses and other business expenses incurred by the Reorganized Debtor during the three-year term of the Plan." [ECF No. 47, Page 20]. Debtor has simply not made an "adequate showing" of "credible evidence" that financing up to $1,500,000 will be available for the years-long pursuit of the Purcell Litigation Claims. The Plan is not feasible.

### **RESERVATION OF RIGHTS**

87.     N9 Advisors reserves the right to supplement this Objection at or prior to the hearing on the Plan.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

WHEREFORE, N9 Advisors requests that the Plan not be confirmed. In the alternative, N9 Advisors requests, pursuant to United States Bankruptcy Court for the District of Nevada Local Rule 9014(7), that the August 22, 2023 confirmation hearing be deemed a status and scheduling hearing to discuss the taking of evidence and/or additional briefing concerning confirmation of the Plan.

Dated: August 8, 2023.

SCHWARTZ LAW, PLLC

By: */s/ Samuel A. Schwartz*
Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
Athanasios E. Agelakopoulos, Esq.
Nevada Bar. No. 14339
Jason J. Thomas, Esq.
Nevada Bar No. 16148
601 East Bridger Avenue
Las Vegas, Nevada  89101

*Attorneys for N9 Advisors, LLC*

# EXHIBIT 1

**SCHWARTZ LAW**

Athanasios E. Agelakopoulos
Attorney at Law
702-929-2003 tel
aagelakopoulos@nvfirm.com

July 27, 2023

*VIA FIRST CLASS MAIL AND E-MAIL*

Bart K. Larsen, Esq.
Shea Larsen
1731 Village Center Circle, Suite 150
Las Vegas, NV 89134
blarsen@shea.law

   **Re:** **In re: Banq Inc. / Nevada Bankruptcy Case No. 23-12378**

Dear Bart:

  As you know, our client N9 Advisors, LLC ("**N9**") filed suit in September 2022 against Banq Inc. ("**Banq**" or "**Debtor**"), Jon Jiles and Prime Trust, LLC ("**Prime Trust**") in the circuit court for Broward County, Florida (the "**Florida Case**"). The Florida Case includes claims brought by N9 on behalf of Banq against Jiles (for breach of fiduciary duty) and against Prime Trust (for aiding and abetting breach of fiduciary duty)(collectively, the "**Banq Claims**"). For your convenience, a copy of the complaint from the Florida Case, which sets out the bases for the Banq Claims in detail, is attached. In short, the complaint alleges that Jiles, while simultaneously acting as the chairperson of Banq's board of directors and managing member of Prime Trust, sabotaged Banq's business operations through various means, including orchestrating a pretext for Prime Trust to terminate its relationship with Banq at a time when Banq was completely reliant on Prime Trust's financial infrastructure in order to operate its business as a neobank. The complaint further claims that Jiles acted in his own best interests and the best interests of Prime Trust to the detriment of Banq and he was aided and abetted in the breach of his fiduciary duties to Banq by Prime Trust.

  The Banq Claims, currently on appeal, should be pursued by the Debtor. To date, however, the Debtor has failed to pursue these claims. <u>N9 hereby requests written confirmation no later than 5:00 p.m. Pacific time on Monday, August 7, 2023, that the Debtor will not pursue these claims</u>. Upon receiving such confirmation or no response, and absent consent to derivative standing, N9 intends to file a motion with the bankruptcy court seeking derivative standing to prosecute the claims based on the Debtor's inability or unwillingness to do so. *See, e.g.*, *In re Spaulding Composites Co.*, 207 B.R. 899, 903-904 (B.A.P. 9th Cir. 1997) (holding that, in appropriate situations, the bankruptcy court may allow a party other than the debtor-in-possession to pursue the estate's litigation when the debtor-in-possession is unwilling to do so). In addition, we intend to seek leave from the automatic stay so that N9 may timely respond to the July 26, 2023 Order of

# SCHWARTZ LAW

Athanasios E. Agelakopoulos
Attorney at Law
702-929-2003 tel
aagelakopoulos@nvfirm.com

the Court of Appeal for the Fourth District in the State of Florida, the court before whom the appeal of the Florida Case currently is pending (see attached order).

Please call me if you have any questions or wish to discuss further. Thank you.

Sincerely,

/s/ Athanasios E. Agelakopoulos

Athanasios E. Agelakopoulos

IN THE CIRCUIT COURT OF THE SEVENTEENTH
JUDICIAL CIRCUIT IN AND FOR BROWARD
COUNTY, FLORIDA

Case No. 22-_____ CA _____

N9 ADVISORS, LLC, on
its own behalf and on
behalf of Banq, Inc.,

        Plaintiffs,

v.

BANQ, INC., JON JILES,
and PRIME TRUST LLC.

        Defendants.

_____/

## COMPLAINT

Plaintiff N9 Advisors, LLC ("N9 Advisors") sues Defendants Banq, Inc. ("Banq") and

Prime Trust LLC ("Prime Trust") and sues, on behalf of Banq, Inc., Defendant Jon Jiles ("Jiles")

and Prime Trust.

### INTRODUCTION

1.      Defendant Jon Jiles, while wearing two conflicting hats, upturned Banq's

business, leaving that company a shell of its former self. Because Jiles breached his fiduciary

duties to Banq, N9 Advisors—an investor in Banq—brings this derivative lawsuit against Jiles

for breaching his fiduciary duties and against Prime Trust for aiding and abetting Jiles's

breaches. It also brings suit on its own behalf for collection on a promissory note signed by Banq

and against Prime Trust for its tortious interference with N9 Advisors' investment relationship

with Banq.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction because this is an action at law in which the matter in controversy exceeds the sum of $30,000, exclusive of interest, costs, and attorney's fees.

3.      Venue is proper in Broward County under Florida Statutes § 47.011 because it is the county where Banq resides and is where the claims accrued and under § 47.061 because it is the county where the maker resides.

4.      The Court has personal jurisdiction over Banq under § 48.193(1)(b) because it is a Florida corporation that engages in substantial activity in Florida and under § 48.193(1)(a)7 for breaching a contract in Florida.

5.      The Court has personal jurisdiction over Prime Trust and Jiles under § 48.193(1)(a)2 because they committed tortious acts within Florida.

## THE CONVERTIBLE PROMISSORY NOTE

6.      Banq is a Florida corporation that in May of 2021 was a neobank—that is, it provided banking services to consumers through a mobile app and website.

7.      On July 16, 2021, N9 Advisors became an investor in Banq when Banq and N9 Advisors executed the Convertible Promissory Note ("Note"), which is attached as Exhibit 1.

8.      Under the Note, Banq promised to pay N9 Advisors $3,000,000 with an interest of 10% per annum, compounding annually.

9.      The Note matured in 2026, and it gave N9 Advisors the option of either receiving payment in dollars or converting the outstanding amount to shares of stock in Banq.

10.     Though the Note matured in 2026, it allowed N9 Advisors to accelerate payment if Banq defaulted under certain events, including "any material change in the nature of [Banq's] business."

11.    Because N9 Advisors was not merely a note holder but also had the ability to convert its interest to ownership in Banq, Banq issued N9 Advisors the Side Letter, which is attached as Exhibit 2.

12.    The Side Letter gave N9 Advisors many rights consummate with an ownership interest in Banq, like broad observer rights and the right to receive information, including confidential information from Banq.

### JILES'S BREACHES OF FIDUCIARY DUTIES

13.    At all relevant times, Jiles was (and is) the chairperson of Banq's board of directors and thus owed Banq fiduciary duties.

14.    At all relevant times, Jiles was also (and is also) the managing member of Prime Trust, a Nevada limited liability company that provides "fintech" and "digital asset" innovators with financial infrastructure.

15.    To operate as a neobank, Banq relied on Prime Trust's infrastructure.

16.    Jiles's position as chairperson of Banq and manager and owner of Prime Trust constitutes a conflict of interest under Florida Statutes § 607.0832 and raises serious questions about Jiles's fiduciary duties, especially his duty of loyalty, given that he headed two different entities, one of which relied heavily on the services of the other entity.

17.    Jiles quickly showed that his loyalty belonged to Prime Trust, not Banq.

18.    Despite being Banq's chairperson and thus owing Banq fiduciary duties, on information and belief, Jiles in July of 2021 threatened to use his family's controlling interest in Banq to terminate Banq's board of directors, assume control of Banq, and leave Banq with just a few months' worth of working capital.

3

19. These threats, in themselves, are radical and breaches of Jiles's fiduciary duties to Banq, but they are more alarming because Jiles freely admitted that he wanted to undertake these actions so that Prime Trust would have leverage over Banq.

20. Not done there, Jiles next sought to require an inexplicable non-compete agreement from Banq's then-CEO Scott Purcell.

21. On information and belief, Jiles became adamant that Purcell must sign a non-compete agreement, but the non-compete agreement would not have barred Purcell from competing with Banq but, rather, would have barred Purcell from competing with Prime Trust.

22. Jiles's insistence that Purcell sign the non-compete agreement highlights Jiles's foremost loyalty to Prime Trust and to his own personal interests at the expense of Banq.

23. Jiles's insistence also propelled an irreconcilable conflict between Jiles and Banq's management team, including Purcell, Banq's general counsel, and Banq's CTO.

24. From July to December of 2021, Jiles, despite his fiduciary duties to Banq, did not resolve an ever-increasing rift with Banq's management team as Jiles's conflict of interest and breach of duty of loyalty became more and more apparent and he began to increase his influence over Banq's other directors, and the relationship between Jiles and management became increasingly dysfunctional as Banq's business hopes became ever-more fraught.

### PRIME TRUST AND BANQ

25. Eventually, and in contravention of his fiduciary obligations to Banq, Jiles began to plot Banq's downfall through his control of Prime Trust.

26. Banq's reliance on Prime Trust's financial infrastructure cannot be understated: Without it or an alternative provider, Banq could not operate as a neobank.

4

27.     On information and belief, in late August or early September, Prime Trust required that Banq meet new "compliance requirements," and Prime Trust sent an on-boarding manual to Banq, even though Banq already used Prime Trust's services.

28.     The new requirements would take a large effort for an early stage company with limited resources, like Banq, to integrate to its code and Application Programming Interface ("API").

29.     To alter its code, Banq would have to blueprint the necessary changes, write new code, amend the old code, undertake quality control, and integrate all the moving pieces.

30.     On information and belief, on or about mid-October 2021, Banq's chief technology officer spoke with Prime Trust's chief compliance officer and chief information and security officer to request that they prioritize the various new demands made on Banq so that Banq could comply in a reasonable, workable manner and timeframe.

31.     Given the breadth of the newly imposed requirements by Prime Trust, the effort would likely have taken a month or two to fully comply, so Banq asked Prime Trust which changes it should prioritize.

32.     At this meeting, Prime Trust's chief compliance officer and chief information and security officer informed Banq that Prime Trust's Board of Managers—on which Jiles served as Chairman—demanded that Banq make all the necessary changes in a few days and informed Banq that the failure to make all the changes would be deemed noncompliance and lead to immediate termination of Prime Trust and Banq's relationship.

33.     The totality of Prime Trust's request was impossible to accomplish within that time period; Banq could not even blueprint or architect all the requested changes in ten business

5

days, and, at this meeting, Banq told Prime Trust that the deadline was impossible for Banq to meet.

34.     On information and belief, just three days later, Banq received a letter from Prime Trust's general counsel in which Prime Trust terminated its relationship with Banq.

35.     Prime Trust and its Board of Managers, led by Jiles, imposed this unattainable goal not for any rational or business reasons but specifically because Jiles wanted to upend Banq's business and knew Banq could not meet the technical goal within the allotted time.

36.     On information and belief, to increase pressure on Banq, Jiles also had Prime Trust send Banq a demand letter, asserting that Banq owed Prime Trust $300,000. Though Banq did owe Prime Trust some money, the money owed was nowhere near $300,000.

37.     The demand letter was simply another attempt by Jiles and Prime Trust to derail Banq's business.

38.     Having recognized the growing conflict of interest of Jiles and other Banq board members with interests and positions with Prime Trust, Banq's management team lined up an alternative banking partner to provide financial infrastructure in lieu of Prime Trust.

39.     When Banq's management reported to Banq's board of directors, Jiles was upset and surprised—not pleased—that Banq would continue its business with an alternative banking partner.

40.     On information and belief, a few days after management informed the Banq board that Banq would survive thanks to its new relationship with a new, alternative banking and financial infrastructure partner in lieu of Prime Trust, someone contacted that new partner and informed it that Prime Trust had allegedly terminated its relationship with Banq because of compliance issues.

6

41.    On information and belief, this contact was from someone on behalf of Prime Trust and was caused by the management team's revelation of Banq's alternative to Prime Trust during Banq's board meeting, which demonstrated the sharing of Banq information to Prime Trust for the benefit of Prime Trust and to the detriment of Banq.

42.    On information and belief, this contact directly led to the banking partner's terminating its relationship with Banq, leaving Banq without its planned alternative to Prime Trust.

43.    Jiles admitted to previously disclosing confidential Banq information handed to him at Banq board meetings to Prime Trust directors and agents, and this event further highlighted his breaches of fiduciary duties to Banq in order for him to benefit personally and through his interests in Prime Trust.

44.    After these events, Jiles decided that he should create a "special committee," selected by him alone, which would make the ultimate decision on whether Banq should sue Prime Trust for its actions that had devastated Banq.

45.    In short, despite the clear conflict, Jiles wanted to decide whether the company he chaired (Banq) should sue the company that he managed and largely owned (Prime Trust).

46.    By October of 2021, Banq was left without time or capital to pursue another infrastructure provider, which effectively ended Banq's business as a neobank.

47.    To help end Jiles's fights with management and his use of Prime Trust to destroy Banq, N9 Advisors sought to purchase Jiles's shares in Banq.

48.    Clearly aware of his improper actions, Jiles refused to sell unless, in part, Banq released him from any and all claims of any nature whatsoever whether based on contract, tort, including breach of fiduciary duties, or statute.

## BANQ'S RADICAL BUSINESS CHANGE

49.     Given Jiles's threats, Prime Trust's actions, and Jiles's fights with management, Banq's entire management team resigned, and Jiles appointed an acting CEO.

50.     The new CEO was given six weeks to create a new plan and goals for Banq.

51.     In February of 2022, Banq hosted a board meeting, at which N9 Advisors expected a business plan with new goals for Banq's business.

52.     Instead, Jiles brought a lawyer to the meeting and pressured the board—with repeated assertions that the board had a fiduciary duty to do so—to investigate the former management team with an eye toward future litigation.

53.     Notably, no meaningful action was taken against Prime Trust despite its interference with Banq's business operations.

54.     At no point during the February 2022 board meeting did Jiles or anyone else present a plan for the continuation of Banq as a viable business.

55.     Instead, just as Jiles had intended, Banq became a company with no active operations or revenue.

56.     When N9 Advisors justifiably expressed concern about the lack of plan, Banq barred N9 Advisors from appearing at any future board meetings in breach of section 5 of the Side Letter.

57.     Eventually, at Jiles's behest, Banq sued the former management team in United States District Court for the District of Nevada, *Banq, Inc. v. Purcell*, No. 22-cv-773 (D. Nev. May 15, 2022).

58.     As of today, Banq is not a neobank and has no discernable business model. Instead, it appears that Banq's true, sole purpose at this time is to sue the former management

team, which is burning through Banq's remaining cash reserves rather than being directed toward generating revenue.

59.　　As a result, Banq's business today has materially changed in nature from Banq's business when N9 Advisors and Banq executed the Note.

60.　　All conditions precedent to this action have occurred, have been performed, or have been waived.

### COUNT I: BREACH OF NOTE
#### (BY N9 ADVISORS AGAINST BANQ)

61.　　Plaintiff incorporates and adopts allegations 1 through 60 herein.

62.　　The Note is a valid contract executed by Plaintiff and Banq.

63.　　By materially changing the nature of its business and breaching the Side Letter, Banq breached the Note.

64.　　Those breaches are material.

65.　　Those breaches damaged Plaintiff.

WHEREFORE, Plaintiff N9 Advisors requests that judgment be entered in its favor and against Defendant Banq, Inc. for (a) compensatory damages, (b) interest on money owed, (c) attorneys' fees, costs, and all expenses to litigate this lawsuit under § 7.7 of the Note, and (d) any and all further relief this Court deems just.

### COUNT II: TORTIOUS INTERFERENCE
#### (BY N9 ADVISORS AGAINST PRIME TRUST)

66.　　Plaintiff incorporates and adopts allegations 1 through 60 herein.

67.　　Banq and N9 Advisors had a business or contractual relationship under which N9 Advisors has legal rights.

68.　　Prime Trust knew of the existence of that relationship.

69.     Prime Trust, with intent and without justification, interfered with that relationship by scheming with and aiding Jiles in ruining Banq's business, demanding that Banq meet compliance goals in impossible timeframes, and interfering with Banq's relationship with its alternative partner.

70.     N9 Advisors was damaged by Prime Trust's interference.

WHEREFORE, Plaintiff N9 Advisors requests that judgment be entered in its favor and against Defendant Prime Trust LLC for (a) compensatory damages, (b) interest, and (c) any and all further relief this Court deems just.

### COUNT III: BREACH OF FIDUCIARY DUTY
### (BY BANQ AGAINST JILES)

71.     Plaintiff incorporates and adopts allegations 1 through 60 herein.

72.     N9 Advisors is a shareholder or beneficial shareholder of Banq.

73.     Under § 607.0742, Florida Statutes, demanding action by the corporation would be futile given Jiles's control over the board of directors.

74.     As director of Banq, Jiles owed Banq certain duties, including fiduciary duties of loyalty and care.

75.     Jiles breached his fiduciary duties to Banq by acting in his best interest and in the interest of Prime Trust rather than in the interest of Banq, by scheming to upend Banq's business, by refusing to create a new business plan for Banq, by treating Banq as a mechanism to fund litigation against Banq's former management, and by using Banq's remaining reserves for litigation.

76.     Jiles's breaches allow him to derive an improper personal benefit by allowing him to aid Prime Trust, a company that he has an ownership interest in, that he is a manager of, and that he effectively controls.

10

77.     Jiles's actions were not fair, reasonable, or in the best interests of Banq and were not done in good faith.

78.     Jiles's breaches proximately caused damage to Banq.

WHEREFORE, Plaintiff, N9 Advisors, on behalf of Banq, requests that judgment be entered in its favor and against Defendant Jon Jiles for (a) damages, (b) attorneys' fees, costs, and all expenses to litigate this lawsuit under § 607.0746, Florida Statutes, and (c) any and all further relief this Court deems just.

### COUNT IV: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY BANQ AGAINST PRIME TRUST)

79.     Plaintiff incorporates and adopts allegations 1 through 60 herein.

80.     Jiles, as Banq's chairperson, owed Banq fiduciary duties.

81.     Jiles breached those fiduciary duties.

82.     Prime Trust knew about Jiles's breach of fiduciary duties.

83.     Prime Trust provided Jiles with substantial assistance or encouragement in the breach of fiduciary duties.

WHEREFORE, Plaintiff, N9 Advisors, on behalf of Banq, requests that judgment be entered in its favor and against Defendant Prime Trust LLC for (a) damages, (b) attorneys' fees, costs, and all expenses to litigate this lawsuit under § 607.0746, Florida Statutes, and (c) any and all further relief this Court deems just.

11

## VERIFICATION

As required by § 607.0742, Florida Statutes, I declare, under penalty of perjury, that I have read the foregoing, and the facts alleged therein are true and correct to the best of my knowledge and belief.

*Petamber Pahuja*
_____
Petamber Pahuja

Dated: September 7, 2022

Respectfully Submitted,

TOTH FUNES PA

s/Freddy Funes
_____
Brian W. Toth
Florida Bar No. 57708
btoth@tothfunes.com
Freddy Funes
Florida Bar No. 87932
ffunes@tothfunes.com
25 Southeast Second Avenue Suite 805
Miami, Florida 33131
Telephone: (305) 617-7850

*Counsel for Plaintiffs*

12

**IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA**
**FOURTH DISTRICT, 110 SOUTH TAMARIND AVENUE, WEST PALM BEACH, FL 33401**

July 26, 2023

**CASE NO.: 4D23-1253**

L.T. No.:     CACE22013341

| N9 ADVISORS, LLC on its own behalf and on behalf of BANQ, INC. | v. | JON JILES |
|---|---|---|
| Appellant / Petitioner(s) | | Appellee / Respondent(s) |

**BY ORDER OF THE COURT:**

   A suggestion of bankruptcy having been filed, it is ORDERED that the parties shall, within fourteen (14) days from the date of this order, request that the United States Bankruptcy Court issue an order stating whether this appeal should be stayed pursuant to 11 U.S.C. § 362(a) or any other provision of the United States Bankruptcy Code. *See, e.g., In re Hill*, 364 B.R. 826, 828 (Bankr. M.D. Fla. 2007) ("Comfort orders serve a valuable purpose. The orders are entered primarily for a third party's benefit, often to help a sister state court attempting to determine whether it can proceed with a pending action, such as a foreclosure."). Upon the filing of the request in the United States Bankruptcy Court, the parties shall file a notice of compliance with this Court. Further, should the United States Bankruptcy Court enter an order on the parties' request, the parties shall file a copy of the order with this Court within five (5) days of issuance of that order.

Served:

cc:  Brian W. Toth           Darryl Woo            David R. Callaway
     Freddy Funes            Michael P. Silver     Roland Chang
     S. Elizabeth King       Clerk - Broward

dl

**LONN WEISSBLUM, Clerk**
**Fourth District Court of Appeal**



# EXHIBIT 2

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

NVF, LLC

**Entity Number:**

E30246332023-6

**Entity Type:**

Domestic Limited-Liability Company (86)

**Entity Status:**

Active

**Formation Date:**

03/14/2023

**NV Business ID:**

NV20232719162

**Termination Date:**

Perpetual

**Annual Report Due Date:**

3/31/2024

**Series LLC:**

☐

**Restricted LLC:**

☐

## REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

Jon Jiles

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Non-Commercial Registered Agent

**NV Business ID:**

**Office or Position:**

**Jurisdiction:**

**Street Address:**

27 Meadowhawk Ln, Las Vegas, NV, 89135, USA

**Mailing Address:**

**Individual with Authority to Act:**

**Fictitious Website or Domain Name:**

## OFFICER INFORMATION

☐ **VIEW HISTORICAL DATA**

| Title | Name | Address | Last Updated | Status |
|-------|------|---------|--------------|--------|
| Manager | Jon Jiles | 27 Meadowhawk Lane, Las Vegas, NV, 89135, USA | 03/14/2023 | Active |

Page 1 of 1, records 1 to 1 of 1

Filing History     Name History     Mergers/Conversions

Return to Search        Return to Results

# EXHIBIT 3

```
                    UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEVADA (LAS VEGAS)

                                       .
IN RE:                                 .   Case No. 23-12378
                                       .   Chapter 11
BANQ INC.,                             .
                                       .
              Debtor.                  .
                                       .
                                       .
                                       .
. . . . . . . . . . . . . . . . .      .
```

                 TRANSCRIPT OF 341 MEETING OF CREDITORS

                          Las Vegas, Nevada

                           July 13, 2023

TELEPHONIC APPEARANCES:

Trustee:
                         Office of the United States Trustee
                         By:  JUSTIN C. VALENCIA, ESQ.
                         300 Las Vegas Boulevard South
                         Suite 4300
                         Las Vegas, NV 89101
                         (702) 388-6600

For the Debtor:
                         Shea Larsen
                         By:  BART K. LARSEN, ESQ.
                         1731 Village Center Circle
                         Suite 150
                         Las Vegas, NV 89134
                         (702) 471-7432

TELEPHONIC APPEARANCES CONTINUED.

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

```
TELEPHONIC APPEARANCES (Continued):


Subchapter V Trustee:      BRIAN D. SHAPIRO, ESQ.
                           510 South 8th Street
                           Las Vegas, NV 89101
                           (702) 386-8600

For N9 Advisors, LLC:
                           Schwartz Law, PLLC
                           By:  ATHANASIOS AGELAKOPOULOS ESQ.
                           601 East Bridger Avenue
                           Las Vegas, NV 89101
                           (702) 802-2207
```

1      (Proceedings commence)

2           MR. VALENCIA:   Good morning.   This is the first

3    meeting of creditors for Banq Incorporated, Case Number

4    23-12378, pending before the Honorable Judge Cox.   This case

5    was commenced on June 13th, 2023, and today's date is

6    July 13th, 2023.   The time is 11:12 a.m. Pacific time.   This

7    meeting of creditors was properly noticed at ECF Numbers 4 and

8    15.   My name is Justin Valencia.   I'm a trial attorney with the

9    Office of the United States Trustee, and this meeting is

10   required under Section 341(a) of the Bankruptcy Code.

11          The purpose of this meeting is to allow for an

12   examination of the debtor under oath.   Questions may include,

13   but are not limited to, why the case was filed, the operation

14   of the business, and the prospects for reorganization.   I will

15   initially question the debtor.   The Subchapter V trustee; and

16   any creditors online will also have an opportunity to examine

17   the debtor.

18          As a reminder, this meeting is being digitally

19   recorded, so please remember that the recorder cannot see who

20   you are or your head nodding.   So identify yourself when asking

21   a question and remember to give verbal responses which can be

22   picked up by the recorder.   Our office keeps this recording for

23   two years after the case closes.   And if anyone would like to

24   obtain a duplicate of today's proceeding or a transcript, the

1  arrangements are made through the Office of the United States

2  Trustee.

3             Debtor's counsel, could you make your appearance,

4  please?

5             MR. LARSEN:  It -- this is Bart Larsen, counsel for

6  Banq Incorporated.

7             MR. VALENCIA:  Okay.  And Subchapter V trustee, could

8  you make your appearance, please?

9             MR. SHAPIRO:  Good morning, Brian Shapiro, Subchapter

10  V trustee.

11             MR. VALENCIA:  Thank you.  Are there any other

12  parties or creditors on the line that would like to make their

13  appearance?  Please do so now.

14             MR. AGELAKOPOULOS:  Good morning.  Athanasios

15  Agelakopoulos of Schwartz Law on behalf of N -- as in

16  Nicholas -- 9 Advisors, LLC.

17             MR. VALENCIA:  Thank you.  And debtor's

18  representative, please make your appearance.

19             MR. SROGE:  Joshua Sroge, CEO Banq, Incorporated.

20             MR. VALENCIA:  Thank you, Mr. Sroge.  So I'm going to

21  administer the oath.  Please raise your right hand.

22             JOSHUA SROGE, DEBTOR'S WITNESS, SWORN

23             MR. VALENCIA :  Is there any reason that you cannot

24  give your best testimony today?

25             MR. SROGE:  There is no reason.

```
 1              MR. VALENCIA:  Have you ever given --

 2              MR. SROGE:  That's fine.

 3              MR. VALENCIA:  Have you ever given or provided

 4   testimony before?

 5              MR. SROGE:  Only in depositions, but not in a

 6   bankruptcy hearing.

 7              MR. VALENCIA:  Do you understand that you're

 8   testifying here under penalty of perjury?

 9              MR. SROGE:  I understand.

10              MR. VALENCIA:  Okay.  Thank you.  Mr. Larsen, I

11   recognize that a driver's license or a Social Security number

12   are not required per the rules because this is a corporate

13   debtor.  But if you would please just verify that the voice of

14   Mr. Sroge is that of the debtor's representative.

15              MR. LARSEN:  Yes.

16              MR. VALENCIA:  Thank you, sir.  Would you like to

17   make an introductory statement?

18              MR. LARSEN:  Oh Your Honor, you mean me?

19              MR. VALENCIA:  Mr. Larsen?

20              MR. LARSEN:  I'm sorry.  If there's anything you'd

21   like me to address, I'm happy to address it, but otherwise, I

22   don't think there's any need for a (indiscernible) introductory

23   statement at this point.

24              MR. VALENCIA:  All right.  Thank you.   Mr. Sroge.

25   So I'm going to ask some questions about the IDI, and that's
```

6

1  the initial debtor interview.  Did you happen to receive the

2  initial debtor interview or the IDI letter?  That was emailed

3  to Mr. Larsen.

4           MR. SROGE:  Bart, is that one -- that's one of the

5  documents that you forwarded to me, right?  Sorry.

6           MR. LARSEN:  Yeah, that would be the worksheet.

7           MR. SROGE:  (Indiscernible)

8           MR. LARSEN:  And you probably (indiscernible) last

9  week.

10          MR. SROGE:  Oh, right.  Yes.  Thank you.  I did

11  receive that.

12          MR. VALENCIA:  Okay.  Do you recall reading in the

13  IDI letter requesting that all documents be provided to the

14  Office of United States Trustee?

15          MR. SROGE:  Yes.

16          MR. VALENCIA:  Did you supply that information to

17  Mr. Larsen as requested by the Office of United States Trustee.

18          MR. SROGE:  By (indiscernible).

19          MR. VALENCIA:  Okay.  And you attended the initial

20  debtor interview?

21          MR. SROGE:  Yes, I did.

22          MR. VALENCIA:  Okay.  And to your knowledge, did the

23  Subchapter V trustee attend and participate as well?

24          MR. SROGE:  From my recollection.  Bart, that was

25  that call last week, correct?

1          MR. LARSEN:  That was the call last week when

2  Mr. Shapiro was on the line.

3          MR. SROGE:  (Audio interference) okay.  Thank you.

4          MR. VALENCIA:  Thank you very much.  So I'm just

5  doing a quick follow up with regards to the documents that we

6  see is outstanding.  We saw that the periodic report was filed

7  in this case.  Looks like your office gave us the copy of the

8  complaint for the Banq Incorporated v. Purcell case and then at

9  least a passport for Mr. Sroge.

10         But we do need evidence that the prepetition bank

11  account has been closed, and that -- evidence of there being at

12  least one or more debtor-in-possession bank accounts.  So,

13  Mr. Sroge, do you happen to know when we're going to receive

14  that information?

15         MR. SROGE:  I'm in communication this morning.  I was

16  made aware that we needed to open a different account.  So I

17  contacted Lexicon Bank, which is the company's sole bank

18  accounts in Las Vegas.  And the rep there told me about an hour

19  ago that, yeah, they should be able to set up the DIP account

20  remotely or get right back to me.  And it's only an hour ago,

21  but once that's set up, we can execute on the -- on these

22  requirements.

23         MR. VALENCIA:  So the following questions are all

24  questions that I ask of every debtor and debtor representative

25  in every Chapter 11 case.  The first thing I'm going to ask you

1   to do is take a look at ECF Number 1, or Document 1, that was

2   filed.  It looks to be about 100 pages.

3          MR. SROGE:  All right.  I'm there.

4          MR. VALENCIA:  All right.  The very first page it

5   says Banq Inc.  Is that the correct debtor name that's listed

6   on the voluntary petition?

7          MR. SROGE:  That is.

8          MR. VALENCIA:  If you scroll to the very next page,

9   under Question 8 --

10          MR. SROGE:  I'm sorry.  Just -- I need just a moment.

11          MR. VALENCIA:  Sure.

12          MR. SROGE:  It's a very large file.  And now the

13   (indiscernible).  I'm sorry about this.  (Indiscernible).

14   Okay.  (Indiscernible).  Oh yeah, I'm on Page 2.

15          MR. VALENCIA:  All right.  Page 2, Question 8, the

16   debtor checked the box saying that this is going to be a

17   Chapter 11 case.  Did the debtor elect to proceed under

18   Subchapter V of Chapter 11?

19          MR. SROGE:  I did.

20          MR. VALENCIA:  Okay.  Did you personally sign the

21   petition schedules and statements and their amendments that

22   were filed in this case?

23          MR. SROGE:  I did.

24          MR. VALENCIA:  All right.  And is the signature your

25   own?

```
 1            MR. SROGE:  It is.

 2            MR. VALENCIA:  All right.

 3            MR. SROGE:  Although in -- and there may be documents

 4  where it's electronic, but I agreed or signed electronically,

 5  but some are -- I believe all physical ones are held by

 6  Mr. Larsen at his office.

 7            MR. VALENCIA:  All right.  Thank you.  And the

 8  documents that were filed in this case, that is the petition,

 9  the schedules, the Statement of Financial Affairs, and their

10  amendments, these were prepared by the debtor's counsel, his

11  office, correct?

12            MR. SROGE:  Correct.  Yeah.

13            MR. VALENCIA:  All right.  And who provided that

14  information to Mr. Larsen's office?

15            MR. SROGE:  I provided the information.

16            MR. VALENCIA:  And did you read, review, and

17  understand the petition, schedules, and Statement of Financial

18  Affairs, and their amendments before you signed them?

19            MR. SROGE:  Yes, I did.

20            MR. VALENCIA:  Are you personally familiar with the

21  information contained in the petition, schedules, statements,

22  and related documents?

23            MR. SROGE:  Yes, I am.
```

```
 1            MR. VALENCIA:  To the best of your knowledge, is the
 2    information contained in the petition, schedules, statements,
 3    and related documents true and correct?
 4            MR. SROGE:  It is.
 5            MR. VALENCIA:  Are there any errors or omissions to
 6    bring to my attention at this time?
 7            MR. SROGE:  Not that I'm aware of.  I will note that
 8    vendor invoices continue to trickle in and affect the -- the
 9    numbers on the document.  That's something that's in the normal
10    course for this proceeding, correct?
11            MR. VALENCIA:  Well, are you suggesting that the --
12    one of these documents may be amended in the future?
13            MR. SROGE:  Well, I mean, we can get off this call,
14    and I can receive an invoice from a vendor, right?  Either, you
15    know, debits are occurring or, you know, periodic invoice from
16    registering something (indiscernible), for example.  So those
17    numbers, I think, in every case are often, you know, subject to
18    an amendment.  Usually I would call it immaterial.  But I just
19    don't want to say that it is exhausting.
20            MR. VALENCIA:  All right.  So, Mr. Larsen, to my
21    knowledge --
22            MR. SROGE:  That's (indiscernible) problem but I
23    just -- yeah.
```

1          MR. VALENCIA:  Mr. Larsen, to my knowledge, debtor

2    has the ability to amend the schedules at any time before the

3    case closes.  Is that what you understand as well?

4          MR. LARSEN:  That is correct, yes.  There was an

5    amendment filed just this morning that (indiscernible)

6    creditors that we just received information on.  We

7    (indiscernible) in court.

8          MR. VALENCIA:  Okay.  Thank you.  Mr. Sroge, so

9    are -- to the best of your knowledge, are all of the debtor's

10   assets identified on the schedules, statements, and related

11   documents that were filed in this case?

12         MR. SROGE:  To the best of my knowledge, yes, they

13   are.

14         MR. VALENCIA:  All right.  To the best of your

15   knowledge, are all the debtor's creditors listed on the

16   schedules, statements, and amendments that were filed in this

17   case?

18         MR. SROGE:  Yes, they are.

19         MR. VALENCIA:  All right.  And since you signed these

20   documents, are you aware of any other changes which must be

21   made to the petition, schedules, and Statement of Financial

22   Affairs, and their amendments at this time?

23         MR. SROGE:  I'm not aware of any other changes that

24   will need to be made.

```
 1              MR. VALENCIA:  Okay.  And therefore, then the

 2    petition, schedule, statements, and their amendments are

 3    accurate as to the assets, liabilities, financial affairs of

 4    the debtor as of the date of filing this case.  Is that

 5    correct?

 6              MR. SROGE:  That is correct.

 7              MR. VALENCIA:  Earlier you mentioned that you --

 8    well, let me ask you this:  Do you have the schedules,

 9    statements, and related documents and amendments with the

10    original handwritten signature?

11              MR. SROGE:  (Audio interference) Mr. Larsen.

12              MR. VALENCIA:  All right.  So I take it then that

13    Mr. Larsen has those copies in his office.  Is that right?

14              MR. SROGE:  (Indiscernible) yes.

15              MR. VALENCIA:  Okay.  So, Mr. Sroge, do you

16    understand that the debtor must appear at the status conference

17    in this case?

18              MR. SROGE:  Yes.

19              MR. VALENCIA:  Do you understand that the debtor must

20    also file a status report 14 days before the status conference?

21              MR. SROGE:  That's a yes.

22              MR. VALENCIA:  Okay.  This case was filed on

23    June 13th, 2023?  Do you understand that debtor's plan, that

24    is, a Subchapter V plan, must be filed within the 90 days from

25    the date that this case was filed?
```

1                MR. SROGE:  Yes.

2                MR. VALENCIA:  And finally, do you understand that

3    the debtor has a duty to cooperate with the Subchapter V

4    trustee in the trustee's performance of his statutory duties?

5                MR. SROGE:  Yes, I do.

6                MR. VALENCIA:  All right.  Let's go back to the

7    Docket Number 1, on the very first page there.  On Question 4,

8    the debtor listed its principal place of business at 7575 West

9    Washington Avenue, Suite 127-118 here in Las Vegas.  Is that

10   still correct?

11               MR. SROGE:  That is.  Okay.

12               MR. VALENCIA:  Is that also considered the mailing

13   address?

14               MR. SROGE:  That is the mailing address, yes.

15               MR. VALENCIA:  So, Mr. Sroge, in your own words,

16   would you please describe the business of the debtor?  For

17   example, how long has it been in existence, does it have any

18   employees, where is it currently located, what's its primary

19   focus?

20               MR. SROGE:  The -- the company has been in business

21   for approximately three years.  It's a technology firm that

22   went through a couple of different iterations.  Its primary

23   business model is kind of a peer-to-peer payment application

24   for both iPhone and Android that has other features embedded

25   related to crypto (indiscernible) at that time.  It's right --

```
 1   it's got -- it -- it's still, over just the course of the last
 2   six months, gave up its (indiscernible) away from that, just
 3   prior to the bankruptcy filing.
 4          It has no employees.  I'm the sole employee, although
 5   unpaid since roughly October of '22.  And I'm sorry.  Let's see
 6   here.  I'm sorry (indiscernible) employee state of the
 7   business.  Let me -- let me -- let me say -- state for this is
 8   that after the company sort of became dormant in a sense that
 9   all the employees had left and, you know, pursuant to a long-
10   standing that's related -- that were -- that you mentioned
11   earlier, the employees left when I came in.
12          The technology was there and its original, you know,
13   vision of this pay -- you know, peer-to-peer payments app, also
14   with crypto involved, given the state of and, you know, the
15   market, we pivoted away from that to the extent that we could
16   given the (indiscernible) and the -- and the debts of the
17   company.
18          MR. VALENCIA:  All right.  So because this case, or
19   at least the debtor, had some history related to
20   cryptocurrency, I'm going to ask a number of questions, but
21   that's a little bit down the road.
22          My next question is why exactly did the debtor file
23   this Chapter 11 case?  In other words, what caused the
24   financial difficulties?
```

```
 1              MR. SROGE:  So without, I mean, too much accounting
 2   detail, so at the time (indiscernible) when I came in January
 3   of 2022, the company had approximately a million dollars in the
 4   bank; had, you know, probably -- probably, you know, 10 percent
 5   of that as accounts payable as it -- it didn't have employees
 6   at the time; had some obligations related to an operating lease
 7   rent for -- being rent for space; and some other ongoing
 8   obligations.  So the company was already on sort of a ticking
 9   clock, as it were.
10              It was in -- it was, you know, pre-revenue, or at
11   least it had very little revenue in mid to late '21, and then
12   it effectively lost its customers when the -- when the team
13   departed, when I was there.  So I got there with no -- had no
14   sorts of revenue, and, you know, had a million dollars in the
15   bank and some -- some liabilities.  And my mission and -- and
16   directive from -- from the board was to, you know, find a way
17   forward in the market with the cash we had.  What would -- what
18   would be in the -- what were the opportunities we could pursue
19   in that, knowing it -- it -- anyway, that it's very likely
20   that -- that we wouldn't have enough capital to get all the way
21   to a -- to the point of revenue.
22              In the course of doing that, discovered various
23   activities that occurred in '21 relating to the original part
24   of business -- or original focus of the business and how the
25   (indiscernible) had left.  And this is all described in the --
```

 1  in the personnel lawsuits.  I won't get into detail here, but

 2  then it -- it definitely created some impairments and some

 3  challenges to -- to raising money to, you know, further get in

 4  -- additional startup capital into the business to pursue

 5  alternate course of business.  At the same time legal bills

 6  related to pursuing the claims, you know, again prior teams

 7  starting to mount.  So those confluence of factors throughout

 8  the company that just need Chapter 11 reorganization.

 9        MR. VALENCIA:  Okay.  Thank you for that explanation,

10  sir.  I appreciate it.  So why exactly did the debtor elect

11  Subchapter V relief?

12        MR. SROGE:  Bart, can you -- is it okay for you to

13  speak to this or do I need to take a stab at it?

14        MR. VALENCIA:  Well, Mr. Sroge, I take it that

15  basically the debtor wanted to --

16        MR. SROGE:  Or am I -- this -- this is the from -- or

17  this is -- this is the direct question for me, as opposed to

18  being able to rely on my counsel to answer that question

19  because again, like -- like I said earlier, I'm not hyper

20  familiar or have been -- been through this process before.

21        MR. VALENCIA:  Yeah.  Mr. Larsen, you can fill in.

22        MR. SROGE:  (Indiscernible).

23        MR. VALENCIA:  You can answer here if you'd like.

24        MR. LARSEN:  I didn't -- sorry, I was on -- sorry, I

25  was on mute, so I apologize for that.  But --

1            MR. VALENCIA:  No worries.

2            MR. VALENCIA:  Yeah.  Essentially since -- to try to

3    minimize the cost of the reorganization process, I think it's

4    probably the overriding reasons for that designation.  Although

5    since the business operations are, you know, suspended

6    presently, the corporation is pursuing mitigation that doesn't

7    tend to restart operations at some point in the future.  A

8    small business designation was just an attempt try to

9    streamline it and minimize the cost of the reorganization

10   process, essentially.

11           MR. VALENCIA:  Okay.  So Mr. Sroge -- and I take it

12   that the debtor has no business operation going on right now.

13   Is that correct?

14           MR. SROGE:  That -- that is correct.

15           MR. VALENCIA:  All right.  So what exactly are the

16   debtor's reorganization and bankruptcy goals?

17           MR. SROGE:  So prior to filing bankruptcy, we had

18   developed, you know, not-quite-ready-for-market code that was

19   going to be a software development toolkit for applications on

20   both iPhone and Android to help folks who are in this world,

21   technical, but basically companies that are neo banks in the

22   sort of bridge between traditional finance and this crypto

23   world, get quicker to market on the applications.  So basically

24   it's a -- I -- short-form software development kit that we

25   would license out to various, what we call, neo banks, or banks

1    are looking to get, you know, a technological edge.  We

2    developed, I'd say, about 60 -- 60 percent of this code and the

3    commercial plan would be to further develop it and then

4    leverage our relationships with these various banking partners

5    to sell this -- to sell this software development kit as a

6    (indiscernible) service application.

7              MR. VALENCIA:  All right.  How far along is the

8    debtor with regards to the development of this software

9    development kit?

10             MR. SROGE:  I -- I would have to maybe need another

11   three to six months to complete it and get the -- you know, the

12   viable product to market.

13             MR. VALENCIA:  Okay.  So I'm going to ask a few

14   questions with regards to Paycheck Protection Program loans and

15   EIDL loans or -- otherwise known as Economic Injury Disaster

16   Loans.  Did the debtor ever apply for a Paycheck Protection

17   Program loan?

18             MR. SROGE:  That's a good answer.  I actually don't

19   know to be -- enough to be able to answer that.  I'd have to go

20   at the records.

21             MR. VALENCIA:  All right.  Do you know if the debtor

22   ever applied for an Economic Injury Disaster Loan, or EIDL

23   loan?

24             MR. SROGE:  I'm not aware of that either, but I can

25   check and refer back to the court if that is acceptable.

```
 1              MR. VALENCIA:  All right.  I just want to be clear.
 2   This is just a meeting.  This is not the court.  I'm a trial
 3   attorney with U.S. Trustee.
 4              MR. SROGE:  Oh (indiscernible).
 5              MR. VALENCIA:  Okay.
 6              MR. SROGE:  (Indiscernible) I'm a civilian, using a
 7   general term here.
 8              MR. VALENCIA:  Sure, I understand.  No, we're just
 9   asking questions with regards --
10              MR. SROGE:  I'll refer to you as "Trustee".  How
11   about that?
12              MR. VALENCIA:  We're just asking questions with
13   regards to the documents that were filed in this case, and the
14   creditors --
15              MR. SROGE:  All right.
16              MR. VALENCIA:  -- will have opportunity to ask
17   questions of you as well.  So I'm going to follow up on the PPP
18   and EIDL loans in an email to debtor's counsel here after the
19   meeting is -- after the meeting today.
20              But let me move on to questions related to
21   cryptocurrency.  And to the best of your knowledge, please
22   answer these questions:  One, has debtor ever owned or
23   controlled any cryptocurrency or other virtual assets?
24              MR. SROGE:  It has.
```

 1          MR. VALENCIA:  All right.  Were any accounts open as
 2  of the date that this case was filed?
 3          MR. SROGE:  You mean in cryptocurrency accounts?
 4          MR. VALENCIA:  Yes.  Or virtual -- or with regards to
 5  other virtual assets?
 6          MR. SROGE:  Okay.  No, there were no virtual assets
 7  owned by the company or on the balance sheet at the time of the
 8  filing.
 9          MR. VALENCIA:  Okay.  How about controlled
10  cryptocurrency or controlled other virtual assets?
11          MR. SROGE:  (Indiscernible).  None.
12          MR. VALENCIA:  Okay.  I'm sorry, did I hear you
13  actually answer yes at the -- to the very first question
14  though?
15          MR. SROGE:  Which was, at any point did the company
16  have virtual assets, cryptocurrency (indiscernible) and
17  control, yes, it had -- there was a point in time when I got
18  there that (indiscernible) had virtual assets on the balance
19  sheet.
20          MR. VALENCIA:  Okay.
21          MR. SROGE:  But then, you know, in -- in the course
22  of shutting down operations, that was disposed of.
23          MR. VALENCIA:  Okay.  So when were those disposed of,
24  to the best of your knowledge?

1         MR. SROGE:  I -- let me take -- sorry.  I should have

2    it.  Let me take a look at the records.  That I can do very

3    quickly.  Actually, I'll need to get back to you.

4    (Indiscernible) can't find it.

5         MR. VALENCIA:  Okay, that's fine.  Do you happen to

6    know what exchange the debtor traded on historically, like, for

7    example, Binance or Coinbase or Coin-pro.

8         MR. SROGE:  It didn't.  So there were two pieces of

9    the operation.  One was the B and C or the consumer-facing part

10   of the business, and that the company did not directly control

11   or manage those assets.  They -- they had a company -- one they

12   called, you know, Neo Banq (phonetic), which is a general term,

13   but they had a relationship with a company that was custodian

14   for those assets called Prime Trust.  And the Prime Trust kept

15   all the customer crypto or digital asset registers in their own

16   sort of walled garden.  Right?  And they may have got another

17   partner in the back end who actually did the custody, but the

18   company itself never managed those assets.  So when this part

19   of the business got wound up, Prime Trust returned all those

20   digital assets to all their customers in their entirety.

21        MR. VALENCIA:  All right.  So another way to say it

22   then that the accounts that the debtor had were actually

23   basically in a noncustodial control by -- held by Prime Trust?

```
1              MR. SROGE:  That -- that's correct.  So there -- so

2    the -- it's an -- accounts of the customers.  The company then

3    had its own accounts.

4              MR. VALENCIA:  Okay.

5              MR. SROGE:  They were at -- I think, one -- one in

6    particular account that one of the employees had a wallet

7    for --

8              MR. VALENCIA:  I see.

9              MR. SROGE:  -- in their possession.

10             MR. VALENCIA:  And is that employee currently with

11   the debtor?

12             MR. SROGE:  That would have been in 2022.  Oh, no,

13   no.  They're not.

14             MR. VALENCIA:  Okay.  So --

15             MR. SROGE:  They were denied (indiscernible)

16   employees of the debtor.

17             MR. VALENCIA:  All right.  So in other words, the

18   debtor doesn't have right now, or at least the date that the

19   case was filed, any ownership or control over any

20   cryptocurrency or other virtual assets.  Is that correct?

21             MR. SROGE:  None.

22             MR. VALENCIA:  All right.

23             MR. SROGE:  None.  That is correct.

24             MR. VALENCIA:  So just to be clear then, the debtor

25   does not possess a crypto wallet.  Is that correct?
```

1               MR. SROGE:  It -- it does not.

2               MR. VALENCIA:  Okay.  And does the debtor have any

3   access to, I guess, the transaction or withdrawal ledgers for

4   the accounts that it had historically?

5               MR. SROGE:  I -- yes.  I can access those.

6               MR. VALENCIA:  Okay.

7               MR. SROGE:  Oh, well, at least -- hold on.  I can

8   access a small portion of it.

9               MR. VALENCIA:  Okay.

10              MR. SROGE:  (Indiscernible).  You know, when I came

11  on board, I didn't have any access or records on company-owned

12  digital assets going backwards.

13              MR. VALENCIA:  Okay.

14              MR. SROGE:  All I knew was there was a balance sheet

15  amount that said, here are some digital assets in January of

16  '21 and it had a contact former employees to gain control of

17  those.

18              MR. VALENCIA:  So with a historical company-owned

19  crypto and virtual assets, who other -- what other individuals

20  had access to the transaction history or the withdrawal

21  ledgers?

22              MR. SROGE:  I don't -- I -- there's a -- there's a

23  person whose last name is -- he's basically named Kevin.  He

24  was the CTO, and he would have had access to those.  I -- but

 1  that's a -- that's not -- I'm sorry.  I need to check, right,

 2  at some point.

 3          MR. VALENCIA:  Okay.

 4          MR. SROGE:  But that's the person who I contacted to

 5  get control of the -- of the assets.

 6          MR. VALENCIA:  Okay.  So since all of those assets,

 7  with regards to virtual assets of cryptocurrency, there is --

 8  the debtor has none of those currently, and they're -- all

 9  right.  Okay.  Does the debtor have any crypto accounts outside

10  of the U.S.?

11          MR. SROGE:  They do not.

12          MR. VALENCIA:  All right.  And at -- these are really

13  going to be follow-up or confirmation questions now.  So are

14  there any crypto accounts being held for another for the

15  debtor's benefit either in the U.S. or outside of the U.S.?

16          MR. SROGE:  There are none.

17          MR. VALENCIA:  All right.  You mentioned that these

18  assets are no longer on the balance sheet.  Do you happen to

19  know if any of these accounts were closed during the year

20  before this case was filed?

21          MR. SROGE:  It looks like -- I'm looking now at it.

22  It looks like these were -- that any -- any digital assets that

23  were owned by the company were disposed or were sold in -- by

24  December of '22 at the latest.

1           MR. VALENCIA:  Okay.  So, Mr. Larsen, I'm just going

2    to ask real quick, do we have -- does the debtor have to amend

3    its Statement of Financial Affairs showing an account has been

4    closed within the year before this case was filed?

5           MR. LARSEN:  Deposit account, bank account, yes.  I

6    need to talk to Mr. Sroge to get a little bit more information

7    about these crypto assets.  If needed, we will file amendment

8    to the State of Financial Services to properly disclose that.

9           MR. VALENCIA:  Okay.  All right.  And Mr. Sroge, how

10   many accounts were actually disposed of or closed within the

11   last year before this case was filed, that you're aware of?

12          MR. SROGE:  Are you -- I'm assuming specifically the

13   digital assets?

14          MR. VALENCIA:  Yes.  Crypto or virtual assets.

15          MR. SROGE:  Yeah, just -- just -- I don't know how to

16   describe it as an account, but -- but there was -- it appears

17   there was one type of asset on the balance sheet and it was

18   sold in one transaction (indiscernible).

19          MR. VALENCIA:  All right.  Well --

20          MR. SROGE:  (Indiscernible) accounts that's part of

21   the bankruptcy.

22          MR. VALENCIA:  Okay.  Well, okay, so if warranted

23   SOFA 18 looks like it might need (audio interference) to the

24   extent it's (audio interference).  But you and Mr. Larsen can

25   talk about that.  We'll follow up.

 1              Does the debtor -- has the debtor opened any
 2   cryptocurrency or the -- or I guess, obtained any other virtual
 3   asset accounts after the -- that this case was filed?
 4              MR. SROGE:  No.
 5              MR. VALENCIA:  Okay.  Did the debtor report to the
 6   IRS on Form 1040, the receipt, sale, transfer, exchange, or
 7   acquisition of any financial interest in any virtual currency?
 8              MR. SROGE:  That I don't know.  And I would have to
 9   look at the tax return from 2021 or the 2022 tax return
10   (indiscernible).
11              MR. VALENCIA:  Okay.  So have you, Mr. Sroge,
12   received any cryptocurrency or other virtual currency as
13   payment for property or services provided in the one year prior
14   to the petition date?
15              MR. SROGE:  (Indiscernible).
16              MR. VALENCIA:  I'm sorry, no?
17              MR. SROGE:  I -- no.  Excuse me.
18              MR. VALENCIA:  Okay.  And same question, but with
19   regards to after this bankruptcy case was filed?
20              MR. SROGE:  No.
21              MR. VALENCIA:  Okay.
22              MR. SROGE:  (Indiscernible).
23              MR. VALENCIA:  Okay.  So have you received
24   cryptocurrency or other virtual assets as a result of a reward
25   or award in the year before this case was filed?

 1              MR. SROGE:  I have not.

 2              MR. VALENCIA:  And same question, but with regards to

 3    after this case was filed.

 4              MR. SROGE:  I have not received any.

 5              MR. VALENCIA:  Okay.  Have you transferred

 6    cryptocurrency or any other virtual currency in exchange for

 7    property or services in the year before this case was filed?

 8              MR. SROGE:  No.

 9              MR. VALENCIA:  Okay.  Same question, but with

10    regards --

11              MR. SROGE:  Well (indiscernible) let me -- let me

12    make --

13              MR. VALENCIA:  Go ahead.

14              MR. SROGE:  Well, let me answer that one.  Sorry.

15    Well, you're going to ask the same question but regards after

16    the filing.

17              MR. VALENCIA:  Right.

18              MR. SROGE:  I know (indiscernible).  The answer is no

19    to that other one, right -- about after the filing.  But I want

20    to point out these in -- and I want to be sure that I'm not

21    missing something, but in the disposition of digital assets

22    that the company had that, you know, involved, '22 that I got

23    there and there were digital assets on the balance sheet and a

24    single wallet address with single assets, which we then sold to

25    help pay -- you know, pay for operating expense bills.  So what

1  the company in the second half of '22, those were sold in a

2  single transaction for cash.  I mean, well as -- as CEO, I had

3  control over that single digital asset wallet and sent those

4  points for the UST that was received by the company.  So I want

5  to make sure that in answering your question, I'm not

6  misstating a yes or no there, because it can be, in my mind, a

7  big bank over, you know, what is -- what is an account and what

8  is a transaction.

9          MR. VALENCIA:  Okay.  So let's just, for the sake of

10  simplicity, then just call it the one asset.

11          MR. SROGE:  Yeah.

12          MR. VALENCIA:  All right.  So that one asset is --

13          MR. SROGE:  The only asset and only transaction that

14  occurred.

15          MR. VALENCIA:  Okay.  Which was around December of

16  2022, right?

17          MR. SROGE:  At least was entered into the books by

18  the accountants in December of '22.  It might have been, you

19  know, a few months prior, but I'll get back with all the

20  details on that --

21          MR. VALENCIA:  Yeah.

22          MR. SROGE:  (Indiscernible).

23          MR. VALENCIA:  Whatever transaction history that you

24  have and any documents that kind of, you know, show that it

25  occurred, we would like a copy of that.  And you can send that

1  to Carla and she -- Carla Cordero.  She's the analyst on the

2  case.  Okay.  Same question, have you ever transferred

3  cryptocurrency or any other virtual currency in exchange for

4  property or services after the bankruptcy was filed?

5            MR. SROGE:  No.

6            MR. VALENCIA:  Okay.  Have you transferred

7  cryptocurrency or any other virtual currency in exchange or

8  trade for another digital asset in the year before this case

9  was filed?

10           MR. SROGE:  No.

11           MR. VALENCIA:  Okay.  Same question, but after the

12  case was filed?

13           MR. SROGE:  No, I have not.

14           MR. VALENCIA:  Okay.  All right.  And have you

15  transferred cryptocurrency or any other virtual currency as a

16  gift in the year before this case was filed?

17           MR. SROGE:  No, I have not.

18           MR. VALENCIA:  Okay.  Same question, and after the

19  case was filed.

20           MR. SROGE:  No, I have not.

21           MR. VALENCIA:  So as mentioned before, we're going to

22  need that -- we're going to need that -- at least that

23  transaction or some sort of ledger to show that that one asset,

24  for sake of simplicity, was sold for cash to pay for the

25  operating expenses.  And then you're going to have to take a

1   look at the 1040 tax return and then take a look at SOFA 18 and

2   see if that needs to be amended.  You could talk with that

3   about -- okay, you can talk about that with your -- with

4   debtor's counsel.

5              MR. SROGE:  Okay.  Yeah.  (Indiscernible)

6              MR. VALENCIA:  So I noticed that the debtor on the

7   Statement of Financial Affairs had a CPA, but my question is

8   with regards to that is, will that CPA be the individual who

9   will prepare the monthly operation report -- reports for

10  operations or the MORS?  Do you know what I'm talking about?

11             MR. SROGE:  Sorry.  But -- are those the ongoing

12  financial statements?  Is that (indiscernible)?

13             MR. LARSEN:  Yes.  The reports that we talked about

14  during the call last week.  It's those reports that we filed at

15  the courthouse.  I don't think we need to involve this

16  (indiscernible) admission (indiscernible).

17             MR. SROGE:  Yeah, I can produce those.

18             MR. VALENCIA:  Okay.  So just a friendly reminder,

19  those reports are due on the 21st every month for the prior

20  month, and they have to be timely filed every month thereafter.

21  And just like I said, a friendly reminder that not timely-

22  filing those may constitute cause to convert or dismiss this

23  case.  From what I can see, the first MOR will be due on

24  July 21, 2023.

25             MR. SROGE:  Okay.  (Indiscernible).

 1                MR. VALENCIA:  So I'm going to get right into the

 2     schedules and Statement of Financial Affairs that were filed in

 3     this case.  And I'm just going to go right to the ECF or

 4     Document Number 43.  And on the very first page -- oh, excuse

 5     me -- on Page 2, you'll see at the top, it says Schedule A/B in

 6     black and bold.

 7                MR. SROGE:  Got it.

 8                MR. VALENCIA:  All right.  If you look down on

 9     Question 3, in particular, 3.1 and 3.2, the debtor lists two

10     checking accounts, one at Piermont Bank and the other one at

11     Lexicon Bank.  I just want to confirm that the account at

12     Piermont has been closed.

13                MR. SROGE:  Yes, it has.

14                MR. VALENCIA:  Okay.  And the Lexicon Bank account

15     number ending 0506, that is going to be the debtor-in-

16     possession bank account.  Is that right?

17                MR. SROGE:  No, we'll open a -- a DIP account.  That

18     is currently the primary operating account of the company.  So

19     as we trussed-out earlier in the call, we've been in

20     communication with Lexicon to open a debtor-in-possession

21     account and to -- I -- I would assume, subsequently close that

22     (indiscernible) checking account and transfer funds into the

23     debtor-in-possession account.

24                MR. VALENCIA:  Okay.  Thank you for that explanation.

25     All right.  If you just scroll to the third page and you look

```
 1   at Question 8 on Line 8.2, it says "see continuation sheet".

 2   All right.  And that really goes to the very last page of this

 3   document.  I just want to confirm that the retainer paid to

 4   Shea Larsen is basically -- it basically has a balance

 5   remaining of $52,137.50 when this case was filed.  Is that

 6   correct, Mr. Sroge?

 7             MR. SROGE:  Yes, it is.  Oh, well, yes, to my

 8   knowledge, it is.

 9             MR. VALENCIA:  Right.  I can see --

10             MR. SROGE:  (Indiscernible).

11             MR. VALENCIA:  I can see from the employment

12   application that was filed in this case, another 50 grand was

13   paid over from the debtor to Shay Larsen on June 6th.  Is that

14   correct, Mr. Sroge?

15             MR. SROGE:  Yes.

16             MR. VALENCIA:  Okay.  But the amount that was on hand

17   and in deposit in the Shea Larsen compliant trust account was

18   the $52,000?

19             MR. SROGE:  Right.

20             MR. VALENCIA:  Okay.  And basically the same question

21   with regards to the litigation expense retainer that was paid

22   to Diamond McCarthy LLP, it's -- it was $40,000.  Is that

23   correct?

24             MR. SROGE:  Yes.
```

1           MR. VALENCIA:  Okay.  So if you would scroll back up

2   to Page 3 of Document 43 and look at Question 15?  I recognize

3   that the debtor filed a periodic report at ECF Number 62, but

4   I'm going to ask some follow-up questions.  There, the debtor

5   lists CashRamp, LLC as an inactive Florida limited liability

6   company.  Is that --

7           MR. SROGE:  Right.

8           MR. VALENCIA:  Is that LLC currently active or an

9   inactive status?

10          MR. SROGE:  Inactive.

11          MR. VALENCIA:  Has that CashRamp, LLC held any assets

12  on behalf of the debtor?

13          MR. SROGE:  No.

14          MR. VALENCIA:  Has it held any kind of liabilities on

15  behalf of the debtor?

16          MR. SROGE:  It has not.

17          MR. VALENCIA:  Okay.  To the best of your knowledge,

18  has that CashRamp, LLC, ever transacted any business?

19          MR. SROGE:  To the best of my knowledge, it has not.

20  When I -- to clarify, when I got there in January of '22, there

21  did not appear to be any set of books for that company or bank

22  account, or any assets or liabilities or business activity.

23          MR. VALENCIA:  Okay.  And the debtor lists Bank

24  Limited, this is a Cyprus -- excuse me -- Republic of Cyprus

25  business.  Is that correct?

```
 1              MR. SROGE:  Yeah.  I'm not -- I'm not very familiar
 2  with it, but yeah, to my understanding it is.
 3              MR. VALENCIA:  Okay.  So does this Bank LTD, does it
 4  hold any assets of the debtor?
 5              MR. SROGE:  No, it does not.
 6              MR. VALENCIA:  Okay.  Does it have any of the
 7  liabilities of the debtor?
 8              MR. SROGE:  It does not.
 9              MR. VALENCIA:  And has it transacted any business
10  whatsoever?
11              MR. SROGE:  Not to my knowledge.
12              MR. VALENCIA:  All right.  Let's go back to the
13  schedules, which is ECF 43.  And I'm going to point you to
14  Question 38, which is on Page 5.
15              MR. SROGE:  Hold on.  Sorry, could you -- could
16  you -- can you repeat that, which document and which page?
17              MR. VALENCIA:  Yeah.  Document 43, Page 5 --
18              MR. SROGE:  Yeah.
19              MR. VALENCIA:  -- Question 38.
20              MR. SROGE:  Oh, I got it.
21              MR. VALENCIA:  Debtor checked the box saying that --
22              MR. SROGE:  I'm getting there.
23              MR. VALENCIA:  The debtor checked the box "no" on
24  Question 38.  I just want to confirm --
25              MR. SROGE:  Right.
```

1          MR. VALENCIA:  -- that the debtor does not own or

2   lease any office furniture, fixtures, equipment, or other

3   collectibles.

4          MR. SROGE:  It does not.

5          MR. VALENCIA:  Okay.  If you scroll to -- down two

6   more pages, which is on Page 7, on Question 54, the debtor

7   checked the box "no".  I just want to confirm that the debtor

8   does not own or lease real property.

9          MR. SROGE:  It does not (indiscernible).

10          MR. VALENCIA:  Okay.  If you just look down between

11   Questions 59 through 65?  I just want to confirm that the

12   debtor does not have any other interests in intangibles or

13   other intellectual property other than what's listed right

14   here, domain names, or software.

15          MR. SROGE:  They do not.

16          MR. VALENCIA:  No?

17          MR. SROGE:  Right, just what's listed.

18          MR. VALENCIA:  Okay.  On the very next page, Page 8,

19   Question 67, the debtor checked the box "no".  I just want to

20   confirm that the debtor does not have any records or lists

21   containing personally identifiable information of any

22   customers.

23          MR. SROGE:  We do not have any PII to my knowledge.

24          MR. VALENCIA:  Okay.  If you just look at Question

25   74, the debtor basically stated it has claims against former

1   officers and related entities for breach of fiduciary duty,

2   fraud, misappropriation, et cetera.  The amount requested is

3   17.5 million.  Is this lawsuit related to the lawsuit that was

4   filed in the District of Nevada or the lawsuit filed in the

5   Southern District of Florida?

6          MR. SROGE:  Bart, help me here.  So we filed this --

7   can -- you mind help answering this question.

8          MR. LARSEN:  Yeah.  It's in the (indiscernible) of

9   litigation that's been filed against Mr. Purcell and other

10  former officers and the related entities.

11         MR. VALENCIA:  All right.  So just to be clear there,

12  I mean, I'm looking at the Statement of Financial Affairs,

13  Question 7, the debtor lists N9 Advisors LLC v. Banq

14  Incorporated, et al; and then also Banq Incorporated v.

15  Purcell, et al.  So which one is it again, the Florida one --

16         MR. SROGE:  No, the second one.

17         MR. VALENCIA:  -- or the Nevada one?

18         MR. SROGE:  The Nevada one.

19         MR. VALENCIA:  Okay.  I saw that Diamond McCarthy

20  filed its retention application.  Was it for both cases, the

21  one in Nevada and Florida, or just Nevada?

22         MR. LARSEN:  Just Nevada.  And just by way of

23  background, the Nevada case has actually been dismissed without

24  prejudice at this point.  So what we anticipate Diamond

25  McCarthy will be doing is filing an adversary complaint

1  relating to some of those claims.  They may also be arbitrating

2  some of the other claims as well.

3          MR. VALENCIA:  Gotcha.  All right.  So, Mr. Sroge, is

4  that your understanding as well?

5          MR. SROGE:  Yes, it is.

6          MR. VALENCIA:  Okay.  Let's see here.  Bear with me.

7  Let's go on back to Document Number 1 real quick.  And once I

8  get to the page, I'll point you to the same.  Document Number

9  1, Page 22 of the PDF.

10          MR. SROGE:  Yep.

11          MR. VALENCIA:  All right.  On Line 2.1, NBF, LLC is

12  listed as the only secured creditor of the debtor.  Is that

13  correct?

14          MR. SROGE:  No, I'm not sure.  Sorry.  I'd have to

15  check the N9 note.  Quite frankly, I'm questioning myself on

16  whether -- if there was any security interest in the N9 note.

17          MR. VALENCIA:  All right.

18          MR. SROGE:  (Indiscernible) answer that.  I'm sorry.

19  (Indiscernible) would know (indiscernible).

20          MR. LARSEN:  I have reviewed the N9 loan documents.

21  They don't have security interest in the company's assets.

22          MR. SROGE:  Thank you.

23          MR. VALENCIA:  All right.  And if you were to scroll

24  down just a couple pages, Page 24 that is, this is Schedule E

25  and F.  The very first part, or Part 1 relates to priority

 1  unsecured claims.  I just want to confirm the debtor has no

 2  priority unsecured creditors.  Is that correct?

 3          MR. SROGE:  That's correct.

 4          MR. VALENCIA:  And if you would scroll on down to

 5  Part 2, on here it's listed at 3.7, and on the amendment I

 6  think it might be 3.8 or 3.9.  But for here, on 3.7, on

 7  Page 26, the debtor listed N9 Advisors, LLC.  Amount of claim

 8  was 3 -- just over $3.6 million.  I just want to know what is

 9  the debtor's relationship to N9 Advisors, LLC?

10          MR. SROGE:  They were -- that was a note that

11  predated my arrival at the company.  That was -- to the best of

12  my recollection, it's unsecured convertible note to help

13  (indiscernible) development.  I'm not sure there's any further

14  relationship between the company and N9 Advisors, but I believe

15  the relationship (audio interference).

16          MR. VALENCIA:  Okay.  Just a general question with

17  regards to all these unsecured creditors here.  And I'm looking

18  both at Document 1 and the amendment at 63, Document 63.  Are

19  any of these nonpriority and unsecured claims considered to be

20  a critical vendor of the debtor?

21          MR. SROGE:  You know, to me, critical is somewhat

22  subjective.  I mean, our attorneys (indiscernible) and then as

23  far as post-reorganization, STRV, which is the last one listed,

24  3.9 (indiscernible) they are developers who developed a

25  substantial portion of the new code, and so post-reorganization

 1  they would be a critical vendor.

 2          MR. VALENCIA:  On the -- on Document Number 1, on

 3  Line 3.5, you are listed as a nonpriority creditor for $391,

 4  but I see on the amendment it's -- looks to be substantially

 5  more.  On the amendment on 63, it said, Line --

 6          MR. SROGE:  (Indiscernible) --

 7          MR. VALENCIA:  -- Line 3.6, it says $175,199.  So

 8  you're an officer and the only employee of the debtor, right?

 9          MR. SROGE:  Yeah.

10          MR. VALENCIA:  And you --

11          MR. SROGE:  (Indiscernible) clarify the difference

12  between those --

13          MR. VALENCIA:  Well, let me just follow up.  Just let

14  me --

15          MR. SROGE:  Yeah.

16          MR. VALENCIA:  All right.  So -- and you said last

17  time that you got paid was, what, October, November, of 2022?

18          MR. SROGE:  Yeah.  To be specific, in October,

19  November, and December of 2022, we reduced my pay to like

20  $1,000 a month, just to keep the worker's comp policy alive in

21  the event the company was going to be able to continue.  If you

22  don't run payroll, the worker's comp insurance gets canceled,

23  and that's mandatory.

24          So we (indiscernible), you know, instead of paying

25  nothing, pay that nominal amount to keep the comp policy alive.

```
 1  So accrued -- so the 170-something thousand is accrued payroll

 2  for October, November, December.  The very last page

 3  (indiscernible) December 31 (indiscernible) thousand dollars or

 4  something.  And then the full amount through January, February,

 5  March, and (indiscernible) at that point in the (indiscernible)

 6  back to the company (indiscernible) insurance issue.

 7          So the $391 is expense reimbursement for when I had

 8  to use my personal credit cards to keep the email account and

 9  the domain for the company alive.

10          MR. VALENCIA:  Okay.

11          MR. SROGE:  And so we just -- I put it on my personal

12  card and (indiscernible) accounts payable.  (Indiscernible)

13  accrual on the books, not an accounts payable (indiscernible).

14  So that creates (indiscernible) separation of records

15  (indiscernible) books between accounts payable vendor and

16  (indiscernible) accrued but not paid.

17          MR. VALENCIA:  All right.  So the -- let me just make

18  sure I understand.  So the $175,000 is basically for the salary

19  accrued but not paid, exclusive of that --

20          MR. SROGE:  Correct.

21          MR. VALENCIA:  -- $391 expense reimbursement?

22          MR. SROGE:  Bart, is that $391 in there?  I'd have to

23  take a look.

24          MR. LARSEN:  Yeah.  In the version that was filed

25  this morning (indiscernible).
```

```
 1              MR. VALENCIA:  Okay.  All right.  So if we go back to
 2    Document Number 1 and -- as soon as I get to the page, I'll let
 3    you know which one it is.  Document 1, Page 29.
 4              MR. SROGE:  Okay.
 5              MR. VALENCIA:  All right.  Debtor lists that it
 6    doesn't have any co-debtors.  Is that correct?
 7              MR. SROGE:  That's correct.
 8              MR. VALENCIA:  So I'm looking at both Document 1,
 9    Page 30, and also Document 44, and both of them related to the
10    statement of financial affairs.  But, if you would, just
11    address the first question here, and it has to do with the
12    gross revenue for the business.  Could you explain why the
13    debtor does not have any gross revenue for the business for
14    2022 and at least for the first part of 2023, from the date
15    that the case was filed?
16              MR. SROGE:  Right.  So when I got there, January '22,
17    the product had been pulled or made inactive after the team
18    that had been with the company left, (indiscernible) between
19    September and November.  Additionally, there was a turn-off or
20    a disruption of the service between company and the custodian
21    (indiscernible) trust related to sort of -- I think banking
22    requirements, informational requirements, PTI require -- sorry,
23    I'm just trying to remember the term.
24              And so, by losing their custodian, the product, you
25    know, they had to stop servicing the customers and return funds
```

1  to customers.  So that basically caused the revenue to go to

2  zero.  So, while there was some revenue in '22, nominal revenue

3  earlier in '22, by the time I got there, there were no

4  customers.  (Indiscernible) were being returned, and thus, no

5  revenue.

6          MR. VALENCIA:  All right.

7          MR. SROGE:  And the product was inactive.

8          MR. VALENCIA:  All right.  So, just to be clear, when

9  you say the "product," are you referring to the software

10  development kit?

11          MR. SROGE:  No.  This is the original product, the

12  sort of peer-to-peer payment system.

13          MR. VALENCIA:  All right.

14          MR. SROGE:  And it involved -- for lack of a better

15  example, like, a Venmo, right?  That was the primary product of

16  the company.

17          MR. VALENCIA:  And that product is no longer in

18  development with the debtor as a company?

19          MR. SROGE:  It is -- yeah, in a shell it exists, the

20  code is still there, and we're paying for the code to be

21  maintained as opposed to being deleted from Microsoft

22  (indiscernible) servers.  But, at this point, it's inactive.

23          MR. VALENCIA:  When you look at Question 2, the

24  debtor checked the box that says it doesn't have any

25  non-business revenue.  Is that still correct?

1              MR. SROGE:  That's correct.

2              MR. VALENCIA:  All right.  If you scroll down to the

3    very next page, the question, Number 3, the debtor checked the

4    box that said "none."  I just want to confirm that there were

5    not any payments or transfers made to creditors within the 90

6    days before the filing in this case.  Is that correct?

7              MR. SROGE:  That is correct.

8              MR. VALENCIA:  All right.  And on Line 4 or Question

9    4, Jon Jiles is listed as having at least a $25,000 expense

10   reimbursement.  Other than that, are there any other payments

11   or transfers in property made within the one year before this

12   case was filed benefiting any insider?

13             MR. SROGE:  Not to my knowledge.

14             MR. VALENCIA:  If you scroll down to Question 7,

15   which is on Page 32 on Document 1, we did talk about this a

16   little bit.  These are the only two lawsuits that the debtor

17   had within the one year before this case was filed, correct?

18             MR. SROGE:  Correct.

19             MR. VALENCIA:  All right.  And with regards to a --

20   the Nevada District Court case, it appears that Diamond

21   McCarthy has an engagement agreement seeking to be paid

22   37.5 percent of any recovery.  Is that correct?

23             MR. SROGE:  Right.

24             MR. VALENCIA:  Okay.  Mr. Sroge, please scroll down

25   to Statement of Financial Affairs Question 11.  That should be

```
 1   on Page 34.

 2            MR. SROGE:  Got it.

 3            MR. VALENCIA:  And I'm just looking at the employment

 4   application, just to be clear.  $50,000 was paid by the debtor

 5   on March 17th, 2023, and then another $50,000 was paid on

 6   June 6th, 2023.

 7            MR. SROGE:  Correct.

 8            MR. VALENCIA:  Okay.  And this case was filed on

 9   June 13th.

10            MR. SROGE:  Correct.

11            MR. VALENCIA:  Okay.  I don't know.  Mr. Larsen, can

12   you help me out here?  Should there be two $50,000 payments, or

13   at least two dates showing $100,000 payment?

14            MR. LARSEN:  There are -- if you scroll to the last

15   page, there's a supplement attached to it that has the second

16   payment on it.

17            MR. VALENCIA:  Okay.  Very last -- got it.  Okay.  I

18   didn't see anything regarding the supplement.

19            All right.  So, Mr. Sroge, for both --

20            MR. SROGE:  (Indiscernible)?

21            MR. VALENCIA:  Yeah.  Go ahead.

22            MR. SROGE:  Yeah.  I'm at ECF 44.  That's where --

23   the last page on ECF 1 and it's probably on the last page.

24            MR. VALENCIA:  Yeah.  ECF 44, Page 15 of 15.  You're

25   right.  I see that.  I just didn't see a reference on the
```

1  question.

2         Okay.  So, Mr. Sroge, if you actually look at either

3  ECF Number or Document Number 1 or 44, Question 11.1, and the

4  attachment on Document 44, I can see that certain funds were

5  paid.  Could you tell me from what account those funds came

6  from?

7         MR. SROGE:  As in what bank account they were paid

8  from?

9         MR. VALENCIA:  Yeah.

10        MR. SROGE:  Lexicon Bank account.

11        MR. VALENCIA:  All right.  Both $50,000 --

12        MR. SROGE:  (Indiscernible) yes.

13        MR. VALENCIA:  So both $50,000 payments came from the

14  debtor's Lexicon checking account, correct?

15        MR. SROGE:  Yes.

16        MR. VALENCIA:  All right.  And that is the company's

17  operating account?

18        MR. SROGE:  It is (indiscernible) account.

19        MR. VALENCIA:  Got it.  On 11.2, debtor lists $40,000

20  retainer for Diamond McCarthy.  Same question.  From what

21  account did that $40,000 payment come from?

22        MR. SROGE:  From the Lexicon account, the company's

23  operating account.

24        MR. VALENCIA:  Okay.  And just to be clear, was that

25  $40,000 payment made before the date and time that this case

1  was filed on June 13th, 2023?

2          MR. SROGE:  It was made before.

3          MR. VALENCIA:  Okay.  Let's stick to Document 44

4  since this is the most recent amendment.  Let's go to Page 6 of

5  Document 44, Question 13.  All right.  So it appears that there

6  was a transfer received by Fortress NFT Group, Incorporated,

7  for a value of $17.5 million.  Is that -- Fortress NFT, is that

8  the new (audio interference) officers formed, at least what the

9  debtor's asserting?

10         MR. SROGE:  Yes, it is.

11         MR. VALENCIA:  Okay.  And that has to do --

12         MR. SROGE:  (Indiscernible) --

13         MR. VALENCIA:  That has to do with the Banq v.

14 Purcell lawsuit filed in the District of Nevada which may be

15 appealed by Diamond McCarthy.  Is that right?

16         MR. SROGE:  That's right.

17         MR. VALENCIA:  All right.  If you scroll down to

18 Question 4.1, the debtor listed 10845 Griffith Peak Drive.  It

19 looks like it was occupying that address until July of 2022.

20 How come the debtor isn't at that address anymore?

21         MR. SROGE:  Due to the cost of the operating

22 (indiscernible) at that location and the lack of employees.

23         MR. VALENCIA:  Okay.

24         MR. SROGE:  So it was in the interest of the company

25 to terminate that lease.

1          MR. VALENCIA:  Just follow-up on Question 16, same

2    page.  You testified earlier the debtor has no PII.  Just want

3    to clarify that the --

4          MR. SROGE:  We do not have any PII.

5          MR. VALENCIA:  Okay.  So the debtor does not collect

6    and retain any PII.

7          MR. SROGE:  It does not.

8          MR. VALENCIA:  Scroll on down to Question 25, which

9    is on Page 10 of 15.  Actually, you already answered my

10   questions.  The only thing I think, though, that the dates

11   though, and the nature of the business and the EIN, ought to be

12   at least filled in if you have -- if the debtor has them.  That

13   has to do with (indiscernible) and Banq LTD in Cyprus.

14         MR. LARSEN:  Okay.  We will (indiscernible)

15   information.  I don't know if we have the EIN, but we should be

16   able to figure out the (indiscernible).

17         MR. VALENCIA:  Let's see.  We did talk about

18   Founder's CPA in Question 26.  They're not going to be

19   retained.

20         Just a follow-up, I guess.  Has the debtor filed it

21   2022 returns with the Internal Revenue Service?

22         MR. SROGE:  It has not yet.  Founder's CPA is listed

23   as the CPA firm and (indiscernible) they have been -- received

24   a payment to prepare those tax returns.

25         MR. VALENCIA:  When was that payment --

```
 1            MR. SROGE:  (Indiscernible) dollars and they should
 2   complete those returns shortly (indiscernible) expected.
 3            MR. VALENCIA:  Do you expect Founder's CPA to
 4   complete any other returns for the debtor?
 5            MR. SROGE:  No, just that 2022.  (Indiscernible) in
 6   2020 (indiscernible) 2023 perhaps this year's.
 7            MR. VALENCIA:  Got it.  All right.  Let's scroll on
 8   down to Statement of Financial Affairs Question 28, which ought
 9   to be on Page 13 of Document 44.  So I just want to follow up
10   on a couple officer statements here.  So Jon Jiles has a
11   1.6 percent interest in the debtor company, correct?
12            MR. LARSEN:  That figure might actually need to be
13   corrected.  Whatever is on the statement of (indiscernible)
14   security holders would be accurate, but (indiscernible).
15            MR. VALENCIA:  So the equity security holder list at
16   ECF 42, is that what you're referring to, Mr. Larsen?
17            MR. LARSEN:  Yeah.  Yes.
18            MR. VALENCIA:  So, Mr. Sroge, while I'm waiting for
19   this to load on my computer, when did Mr. Jiles become a
20   director of the debtor?
21            MR. SROGE:  I don't know the answer to that.
22            MR. VALENCIA:  Okay.
23            MR. SROGE:  It was before my time.
24            MR. VALENCIA:  And when did you become CEO and
25   director of the debtor?
```

49

```
 1              MR. SROGE:  In January of 2022.

 2              MR. VALENCIA:  Okay.  Do you know when Dirk O'Hara

 3   became the -- became a director of the debtor?

 4              MR. SROGE:  I'd have to look that up.  I can get that

 5   (indiscernible).

 6              MR. VALENCIA:  Well, if you don't know offhand,

 7   that's fine.  I'll follow up in an email.

 8              MR. SROGE:  (Indiscernible) okay.  Great.  Yeah, that

 9   would be great.  I can get that.

10              MR. VALENCIA:  And same with Christina Favilla.  Do

11   you know when she became a director?

12              MR. SROGE:  Yeah, I'd have to -- have to follow up

13   with that information.  (Indiscernible) follow up.

14              MR. VALENCIA:  All right.  On Document 42, and you

15   may not have this in front of you, but I see -- I don't see a

16   Jon Jiles.  I see a Max Jiles.  J --

17              UNIDENTIFIED:  (Indiscernible) 42 --

18              MR. VALENCIA:  -- Max Jiles.

19              MR. LARSEN:  When it got filed, the first column got

20   cut off (indiscernible) I didn't realize that it was cut off.

21              MR. VALENCIA:  Okay.

22              MR. LARSEN:  I believe the third entry there is Jon

23   Jiles initially, but he also holds other interests indirectly

24   to different entities.

25              MR. VALENCIA:  Got it.
```

1          MR. LARSEN:  Which is why I didn't mention

2   (indiscernible).  We'll file a revised version that includes

3   that first column that was cut off.

4          MR. VALENCIA:  Let's see here.  And Mr. Sroge, you

5   don't have any first (indiscernible) interest in the debtor?

6          MR. SROGE:  No.

7          MR. VALENCIA:  If you scroll down to Line -- Question

8   30, excuse me, which is just right below that, the debtor

9   checked the box that said "no."  But that question asks:

10  "Within the one year before filing this case, did the debtor

11  provide an insider with value in any form including salary or

12  other compensation, draws, bonuses, loans, credits on loans,

13  stock redemptions, and options exercised?"

14         Correct me if I'm wrong, but didn't you receive some

15  sort of salary through motion of 2022?

16         MR. SROGE:  That's correct.

17         MR. VALENCIA:  Okay.  Are you an officer of the

18  debtor?

19         MR. SROGE:  I'm sorry.  Can you repeat that?

20         MR. VALENCIA:  Yeah.  Mr. Sroge, so you're a CEO,

21  right?  So you're the chief executive officer of the debtor,

22  right?

23         MR. SROGE:  Yeah.

24         MR. VALENCIA:  Okay.  Do you know --

25         MR. SROGE:  Correct.

```
1              MR. VALENCIA:  Do you know approximately how much of
2   salary was paid to you from the debtor within the one year --
3              MR. SROGE:  Yeah.
4              MR. VALENCIA:  -- before this case was filed?
5              MR. SROGE:  Yeah.  Hold on.  I can get -- yes, I can
6   get that really quickly from the W-2.
7              MR. VALENCIA:  Well, whatever amount you get from the
8   W-2 would probably be for the entire 2022 year, right?  So we
9   just want the one year.
10             MR. SROGE:  It would.
11             MR. VALENCIA:  All right.  So figure --
12             MR. SROGE:  So I'd have to go from June 13 -- you
13  know, June 13th of 2022, right?
14             MR. VALENCIA:  Yeah.  So --
15             MR. SROGE:  I'll have to follow up with that
16  information.
17             MR. VALENCIA:  So it sounds to me you're going to
18  amend the schedule -- or Statement of Financial Affairs
19  Question 30, as well, right?  So you figure out that number
20  with debtor's counsel.
21             MR. SROGE:  Okay.
22             MR. VALENCIA:  All right.  Just quick follow-up
23  questions before I turn it over.  You have -- the debtor has
24  two district court lawsuits, one of which is basically
25  concluded but may be appealed.  Just a general question.  Was
```

1  the debtor involved in any other litigation in the two years

2  before this case was filed?

3          MR. SROGE:  Not that I'm aware of.

4          MR. VALENCIA:  Okay.

5          MR. SROGE:  There was no litigation when I joined in

6  January of '22.

7          MR. VALENCIA:  Okay.  There is a claim, I think,

8  against Fortress.  Let's see.  The value was $17.5 million and

9  then Diamond McCarthy is going to be appealing that Nevada

10  lawsuit, potentially.  The debtor in three to six months will

11  have a software development kit -- I guess for lack of better

12  term, "online."  Will it become immediately profitable?

13      (No audible response)

14          MR. VALENCIA:  I guess, more to the point, how is

15  the --

16          MR. SROGE:  (Indiscernible) --

17          MR. VALENCIA:  -- how is the debtor going to be able

18  to fund a plan of reorganization in this case if it's not

19  currently operating?

20          MR. LARSEN:  There's a plan of reorganization on file

21  already that is set for confirmation hearing on August 22nd.  I

22  mean, the gist of the plan is that Mr. Jiles (indiscernible)

23  board of directors (indiscernible) entity is going to advance

24  loan funds to the debtor (indiscernible) litigation against

25  former officers and directors, but -- that that will ultimately

1  result in additional (indiscernible) available for the company

2  and (indiscernible) development of the software.  And, you

3  know, that will allow the debtor to get back (indiscernible) at

4  some point in the future.

5            MR. VALENCIA:  So I recall reading that the secured

6  lender agreed with -- consistent with new secured loan

7  documents and contingent with the bankruptcy court confirming

8  the plan, an advancement of $350,000 in new financing to the

9  reorganized debtor secured by a first priority perfected

10  security interest in all personal property of the reorganized

11  debtor including the Nevada litigation and other causes of

12  action, that that will be used to pay admin claims, priority

13  claims, and fund its business operations and other out-of-

14  pocket litigation expenses during the life of the plan, and

15  then also create a reserve to provide for payment of a

16  guaranteed distribution at the conclusion of the three-year

17  plan.  And then, I guess, there was a projection, a recovery

18  projection, of projected disposable income of $9,237,500.  Is

19  that right?

20            MR. LARSEN:  If the debtor was to recover the full

21  amount that is currently claimed in that litigation, yes.

22            MR. VALENCIA:  Gotcha.

23            All right.  So, Mr. Sroge, is that your current

24  understanding of how this case is going to proceed --

25            MR. SROGE:  Yes.

```
 1                MR. VALENCIA:  -- and move forward?  Okay.

 2                MR. SROGE:  That is.

 3                MR. VALENCIA:  Do you -- and, Counsel, you can chime

 4    in here.  Do you contemplate a consensual or nonconsensual

 5    plan?

 6                MR. SROGE:  I'm not sure what the definition of

 7    (indiscernible) --

 8                MR. LARSEN:  We're optimistic we can get to a

 9    consensual confirmation, but some of these creditors we have

10    not -- we haven't dialogued with yet, including N9 Advisors

11    (indiscernible).

12                MR. VALENCIA:  Gotcha.  So I see an amended --

13                MR. LARSEN:  (Indiscernible) we're optimistic

14    (indiscernible) --

15                MR. VALENCIA:  So I see an Amended Chapter 11 Small

16    Business Plan Number 2 was filed at ECF 47 on the 29th of June.

17    Subchapter V trustee was appointed almost immediately when this

18    case was filed, a few weeks before that.  Did the debtor have

19    an opportunity to reach out to the Subchapter V trustee and get

20    his take on that plan before it was filed?

21                MR. LARSEN:  The initial plan was filed, I believe,

22    the same day as the petition, so we hadn't --

23                MR. VALENCIA:  Right.

24                MR. LARSEN:  -- met with the Chapter V trustee yet.

25    The amendment really doesn't change much, just filled in some
```

1  information that we didn't have available to us when the

2  original plan was filed.  So there hasn't been a lot of

3  dialogue with the Subchapter V trustee on that yet, no.

4          MR. VALENCIA:  Okay.  I take it, then, going forward,

5  that the debtor will have dialogue with the Subchapter V

6  trustee?

7          MR. LARSEN:  Yes.

8          MR. VALENCIA:  All right.  I don't have any other

9  questions.  Mr. Shapiro, do you have questions?

10          MR. LARSEN:  Not at this time.  Mr. --

11          MR. VALENCIA:  Mr. -- Subchapter V Trustee Shapiro --

12  pardon me.  Sorry.

13          Brian, do you have any questions?

14          MR. SHAPIRO:  Brian Shapiro -- yeah.  Brian Shapiro,

15  Subchapter V trustee.  Just to clarify just a few comments that

16  were made by Mr. Larsen, is that I certainly have had some

17  email communication with him and there's been discussions with

18  the IDI, and I've actually had some other discussions with Jim

19  Shea, his partner, just generally about the case as filed.

20          But as to questions, I think the questions that were

21  asked really covered a couple issues that I had, so I don't

22  really have anything further to ask besides what was previously

23  asked by yourself.  So thank you.

24          MR. VALENCIA:  Okay.  Thank you.  Appreciate that.

25          Mr. Agelakopoulos, do you have any questions on

1  behalf of N9?

2          MR. AGELAKOPOULOS:  Yes.  Before I start asking

3  questions, we're at 12:26, and I know that there were amended

4  schedules filed 30 minutes before the meeting, or thereabouts.

5  Is there going to be a continued meeting or is this our only

6  shot?

7          MR. VALENCIA:  Well, to be honest with you, I'd

8  really had all my questions answered.  I know Mr. Shapiro

9  didn't have anything further.  So you are welcome to take all

10 the time that you want to look at all the amendments and ask

11 all the questions that you have.  I'm really kind of thinking

12 that this would end -- this would be concluded today.

13         MR. AGELAKOPOULOS:  Okay.  I will -- then I will do

14 what I can.  And for the record, this is Athanasios

15 Agelakopoulos of Schwartz Law on behalf of N9 Advisors.  I

16 guess, you know, it probably helps probably to start back at

17 the beginning.  In ECF Number 1, Mr. Sroge, do you have that

18 document in front of you?  The original petition, schedules,

19 related financial documents, do you have that in front of you?

20         MR. SROGE:  Is it the Document 1, voluntary Chapter

21 11 petition?

22         MR. AGELAKOPOULOS:  Correct, it's a -- if you look at

23 the top of the document, there's the clerk of the court's ECF

24 file stamp.  It's the case number followed by the docket

25 number, followed by the date --

```
 1              MR. SROGE:  Yep.

 2              MR. AGELAKOPOULOS:  -- and time --

 3              MR. SROGE:  Yep.

 4              MR. AGELAKOPOULOS: -- the documents was filed.  And

 5  then there's a series of page numbers in the top right-hand

 6  corner.  Do you see that?

 7              MS. SROGE:  Yes.

 8              MR. AGELAKOPOULOS:  Okay.  So when I refer to a page

 9  number, that's the page number I'm referring to.  So if you

10  could scroll to Page 22 of 100, if you're looking at this on a

11  computer screen --

12              MR. SROGE:  Yep.

13              MR. AGELAKOPOULOS:  -- or turn to Page 22 of 100, and

14  let me know when you're there.

15              MR. SROGE:  Yes, Schedule D, creditors who have

16  claims secured by property.

17              MR. AGELAKOPOULOS:  Uh-huh.

18              MR. SROGE:  Sure.

19              MR. AGELAKOPOULOS:  Do you recognize the name of the

20  entity listed in item 2.1?

21              MR. SROGE:  NVF, LLC, yes.

22              MR. AGELAKOPOULOS:  Do you know who is the principal

23  of NVF, LLC?

24              MR. SROGE:  I do not, actually, no.  I could -- I

25  don't know.  I could look it up.  I'm not (indiscernible)
```

1           MR. AGELAKOPOULOS:  Were you the only officer and
2   director of the debtor entity at the time this indebtedness was
3   incurred?

4           MR. SROGE:  No.

5           MR. AGELAKOPOULOS:  Who were the officers and
6   directors of the debtor entity on March 15th, 2023?

7           MR. SROGE:  At that time the main corporation, it was
8   myself, Jon Jiles, the chairman, Dirk O'Hara, Christina
9   Favilla.  Those were the directors at the time.

10          MR. AGELAKOPOULOS:  Okay.  And you mentioned it was
11  Mr. Jiles as well?

12          MR. SROGE:   Yes.

13          MR. AGELAKOPOULOS:  Okay.  Who negotiated this
14  transaction on behalf of the debtor entity?

15          MR. SROGE:  That would -- you know, that, I'm not
16  sure of.  I was aware of -- let me rephrase that.  I was aware
17  of this transaction, but it was not -- I did not negotiate it
18  personally.  So I --  you know -- and I say I'm sorry, a lot
19  has happened, and I would have to go back and look.  It's
20  possible that in the course of the bankruptcy and the company
21  contemplating it, there were a lot (indiscernible) parts at the
22  time, and the this is the one of the ways to get financing
23  accomplished to get it through -- launch the Chapter 11
24  process.

25          MR. AGELAKOPOULOS:  If I understand your answer

```
 1  correctly, was this indebtedness incurred with an eye toward

 2  the Chapter 11 bankruptcy case?  (Indiscernible).

 3           MR. SROGE:  Yes, it was encouraged in that case.

 4           MR. AGELAKOPOULOS:  So was it -- is it your

 5  understanding that the $225,000 indebtedness listed here was

 6  incurred in contemplation of the bankruptcy?

 7           MR. SROGE:  It was -- my understanding, and again

 8  this -- you know, just keep in mind my lack of experience in

 9  Chapter 11 cases, but this was a form of debtor in possession

10  financing.  I did not -- you know, and I'm saying this not

11  knowing specifically the nuances of Chapter 11 processes.  But

12  in my mind, from an operational perspective and trying to keep

13  the company, you know, alive, and through reorganization, which

14  was a kind of form of bridge or DIP financing to get us through

15  this process we're at today.

16           MR. AGELAKOPOULOS:  Do you know which bank account

17  the loan proceeds were deposited into?

18           MR. SROGE:  Into the company's primary operating

19  account at Lexicon Bank.

20           MR. AGELAKOPOULOS:  Do you happen to know what the

21  balance of the Lexicon Bank account was on or about March 15th

22  of 2023?

23           MR. SROGE:  Yep.  I can find (indiscernible) because

24  I'm (indiscernible).  On March 15th --

25           MR. AGELAKOPOULOS:  That's listed (audio
```

1  interference).

2            MR. SROGE:  On Page -- the bank account was $4,486.

3            MR. AGELAKOPOULOS:  I'm sorry, how much?

4            MR. SROGE:  $4,486.

5            MR. AGELAKOPOULOS:  Would it surprise you if I told

6  you the debt -- the Nevada Secretary of State's website lists

7  the formation date of NVF, LLC as March 14th of 2023?

8            MR. SROGE:  Is it relevant?

9            MR. AGELAKOPOULOS:  I'm asking if you know.

10           MR. SROGE:  I don't know, I'm not aware of it.

11           MR. AGELAKOPOULOS:  Do you know if Mr. Jiles is

12  listed as a managing member of NVF, LLC?

13           MR. SROGE:  I do not.

14           MR. AGELAKOPOULOS:  Would it surprise you if he's

15  listed as the managing member?

16           MR. SROGE:  It would not surprise me.

17           MR. AGELAKOPOULOS:  I'm sorry, he's listed as --

18  excuse me, let me rephrase those questions.  He's listed as the

19  manager, excuse me, according to the officer information,

20  listed on the Nevada Secretary of State's website.  He is

21  listed as the -- excuse me, manager, not the managing member, I

22  want to restate that.

23           MR. SROGE:  Well, you're (indiscernible) (audio

24  interference).

25           MR. AGELAKOPOULOS:  I'm just trying to wrap my arms

 1  around the transaction as I understand -- try to get a better

 2  understanding of it, Mr. Sroge.  Was there any discussion among

 3  the directors about this -- incurring this indebtedness?  I

 4  mean, how was it approved by the (indiscernible).

 5          MR. SROGE:  Well, I'm looking, you know, what we got,

 6  the loan documents that I have.  For example, there is no --

 7  there's (indiscernible) note $50,000 on this portion

 8  (indiscernible) signed on behalf of the company.

 9  (Indiscernible) to allow us to receive (indiscernible).

10          MR. AGELAKOPOULOS:  How much was the amount you just

11  testified to?

12          MR. SROGE:  I believe 50 -- sorry, I'm trying to get

13  to the wrong document.  (Indiscernible)  The 225

14  (indiscernible).  Initially -- I believe that this initially --

15  it was -- I can't recall exactly, so I'm hesitant to speak to

16  the exact (indiscernible).  But I do not feel (indiscernible)

17  at one time there was a lot of concentration, obviously,

18  putting together $4,000 (indiscernible) some sense of urgency

19  around how can we actually get on this quickly, how can we do

20  it in a way that is, you know, in the concrete interest and yet

21  still receiving that money to proceed with the filing.  So I

22  don't want to speak out turn and end up looking at random

23  graphs and documents, because I'm not prepared at this time for

24  this line of questions to be exactly accurate.

25          MR. AGELAKOPOULOS:  I'm sorry?

1           MR. SROGE:  I'd rather not speak off the cuff.  I'd

2    rather be able to do the research and you know, find the

3    documents, or actually find, I suppose, the draft ones.

4           MR. AGELAKOPOULOS:  Did you execute -- was there --

5    well, let me -- I'll ask you it this way.  Was the security

6    agreement that was executed by the debtor and in connection

7    with this indebtedness?

8           MR. SROGE:  With for 225,000, yes.

9           MR. AGELAKOPOULOS:  Who (Indiscernible).

10          MR. SROGE:  I did, I did.

11          MR. AGELAKOPOULOS:  You did?

12          MR. SROGE:  I did.

13          MR. AGELAKOPOULOS:  How did you come to execute --

14   I'm sorry, go -- I just want to make sure we're not speaking

15   over each other.

16          MR. SROGE:  Right, right, no, I think that I executed

17   it.  And if my memory serves me correctly, (indiscernible) for

18   the company, and you know, the directors that I mentioned that

19   it was approved to execute this.

20          MR. AGELAKOPOULOS:  When you mentioned that this was

21   executed after -- I just want to make sure -- so there were

22   discussions with the board about incurring this indebtedness?

23          MR. SROGE:  To the best of my recollection, yes.

24   (Indiscernible).

25          MR. AGELAKOPOULOS:  Did those communications include

```
 1  Mr. Jiles?

 2          MR. SROGE:   I don't recall.  I would have to

 3  research those emails.  But I would -- I will not assume.  I'll

 4  have to get back to you.

 5          MR. AGELAKOPOULOS:  Do you know who -- which -- do

 6  you know if NVF, LLC was represented by counsel?

 7          MR. SROGE:  I don't know.

 8          MR. AGELAKOPOULOS:  Who reviewed the NVF, LLC loan

 9  documents on behalf of the debtor entity?

10          MR. SROGE:   I, again, I don't know.  I will have to

11  use emails (indiscernible).

12          MR. AGELAKOPOULOS:  Is legal -- did the debtor entity

13  Banq have legal counsel review these documents?

14          MR. SROGE:  I'm -- again, I'm sorry, I wasn't

15  prepared for this line of questioning to be able to

16  (indiscernible).

17          MR. AGELAKOPOULOS:  So you're saying you don't know

18  whether the debtor entity had legal counsel review these

19  documents?

20          MR. SROGE:   I'm -- well, the thing is, is that

21  there's a lot of activity.  And for me to answer either in the

22  affirmative or negative without being able to (indiscernible)

23  sources, you know.  I can see exactly the communication chain

24  at that time, I don't want mistakes on this answer.

25  (Indiscernible).
```

64

```
 1            MR. AGELAKOPOULOS:  We did -- I'm sorry.  So -- okay.
 2   Mr. Sroge, I'm not trying to put you in a difficult position.
 3   I'm just trying to get the payment -- the witness's
 4   understanding.  And I'm not -- again -- let me ask you this,
 5   right.  What records, Mr. Sroge, would you look at to sort of
 6   refresh your recollection (indiscernible) payments
 7   (indiscernible).  What might you look at?
 8            MR. SROGE:   Well, for -- for example (indiscernible)
 9   for example, an email.  That's between -- that's where Mr.
10   Larsen reviews the -- hold on.  See, there's a lot of --
11   there's so many emails.  But I basically review them
12   (indiscernible) I'm sorry (indiscernible).
13            MR. LARSEN:  And Josh, to the extent that there were
14   emails between you and me, or you know (audio interference) --
15            MR. SROGE:   Right, yeah.  Yeah.  That this is --
16   yeah.  This is -- yeah.  That's that part I understand that
17   business there.  What I'm saying is if I was able to prepare
18   for a line of questioning like this, I would be able to go in
19   and find (indiscernible 1:29:09) say whether or not parties
20   were involved, what the process was, what the sequence of
21   events was.  But I was not preparing for this in this call
22   today.  I do not have all these things (indiscernible).
23            MR. AGELAKOPOULOS:  So in terms of the records you
24   would look at, do you have, for example -- do you have emails
25   that you can see from opposing counsel, or counsel for NVF --
```

```
 1   or NVF, LLC?  Emails -- just in looking through those emails,
 2   I'm not asking about privileged communications, and I'm not
 3   trying to inquire about privileged communications.  But what I
 4   would like to know is who represented NVF, LLC on the
 5   counterparty side of the ledger?  Who might that have been?
 6            MR. SROGE:  I don't know.  You know, meaning that
 7   (indiscernible) some recollection.
 8            MR. AGELAKOPOULOS:  Would your emails bear out who --
 9   I mean what would you look at to determine that?
10            MR. SROGE:   I mean I would have to assess
11   (indiscernible) find out.  If not (indiscernible) I suppose the
12   (indiscernible).
13            UNIDENTIFIED:  And again, I'm asking you if it's
14   helpful (indiscernible).
15            MR. SROGE:  Okay.
16            MR. AGELAKOPOULOS:  No, and again, Mr. Sroge, I'm not
17   asking you to delve into attorney client communication.  But
18   I'm trying to understand the timing of this particular
19   transaction.  I'm just trying to wrap my mind around how this
20   came into existence.  Because I have a formation date on the
21   Secretary of State's website of March 14th, 2023 for NVF, LLC.
22   And the note -- you -- and I don't want to misstate your
23   testimony, so if I'm incorrect, please tell me.  But a note was
24   apparently executed the very next day.  And now based on
25   debtor's counsel's statement, an entity managed to engage
```

```
 1   counsel, negotiate a security agreement, have a UCC-1 filed.  I
 2   mean all of this happened in -- I'm trying to understand how
 3   all of this came into existence.  You see where I'm going with
 4   this?  I'm having a hard time understanding (indiscernible) --
 5           MR. SROGE:  (Indiscernible) Not exactly, because it
 6   sounds like a line of questioning around NVF, LLC, which I'm
 7   not involved in any (audio interference) how they were able to
 8   -- you know, get a boilerplate document together, register an
 9   LLC, and do all this in a day or two?  (Audio interference)
10   another (indiscernible) but, you know, for all I know, and
11   everything (indiscernible) out, ready to go.  So
12   (indiscernible) hypothesis by me.
13           MR. AGELAKOPOULOS:  Okay.  So and in all the
14   conversations with the board, Mr. Jiles never mentioned any
15   role with NVF, LLC?
16           MR. SROGE:  I can't recall specifically.
17           MR. AGELAKOPOULOS:  Do you have any emails from him
18   to that effect?
19           MR. SROGE:  I would have to look (indiscernible).
20           MR. AGELAKOPOULOS:  Okay.  So on the date of the
21   transfer and the date the loan was funded, I don't want to
22   misstate the testimony.  You mentioned that there's an account
23   balance was $4,486, correct?
24           MR. SROGE:  Yes.  Only because that would have been
25   about on March 15th, and I don't know if that was the date --
```

```
 1  I'm sorry, that was the balance (audio interference).

 2            UNIDENTIFIED:  March 15th, (indiscernible).

 3            MR. AGELAKOPOULOS:  Okay.  Now -- so what use did the

 4  company make of those loan (indiscernible)?

 5            MR. SROGE:  I think they're all specified in the

 6  bankruptcy documents, but I'll tell you generally about it.  As

 7  discussed already in this call earlier, there were payments to

 8  -- for legal representation to Shea Larsen (indiscernible)

 9  payments to this email a lot.

10            MR. AGELAKOPOULOS:  And in connection -- well -- do

11  you have the plan in front of you?

12            MR. SROGE:  I have documents one that you're talking

13  about.

14            MR. AGELAKOPOULOS:  ECF Number 47, this is the

15  amended plan that was filed on June 29th of 2023.

16            MR. SROGE:  47, I'm bringing it up.  Okay.

17            MR. AGELAKOPOULOS:  Okay.

18            MR. SROGE:  Okay.  What page number.

19            MR. AGELAKOPOULOS:  Now, if you could, please scroll

20  down to Page 36 of 43.

21            MR. SROGE:  Okay.

22            MR. AGELAKOPOULOS:  There's a paragraph there,

23  Paragraph 3, it's roughly if you're looking at the left-hand

24  column Line 19 on the pleading paper, entitled third party

25  releases.
```

```
 1                MR. SROGE:  Okay.  Number 3, all capitals?

 2                MR. AGELAKOPOULOS: Yeah.  Well, yes, the text is all

 3   in capitals, the title is in bold face.

 4                MR. SROGE:  I'm there.

 5                MR. AGELAKOPOULOS:  Okay.  Do you see the reference

 6   roughly at Line 21 to the secured lender?

 7                MR. SROGE:  Yeah.

 8                MR. AGELAKOPOULOS:  Okay.  So is it your

 9   understanding that the secured lender is being released under

10   the debtor's plan?

11                MR. SROGE:  It reads like that, yes.

12                MR. AGELAKOPOULOS:  Now -- so the secured lender, is

13   that NVF, LLC?

14                MR. SROGE:  Let me -- you're asking someone who's

15   not, you know, a lawyer to interpret this.  But my -- but that

16   is what my interpretation would be, yes.  That -- I would infer

17   as much.

18                MR. AGELAKOPOULOS:  Well, let me call your attention

19   then to, if you have it in front of you, Mr. Sroge, let's

20   scroll back up to Page 12 of 43.  I apologize, we're going to

21   have to keep jumping back and forth between the documents,

22   but --

23                MR. SROGE:  No, that's fine.  I got it a PDF of them.

24   What line number?

25                MR. AGELAKOPOULOS:  Line roughly between Lines 7 and
```

1    8.

2              MR. SROGE:  Oh, there it is.  Yeah, yep.  And that is

3    what it refers to.  If you read the document, it seems like

4    that would be the right issue.

5              MR. AGELAKOPOULOS:  Okay.  So the secured lender is

6    identified as NVF, LLC.  Do you see that?

7              MR. SROGE:  Yep, I do.

8              MR. AGELAKOPOULOS:  Okay.  So let's scroll back to

9    the release provision on Page 36.

10             MR. SROGE:  I'm there.

11             MR. AGELAKOPOULOS:  Okay.  Now do you also have a

12   copy of the debtor's schedules in front of you?

13             MR. SROGE:  No.  Looking at document number

14   (indiscernible).

15             MR. AGELAKOPOULOS:  Yeah, because you were -- we're

16   going to go back to that, but let's take a look at the release

17   first.  I'm just -- you know, because we have to kind of look

18   back and forth between these documents, so -- just to get the

19   context of it.  But it says here, it's my understanding that

20   the secured lender, as well as all of their attorneys, and

21   professionals employed by the foregoing shall receive a full

22   release from the debtor and its estate from any and all causes

23   of action.  Do you see that?

24             MR. SROGE:  You're talking about in lines -- under

25   third party release?  Correct, from Line 22 there, any and all

1   causes of action that might be asserted on behalf of the debtor

2   or its estate, yeah.

3            MR. AGELAKOPOULOS:  Did the debtor investigate that

4   he -- what kinds of claims that could be released

5   (indiscernible)?

6            MR. SROGE:  I'm not sure I can answer that.  It

7   involves my conversation with counsel.  Right now I'm not -- I

8   don't -- I'm not sure if I'm barred, so I can -- I'm not -- I'm

9   (indiscernible) I'm not sure here what I can answer.

10           MR. AGELAKOPOULOS:  Okay.  Well, let me take you back

11  to the schedule.  Let me -- let's go back to ECF Number 1,

12  Schedule D.  Here I'm looking at -- this is the first -- this

13  is the very first item.

14           MR. SROGE:  Can I get a docket number?  It's E --

15           MR. AGELAKOPOULOS:  Docket Number 1.  This is the

16  100-page document.

17           MR. SROGE:  Yep.  Uh-huh.

18           MR. AGELAKOPOULOS:  Okay.  Now here, you prompted,

19  and this is on Page 19 of 100, and this -- I'm looking at Part

20  11, Items 75 and 75.

21           MR. SROGE:   I'm sorry, page -- I'm sorry, Page 19?

22           MR. AGELAKOPOULOS:  Yes, correct.

23           MR. SROGE:  75 and 75?

24           MR. AGELAKOPOULOS:  Correct.

25           MR. SROGE:  Causes of action against third parties,

1  then contingent and unliquidated claims?

2          MR. AGELAKOPOULOS:  Correct.  And then you could

3  also, for example, look at you know for example Item 77, other

4  property of any kind not already listed involved.  But we don't

5  see any reference there to NVF, LLC?

6          MR. SROGE:  No.

7          MR. AGELAKOPOULOS:  Now, with respect to -- and let's

8  look at Document Number 43, Page 8 of 10.

9          MR. SROGE:  43, Page 8 of 10.  Okay.

10          MR. AGELAKOPOULOS:  There's no claim listed there

11  against NVF, LLC, right?

12          MR. SROGE:  Right.

13          MR. AGELAKOPOULOS:  Okay.  All right.  So I guess my

14  question is, describe for me the process for which this plan

15  was negotiated with NVF, LLC.  Without -- and I'm not asking

16  about your conversations with Mr. Larsen's firm.  I'm just

17  asking you to describe for me how this plan came into

18  existence.  And more particularly, how did the release of NVF

19  find its way into the plan?

20          MR. SROGE:  Let's see.  Well, I (indiscernible) a lot

21  (indiscernible) creditors (indiscernible) process.  I can't

22  specifically (indiscernible) discussion around, you know,

23  discussions of that -- those (indiscernible) claims,

24  specifically as you mentioned, to include NVF and

25  (indiscernible) recall the specifics of that.

1          MR. AGELAKOPOULOS:  Do you recall who were the -- who

2    negotiated this plan on behalf of the debtor?

3          MR. SROGE:  You mean the $225,000 note?

4          MR. AGELAKOPOULOS:  No, the plan at ECF 47.

5          MR. SROGE:  Oh, oh, I'm sorry.  You're talking about

6    the overall reorganization plan?

7          MR. AGELAKOPOULOS:  Correct.

8          MR. SROGE:  Yeah.  We know that (indiscernible).

9          MR. AGELAKOPOULOS:  Was there anybody else at the

10   debtor entity who was involved in that?

11         MR. SROGE:  I mean I -- you know, on the whole, we

12   have a board, and the board is involved in sort of the larger

13   business decisions.  There are certain elements that, you know,

14   that involve -- you know, that are detail oriented.  They may

15   not -- you know, in every (indiscernible).

16         MR. AGELAKOPOULOS:  Do you know if Mr. Jiles was

17   involved on behalf of the debtor entity?

18         MR. SROGE:  To the extent that that -- you know, he's

19   the chairman of the board (indiscernible) in terms of, you

20   know, (indiscernible) file Chapter 11 (indiscernible), yes.

21         MR. AGELAKOPOULOS:  But with respect to the plan,

22   though, negotiating the plan (audio interference) --

23         MR. SROGE:  Negotiating the (audio interference) --

24         MR. AGELAKOPOULOS:  The original plan filed at ECF, I

25   believe, correct me if I'm wrong, at ECF Number 5.

```
 1              And correct me if I'm wrong, Mr. Larsen.  I don't
 2   want to get the numbers wrong.  But ECF 47 is the amended plan
 3   and I believe it was an original plan at ECF (indiscernible)
 4   ECF 5, I think.  Was Mr. Jiles involved in negotiating either
 5   one, either the original plan or the amended plan on behalf of
 6   the debtor entity?
 7              MR. LARSEN:  If it's helpful, Athanasios, I can tell
 8   you both negotiations were (indiscernible).
 9              MR. AGELAKOPOULOS:  Let me ask it this way,
10   Mr. Sroge.  Do you know if Mr. Jiles ever recused himself from
11   any of these decisions?
12              MR. SROGE:  At various times.  (Indiscernible) hard
13   to recollect exactly, but at various times.
14              MR. AGELAKOPOULOS:  Let's go back to ECF Number 1.
15   This is the first document.  These are the petition, schedules,
16   statement of financial affairs.
17              MR. SROGE:  Right.
18              MR. AGELAKOPOULOS:  And I want to turn to the
19   original statement of financial affairs, and this is the
20   document that begins on Docket ECF Number 1.  Is that what you
21   refer to, Mr. Sroge, as Document Number 1?  And this --
22              MR. SROGE:  Right.
23              MR. AGELAKOPOULOS:  -- starts on Page 30 of 100.
24              MR. SROGE:  30, you said?
25              MR. AGELAKOPOULOS:  Document -- Page 30 of 100.
```

```
 1                  MR. SROGE:  Got it.

 2                  MR. AGELAKOPOULOS:  Okay.  So now -- here I'm looking

 3      at Page 31 of 100, Part 2, entitled (indiscernible) certain

 4      transfers made before filing for bankruptcy," and specifically

 5      Item Number 3, "certain payments or transfers to creditors

 6      within 90 days before filing this case."  Do you see that?

 7                  MR. SROGE:  Right.  I do.

 8                  MR. AGELAKOPOULOS:  Now, it says "none."  Do you see

 9      that?

10                  MR. SROGE:  I do.

11                  MR. AGELAKOPOULOS:  Okay.  Is that correct?

12                  MR. SROGE:  (Indiscernible) March 13th

13      (indiscernible) --

14                  MR. LARSEN:  (Indiscernible) there's a dollar amount

15      there shown, as well.

16                  MR. SROGE:  Right.  (Indiscernible) --

17                  MR. AGELAKOPOULOS:  So, yeah, please read the

18      question prompt, and then it says "none."

19                  MR. SROGE:  Correct.  "Certain payments or transfers

20      to creditors within 90 days before filing this case."  Right.

21      There were none (indiscernible).

22                  MR. AGELAKOPOULOS:  Okay.  So -- and at ECF 44,

23      Document 44, here Page 2 of 15, same question.  It says "none"

24      again, but I -- please read the question prompt, and then let

25      me know if the answer to Question 3 in the statement of
```

```
1   financial affairs is listed -- is correct.

2              MR. SROGE:  That's correct (indiscernible).

3              MR. AGELAKOPOULOS:  Okay.  So -- and going back to

4   Schedule B -- and this is back, you know -- when was the

5   ECF 63 -- there was an amended -- Mr. Larsen, there were

6   amended schedules that were filed.  Was that ECF 63?

7              MR. LARSEN:  I believe it was, yeah.  There were two

8   creditors who were added (indiscernible) --

9              MR. AGELAKOPOULOS:  No, no.  I got it.  Thank you for

10  the clarification.  But that's only to E and F.  So there

11  wasn't an amendment to Schedule B, correct?

12             MR. LARSEN:  Correct.

13             MR. AGELAKOPOULOS:  Okay.  So going back then,

14  Mr. Sroge, to Document Number 1 --

15             MR. SROGE:  Right.

16             MR. AGELAKOPOULOS:  -- what I refer to as ECF

17  Number 1, and then going back to Schedule B, the secured

18  creditor schedule, it says here that the date the debt was

19  incurred -- and here, I'm looking at Page 22 of 100,  ECF

20  Number 1.  Let me know when you're at the page and I'll direct

21  you to --

22             MR. SROGE:  Yeah.  Date (indiscernible) 3/15.  Yeah,

23  I'm there.  (Indiscernible) 3/15 (indiscernible).

24             MR. AGELAKOPOULOS:  Now, this may be, you know, an

25  open issue and I'll flag this for debtor's counsel.  I know
```

1  that under the computation of time rules, under Rule 9006(a)

2  you are to exclude the date and the amount.  But, by my math, I

3  think the -- by virtue of the filing date being June 13th of

4  2023, I think the indebtedness was incurred on or within the

5  90-day period.

6          Again, just flagging it for you, Mr. Larsen.  I'm not

7  asking you.  I'm just flagging a potential issue, and whether

8  SOFA 3 needs to be amended or not.  Just putting that on the

9  record.  I'm not asking (indiscernible) but, by my math, it

10  looks like it's within the 90-day period, prompting me to

11  wonder whether it needs to be included on SOFA 3.  Just

12  flagging it.  (Indiscernible) just throwing it out there.

13          But moving on to Question 4, probably more

14  importantly, and here I'm looking at, going back to the

15  original statement of financial affairs, and this is, again, at

16  Docket -- Mr. Sroge, at Document Number 1, Page 31 of 100.  And

17  here, I want you to focus on Question 4.  Please read the

18  prompt before you answer.  Take your time.  Let me know when

19  you're ready.  Take a look at that prompt and then let me know

20  when you're ready to answer some questions.

21          MR. SROGE:  (Indiscernible) short-term loan

22  (indiscernible) but yes, I've read it.

23          MR. AGELAKOPOULOS:  Okay.  And there's no transaction

24  here -- the only transaction here that (indiscernible) into the

25  one with Mr. Jiles is dated December 10th of 2022 for $25,000,

```
 1  correct?

 2          MR. SROGE:  Right.

 3          MR. AGELAKOPOULOS:  So there's no transaction listed

 4  here with NBF, LLC, correct?

 5          MR. SROGE:  Correct.

 6          MR. AGELAKOPOULOS:  And, to the best of your

 7  knowledge, is that correct?

 8          MR. SROGE:  Yeah.  Yeah.  I'm a little confused on

 9  your question there.  NBF was -- are you inquiring whether NBF

10  received a payment within a year from the company or just

11  (indiscernible) --

12          MR. AGELAKOPOULOS:  Well, I'm asking -- I'm just

13  asking if there's no -- I just want to make sure that there's

14  no -- that it's correct that NBF is not listed on the original

15  statement of financial affairs in response to Question 4.

16          MR. SROGE:  Right.

17          MR. AGELAKOPOULOS:  Okay.  Now moving to Document 44,

18  and here I'm looking at Page 2 of 15 --

19          MR. SROGE:  Okay.  Which page?

20          MR. AGELAKOPOULOS:  Here I'm looking at Page 2 of 15.

21  Again, it's Item 4.  Please read the prompt and then

22  (indiscernible) --

23          MR. SROGE:  (Indiscernible) the same as the other

24  documents.  Yeah.

25          MR. AGELAKOPOULOS:  Let me know when you're ready.
```

1  Okay?

2         MR. SROGE:  Yeah.

3         MR. AGELAKOPOULOS:  And once again, NBF, LLC is not

4  listed in responses to Question 4 from the statement of

5  financial affairs, correct?

6         MR. SROGE:  That is correct.

7         MR. AGELAKOPOULOS:  And it's your understanding that

8  NBF does not need to be listed there, correct?

9         MR. SROGE:  Right.

10        MR. AGELAKOPOULOS:  Let's turn to -- let me ask you

11 something about the -- describe for me what you understand to

12 be the operations of the reorganized -- assume your plan is

13 confirmed.

14        MR. SROGE:  Right.

15        MR. AGELAKOPOULOS:  What would the operations of the

16 debtor entity look like following confirmation of the plan?

17 What would it do?

18        MR. SROGE:  So, if we were successful in our case,

19 right, and received this -- you know, we won the lawsuit or

20 some settlement or something of that fashion, right, if I had

21 capital, right, the company has its existing code, which is the

22 peer-to-peer payment platform.  That might have some

23 marketability.  But the primary -- you know, we also pivoted

24 the company to this sort of software development tool kit

25 (indiscernible) and we would -- with one of our unsecured

1   creditors (indiscernible) we would, you know, resume the

2   development of this kit, which is nearly ready for market, and

3   go out and market it.  (Indiscernible) as possible.

4           MR. AGELAKOPOULOS:  Now, you mentioned that -- you

5   just testified, and again I don't want to misstate your

6   testimony, that the code might have marketability.  Did I

7   misunderstand your testimony or (audio interference) --

8           MR. SROGE:  (Audio interference) the first iteration

9   (indiscernible) what I just said about the code having

10  marketability, but peer-to-peer payments).

11          MR. AGELAKOPOULOS:  What did you mean by -- which

12  code has marketability?

13          MR. SROGE:  So the first -- so there's the original

14  -- or there's -- the business, I view it, has two pieces.  One

15  is the original peer payment business, right?  That was the D-

16  to-C business that the company was originally focused on up to

17  2/4 of 2021.  At that point, you know, it was shut down, that

18  portion of the business.  Right?  It had to return assets to

19  customers.  We had -- you know, it was sort  of quote,

20  (indiscernible) turned off, as it were.  Although it was still

21  available for download, it didn't actually function.

22          To get that -- that's a highly capital-intensive

23  business.  So the code, you know, could work, right?  Could

24  have functionality (indiscernible) marketability, I mean, you

25  know, with the right amount of capital, it could be

1  (indiscernible) back up.  Lots of marketing expense, get people

2  aware of it, and so on.

3          So you could turn that into a business.  But

4  (indiscernible) the quicker revenue business, the quicker

5  self-sustainability model would be the software tool kit path.

6  That's sort of (indiscernible) and I would execute on that

7  first in order to achieve the positive outcome (indiscernible)

8  quicker way.  Later,  you can -- you know, you can always go

9  back to the original (indiscernible).

10         MR. AGELAKOPOULOS:  Is any of the code immediately

11  marketable?

12         MR. SROGE:  It would be -- not in any -- you mean the

13  old code or (indiscernible) you know --

14         MR. AGELAKOPOULOS:  Any of --

15         MR. SROGE:  Neither one is ready for -- neither one

16  is ready to turn on and sell tomorrow.  They both require, you

17  know, sort of work.  It's like a neglected landscape, right?

18  The plants are there.  They just haven't been trimmed

19  (indiscernible) walk down the path (indiscernible) situation.

20         Now, marketability could also mean we sell it at --

21  everything as is, (indiscernible) "for sale" sign, right?

22  (Indiscernible) you're not going to get maximum value for the

23  shareholders (indiscernible) you know, updating the

24  (indiscernible), things of that nature.

25         MR. AGELAKOPOULOS:  Okay.  So --

```
 1              MR. SROGE:  (Indiscernible) general terms.

 2              MR. AGELAKOPOULOS:  So any of the code by itself, if

 3    I understand your testimony, is it your testimony that the code

 4    by itself is not immediately marketable, but the entire

 5    business would be?

 6              MR. SROGE:  The code itself is not able to be turned

 7    back on and have customers in its state (indiscernible).  It

 8    would be -- it would be to say that -- it's a -- can't just

 9    turn, flip a switch, and have customers.  It requires updating

10    and maintenance.  However, that doesn't mean you can't stick a

11    "for sale" sign in (indiscernible) three-quarter

12    (indiscernible).  You know, the house doesn't have a

13    certificate of occupancy (indiscernible) three-quarter

14    finished.  So you could sell it as it is, or you can finish it

15    and get a much better market result either by running the

16    company in operating fashion or then selling it when it's --

17    you know, it's fully finished.

18              I mean, code deteriorates over time.  I mean,

19    obviously it's still in its state (indiscernible) market

20    changes, right?  The partners have changed.  (Indiscernible)

21    right now, but the market (indiscernible).

22              MR. AGELAKOPOULOS:  Is it possible to market the

23    company now?

24              MR. SROGE:  For sale?  You mean like here's two

25    pieces of code, in the state that they're in?  Sure.  You can
```

1  put a "for sale" sign on (indiscernible).

2          MR. AGELAKOPOULOS:  Let me ask it this way.  Explain

3  to me how creditors get paid under the debtor's plan.  How do

4  they get paid?

5          MR. SROGE:  Ah, yes.  See, that's -- it's

6  (indiscernible) business model, right?  Again, this was -- this

7  is sort of like why I'm here, is not to be a -- you know, get

8  the company in and out (indiscernible) you know, that's -- my

9  talent is not, oh, you take the company to Chapter 11 and

10 figure out, you know, that.  It's to build companies, right, to

11 develop revenue streams.

12          So, after looking at the company and what product it

13 had created, it appeared that the -- because the company's

14 relationships in the market, and some of them being mine, that

15 the quickest way to revenue was to build this software

16 development kit.  So (indiscernible) development path the least

17 amount of code needed to be written, reliance on third parties,

18 you know, that need to be -- so you're not out blowing tons of

19 money on marketing.  This was the ideal (indiscernible)

20 development kit, and it would be a quick way to get revenue and

21 quick way to rebuild the business.  And you know, again,

22 (indiscernible) multi-year path to return money to creditors

23 and eventually shareholders, but that was the business plan

24 forward.

25          MR. AGELAKOPOULOS:  When you say a quick way to build

1   revenue and a quick way to build value, how quick is that?

2   What are you looking at?  What sort of time horizon would you

3   forecast?

4            MR. SROGE:  Yeah, the idea was three to six months of

5   more code work, testing, release.  And then, you know,

6   immediately start with our business partners and folks we know

7   to get this product into -- into our customer's hands, into

8   the -- into the businesses that would use the software tool

9   kit.  So another three to six months.  But ideally, first

10  revenue is nine months out.  And I'm saying that without, you

11  know, being -- I don't want to be over-exuberant

12  (indiscernible) provide us money, 2024 (indiscernible) the

13  motion important thing is revenue (indiscernible).

14           MR. AGELAKOPOULOS:  So, optimistically, three to six

15  months.  Is it fair to say more realistically nine to twelve?

16           MR. SROGE:  I think -- well, three to six for the --

17  to finish out the code, testing, and all that, you know, sales

18  cycle, be at nine to twelve for revenue, first customer.

19           MR. AGELAKOPOULOS:  Okay.  Do creditors stand to, you

20  know, be paid any money out of the projected revenue stream of

21  the reorganized debtor?

22           MR. SROGE:  I don't know if that's -- I'm not sure

23  how to answer that one, if that were a bankruptcy process or a

24  business process.  In other words, I don't know because I've

25  not taken a company -- this is not my subject matter expertise,

 1  of taking a company through this.

 2          MR. AGELAKOPOULOS:  Well, let me ask it this way.

 3  Let's go to Document -- let's go with the first plan and then

 4  I'll ask you about the amended one.  On the first plan at ECF

 5  Number 5, here I'm looking at -- let me know -- well, let me

 6  know when you have it in front of you, and then I'll --

 7          MR. SROGE:  Which -- which document number?

 8          MR. AGELAKOPOULOS:  Document Number 5.  Document

 9  Number 5 --

10          MR. LARSEN:  Just to try to streamline things here,

11  there's really no material difference between the two versions

12  of the plan.  The amended plan just filled in some blanks that

13  we didn't have the information on when we filed the original

14  plan, such as Mr. Shapiro being appointed as the Subchapter V

15  trustee and things like that.  There's no -- nothing that's

16  substantively different.

17          MR. AGELAKOPOULOS:  Okay.  So then -- really quickly

18  then, I'm just going to go to the signature pages then.  Okay.

19  So, with that, let me go directly to Document Number 5, Page 41

20  of 43, at the very bottom of that document.  Let me know when

21  you're there, Mr. Sroge.

22          MR. LARSEN:  Josh, I don't think 5 was included in

23  what I sent you.  I'll (indiscernible) right now.

24          MR. AGELAKOPOULOS:  Well, while we do that then,

25  let's go over to Document 47, Page Number 41 of 43.  Again, all

 1   the way at the bottom, Mr. Sroge.  Let me know when you're

 2   there.

 3            MR. SROGE:  You mean my signature?

 4            MR. AGELAKOPOULOS:  Yes.

 5            MR. SROGE:  Yeah.

 6            MR. AGELAKOPOULOS:  Were you the one who signed this

 7   document before it was filed --

 8            MR. SROGE:  Yeah.

 9            MR. AGELAKOPOULOS:  -- in the bankruptcy court?

10            MR. SROGE:  Yeah, I was.

11            MR. AGELAKOPOULOS:  Did you review the plan before

12   you signed it?

13            MR. SROGE:  Yeah.  Yeah.  But do I have it memorized

14   for this line of questioning (indiscernible) expecting today,

15   no, I do not.  And so if it says that we're going to pay back

16   creditors (indiscernible) that's what we'll do.

17   (Indiscernible) and then -- is this where you're going with

18   this, so we can short-circuit and go right to that part.  And I

19   can say, oh, yes, says in the plan that's what we'll do.  Well,

20   then that's what we'll do.  But I don't know what's happening

21   as a result of this Chapter 11 filing and this reorganization.

22   Will all the debt be carried forward into the new company, in

23   which case, great.  And when I get some revenue, I'll pay them

24   back.  The company will because I don't know that I'll be the

25   CEO.  Someone else might be.  But that would be the process.

1   (Indiscernible) whatever this plan is.

2          I'm not trying to be snarky.  I'm just pointing out

3   that I can't have every fact that you have in front of you for

4   your line of questioning in front of me at the time

5   (indiscernible).  I'm not -- I wasn't --

6          MR. AGELAKOPOULOS:  No, that's fine.  No --

7   Mr. Sroge, I understand that.  I'm not -- I'm just trying to

8   get your understanding of how creditors get paid.

9          MR. SROGE:  (Indiscernible) --

10          MR. AGELAKOPOULOS:  Because I represent a creditor,

11  I'm just trying to figure out how (indiscernible) would be

12  paid.  So let me take you then --

13          MR. SROGE:  (Indiscernible) if you would.

14          MR. AGELAKOPOULOS:  Okay.  Okay.  Document 47,

15  Page 23 of 43, and here we're looking at -- I'm looking

16  specifically at (indiscernible) 2, the unsecured convertible

17  promissory note payable to N9 Advisors, LLC.  Please take a

18  moment to read the text from between Lines 11 through 22, and

19  then let me know when you're ready.

20          MR. SROGE:  Okay.  Go ahead.

21          MR. AGELAKOPOULOS:  Okay.  So now -- recall there are

22  some defined terms here, and those defined terms are set out in

23  the debtor's plan immediately above.  So, if you want to

24  consult those definitions, I'll take you to them.  Again, I'm

25  just trying to get your understanding, Mr. Sroge.  I'm not

```
 1   trying to play games --

 2            MR. SROGE:  Yeah.

 3            MR. AGELAKOPOULOS:  -- with you or anything

 4   (indiscernible) --

 5            MR. SROGE:  No, I know.  I know.

 6            MR. AGELAKOPOULOS:  (Indiscernible) your

 7   understanding --

 8            MR. SROGE:  Right.

 9            MR. AGELAKOPOULOS:  So, for example -- and this is

10   not -- and I'm not (audio interference) exhaustive list of

11   terms that you just read through.  For example, there's the

12   guaranteed distribution that's defined on Page 9 of 43, roughly

13   Lines 23 through 27 (indiscernible).  Another one would be the

14   litigation proceeds distribution.  That would be on Page 10 of

15   43, roughly Lines 8 through 11.

16            So take a look at those definitions, too, and then go

17   back and reread the treatment of my client's claim under the

18   plan, and then let me know when you're ready.  Because, again,

19   I'm not trying to play "gotcha."  I'm just trying to

20   understand --

21            MR. SROGE:  No, I get it.  I get it.

22            MR. AGELAKOPOULOS:  -- (indiscernible) proposed --

23            MR. SROGE:  Yeah.  Bart, can you be helpful in this?

24   Because, you know, this is all -- you know, I can't do this

25   quickly.
```

```
 1              MR. LARSEN:  It's not a memory test or --
 2              MR. SROGE:  No, I know.
 3              MR. LARSEN:  I mean, I can summarize it quickly.
 4   It's essentially -- you know, there's a guaranteed minimum
 5   payment to be paid at the end of the three-year period on a pro
 6   rata basis to general unsecured creditors, you know, to the
 7   extent that claims are allowed.  But the more optimistic view
 8   is that there will be a recovery through the litigation against
 9   the former officers and directors and the related entities that
10   would allow the debtor to pay back the unsecured claims.
11              Now, to Mr. Athanasios's correct -- to Athanasios's
12   original question in terms of the revenue of the company being
13   included in the plan, it's not currently contemplated that
14   there would be any real revenue from business operations during
15   the three-year period of the plan, considering that the debtor
16   doesn't currently have the cash that I think it would probably
17   need to get the software and the other products (indiscernible)
18   up and going.  It's most likely going to depend on recovery
19   from litigation, which is probably going to put any revenue the
20   company might get out past the three-year term of the plan.
21   But, again, the optimistic view is that the recovery through
22   the litigation will be sufficient to pay back the unsecured
23   creditors, including N9 Advisors.
24              MR. AGELAKOPOULOS:  Okay.  So, Mr. Sroge, did you
25   just listen to Mr. Larsen's statement (audio interference) --
```

```
 1            MR. SROGE:  Of course.

 2            MR. AGELAKOPOULOS:  And so I just want to make sure

 3   that I'm not misunderstanding.  The creditor body does not

 4   stand to receive anything out of any future revenue stream from

 5   the debtor entity, with the exception of perhaps maybe any

 6   litigation recovery in the -- I don't want to misidentify it or

 7   identify it incorrectly, but the Purcell litigation.  Other

 8   than that, or the guaranteed distribution of $45,000, with

 9   respect to the operation that you just described, Mr. Sroge,

10   it's not the case that the creditor body stands to receive any

11   of those profits or any payment out of that revenue stream

12   (indiscernible) operate in a revenue stream.  Is that correct?

13            MR. SROGE:  (Indiscernible) question.

14            MR. AGELAKOPOULOS:  So if we turn to the debtor's

15   (indiscernible) the reorganized debtor's future operations,

16   whatever operating income comes in, none of that's going to go

17   to the creditor body.  Is that right?

18            MR. SROGE:  It sounds like (indiscernible) yes.

19            MR. LARSEN:  Yeah, that's how the plan

20   (indiscernible) yes.

21            MR. AGELAKOPOULOS:  Well, let me ask this.  On the --

22   and I don't want to misstate this, but I noticed on the

23   original petition that was filed at Docket Number 1, the

24   100-page document, there was a tax return attached at Page -- I

25   mean, I think it's beginning at Page 55 of 100.  I'm sorry.
```

1   Page 45 of 100 on Document Number 1.

2           MR. SROGE:  Right.

3           MR. AGELAKOPOULOS:  So this is the 2021 --

4           MR. SROGE:  Yeah.

5           MR. AGELAKOPOULOS:  -- various tax returns, I believe

6   the federal return -- or at least one certain photocopy.

7   Anyway, there's -- there's a loss that's listed on Page -- I

8   think it's 56 of 100, (indiscernible) hasn't been changed.

9   Does the debtor entity have any net operating losses that

10  you're aware of?

11          MR. SROGE:  Does the debtor have any net operating

12  losses?  You mean (indiscernible).

13          MR. AGELAKOPOULOS:  Table that one for a moment,

14  Mr. Sroge.  Mr. Larsen --

15          MR. LARSEN:  Yeah.

16          MR. AGELAKOPOULOS:  -- does the debtor have any net

17  operating losses?

18          MR. LARSEN:  I'm not entirely sure.  That one, we're

19  going to have to look into.

20          MR. AGELAKOPOULOS:  Okay.  Because, again, I'm just

21  trying to determine what assets are available or could be

22  available.

23          MR. SROGE:  I'm sorry.  Are you asking if the

24  company's always operated (indiscernible) logbooks

25  (indiscernible)?

```
 1              MR. AGELAKOPOULOS:  No, Mr. Sroge, I'm not (audio

 2    interference) my question (audio interference).  I'm

 3    withdrawing it as to you.

 4              Mr. Larsen, I'm just trying to figure out if there

 5    are any net operating losses that could potentially be assets

 6    of the bankruptcy estate, because I didn't see anything in the

 7    schedules to that (indiscernible) I missed it.  But if you

 8    could direct me to that, I'd appreciate it, but I didn't see

 9    any.

10              MR. LARSEN:  Because there are no net operating

11    losses identified in the schedule.  We will look into it.  If

12    there is something there that may be of value (indiscernible),

13    in other words.

14              MR. AGELAKOPOULOS:  Do you know -- Mr. Sroge, do you

15    know when the 2022 tax return will be filed and be available?

16              MR. SROGE:  I'm waiting for a response from the tax

17    preparer.

18              MR. AGELAKOPOULOS:  Okay.  Is -- are there any

19    efforts underway to retain a tax professional in the bankruptcy

20    case?

21              MR. SROGE:  Not presently, no.

22              MR. AGELAKOPOULOS:  So, Mr. Sroge, do you know if

23    there are -- let's figure out a way to phrase this

24    (indiscernible).  Again, I'm not trying to trick you, I'm not

25    trying to play got-you.  I'm just trying to figure out -- I
```

```
 1   mean, is there any -- do you anticipate any effort to identify

 2   whether any such net operating loss assets exist before

 3   confirmation or your attempts to confirm this plan?  Do you

 4   know if there's going to be anything along those lines or --

 5              MR. SROGE:  I -- I can tell you (indiscernible) make

 6   sure that anything that is there (indiscernible) evaluated

 7   (indiscernible).

 8              MR. AGELAKOPOULOS:  I want to go back to the primary

 9   means as I understand it just reading through the documents,

10   Mr. Sroge.  I want to take you back to the plan, and I'm going

11   to point you to the operative provisions again.  I'm not trying

12   to play got-you.  I understand these are voluminous--

13              MR. SROGE:  Yeah.  Yeah.

14              MR. AGELAKOPOULOS:  -- documents.  I understand, but

15   I just -- I'm trying to understand how creditors can expect to

16   be paid.  So I want to call your attention to Document 47, Page

17   20 of 43.  And there's a chart there, there's a series of

18   numbers in a table or chart format.  And I want to call your

19   attention specifically to roughly the pleading paper, it's Line

20   4.  It's repayment of new secured loan, one and a half million

21   dollars.  Do you see that?

22              MR. SROGE:  I do.

23              MR. AGELAKOPOULOS:  Can you give me your

24   understanding of what that is?

25              MR. SROGE:  I'm going back on my memory, yeah.
```

1          MR. AGELAKOPOULOS:  Yeah.  And if it helps, there are

2    defined terms on Page 10 of 43, again Document 47, those being

3    the new secured loan, the new secured loan documents, and the

4    new secured note.  If you want to take a look at those, and

5    then maybe that'll help --

6          UNIDENTIFIED:  I mean, it's already here.

7          MR. SROGE:  Yeah.  To jar the memory on whether this

8    was like a convertible note or some sort of, you know,

9    financing for the company and -- you know, in terms of the

10   company not being able to secure additional --

11         MR. AGELAKOPOULOS:  Yeah.

12         MR. SROGE:  -- (Indiscernible).

13         MR. AGELAKOPOULOS:  -- take a look at the chart and

14   then let me know when you're ready.

15         MR. LARSEN:  And -- but your question is, you know,

16   why is that amount is what it is, I didn't explain that.

17         MR. AGELAKOPOULOS:  Fine.  As long as Mr. Sroge is

18   willing to testify to it, that's fine.

19         UNIDENTIFIED:  Yeah.

20         MR. AGELAKOPOULOS:  I'm just trying to figure out

21   where these numbers are coming from.

22         MR. LARSEN:  Yeah.  That -- that particular number, I

23   mean that achieves the amount that the creditor would be

24   required to advance under the plan, but if (indiscernible) to

25   allow such a lender (indiscernible) to increase the

```
 1  (indiscernible) of the credit of $1.5 million (indiscernible)

 2  sometime (indiscernible) testified to what the total costs

 3  might be (indiscernible) arbitration (indiscernible).  So

 4  that's why that figure is what it is.

 5          MR. AGELAKOPOULOS:  Is that your understanding,

 6  Mr. Sroge?

 7          MR. SROGE:  Yes.  Thank you, Bart, for that.

 8          MR. AGELAKOPOULOS:  And you adopt that statement as

 9  your testimony, Mr. Sroge?

10          MR. SROGE:  Yes.

11          MR. AGELAKOPOULOS:  Now, Mr. Sroge, where would the

12  money -- where would the additional funding come from?  I mean,

13  if the -- if there's only (indiscernible) a specific commitment

14  by NVF to fund (audio interference) what is the cap (audio

15  interference) as you understand it?  Is it 500,000, it is

16  600,000, and then they -- and then you guys have to go off and

17  find another million dollars?  I mean, am I reading that

18  correctly?

19          MR. SROGE:  Meaning are -- are you asking whether NVF

20  is going to be the sole source of capital for that 1.5 or

21  whether they're -- the 225 was it and I would have to then go

22  off and find 1.275 on my -- my own?

23          MR. AGELAKOPOULOS:  Yeah.  Well, I'm just trying to

24  be figure out -- I'm just trying to figure out, Mr. Sroge, what

25  the funding mechanism looks like.  I mean, if ultimately you
```

1   could need up to one and a half million dollars in litigation

2   costs, let's break this into parts.  What is the current amount

3   of financing -- and maybe, Mr. Larsen, if you could speak to

4   this just so I have a better understanding of what this looks

5   like in terms of the ability to pay back creditors -- what is

6   the current funding cap for the NVF the new secured loan, what

7   is -- what is it currently at?

8           MR. SROGE:  I believe it's $250,000 it must be

9   committed to funding (indiscernible).

10          MR. AGELAKOPOULOS:  Now, is that new money or is that

11  --

12          MR. SROGE:  No.

13          MR. AGELAKOPOULOS:  Okay.  So is there going to be, I

14  guess, a roll off of the 225?

15          MR. SROGE:  Yes.  The 225 will be funded with the 350

16  being in advance, so I guess (indiscernible) 575 going forward

17  at that point.

18          MR. AGELAKOPOULOS:  And is it written in the plan

19  that they would allow that amount to be increased

20  (indiscernible) going forward?

21          MR. SROGE:  (Indiscernible).

22          MR. AGELAKOPOULOS:  But a cap right now is at 250 in

23  your fund in the plan?

24          MR. SROGE:  (No audible response).

25          MR. AGELAKOPOULOS:  And -- so that would mean that

```
 1   potentially you'd have to go out by the debtors on this, and

 2   there's some litigation costs, there could -- there could be

 3   the need for another $925,000 (indiscernible) in additional

 4   funding that would have to be obtained?

 5           MR. SROGE:  Possibly.  It really depends on whether

 6   or not there are claims that have to go to arbitration

 7   (indiscernible) the arbitration to use would take up a big

 8   chunk of (indiscernible) expense.  If the matter continues to

 9   be litigated (indiscernible) the bankruptcy court

10   (indiscernible) can be, then expenses will be much, much less.

11   If -- and their arbitrators have to be paid (indiscernible)

12   year period while the arbitration's ongoing, then it's going to

13   be much more.  So that -- that's really what it's going to come

14   down to.  And once it's determined whether or not there has to

15   be arbitration, and they'll have to a decision made that -- and

16   whether (indiscernible) is whether they can fund it, whether or

17   not that part of the case will be pursued.

18           But, again --

19           MR. LARSEN:  (Indiscernible).

20           MR. SROGE:  I'm sorry?

21           MR. LARSEN:  I said I think it's unlikely that we'll

22   have a petition in the court on the arbitration issues before

23   the (indiscernible).

24           MR. AGELAKOPOULOS:  Mr. Sroge, did you just hear

25   Mr. Larsen's statement?
```

```
 1                 MR. SROGE:  Yes, I did.

 2                 MR. AGELAKOPOULOS:  Is that your understanding of the

 3     debtor's position?

 4                 MR. SROGE:  It is my understanding.

 5                 MR. AGELAKOPOULOS:  Do you adopt that statement as

 6     your own testimony?

 7                 MR. SROGE:  Yeah.

 8                 MR. AGELAKOPOULOS:  So then the real question is, in

 9     terms of the potential for -- the potential (indiscernible) of

10     thousand dollars, it really turn -- of the debtor's

11     perspective, it really turns on how much of this -- how much of

12     these claims -- how much -- how many -- how much of the dollar

13     (indiscernible) these claims has to be committed to arbitration

14     versus how much can be resolved in a judicial forum.  Is that

15     correct?

16                 MR. SROGE:  Yeah.  That's correct.

17                 MR. AGELAKOPOULOS:  Has any of the operation  or

18     other entity agreed to stand ready to provide that financing,

19     or is that something that the debtor would have to go out and

20     obtain or obtain a new loan or negotiate (indiscernible)?

21                 MR. SROGE:  It's most likely to come from --

22                 MR. LARSEN:  There's no commitment beyond the

23     $250,000 --

24                 MR. AGELAKOPOULOS:  Is that correct, Mr. Sroge?

25                 MR. SROGE:  Yes.  Thank you, Bart.  Yes.
```

1          MR. AGELAKOPOULOS:  And you adopt that as your own

2    testimony?

3          MR. SROGE:  I do.

4          MR. AGELAKOPOULOS:  And there are no other -- is my

5    understanding correct that there are no other lenders lined up

6    who will agree to provide that funding?  Is that correct,

7    Mr. Sroge?

8          MR. SROGE:  Not at this time.

9          MR. AGELAKOPOULOS:  So it's correct then that there

10   are no other lenders?

11         MR. SROGE:  That's correct.

12         MR. AGELAKOPOULOS:  With respect to the wholly-owned

13   entities of the debtor that the debtor has a 100 percent

14   interest in and the values are listed as unknown, do those

15   entities, Mr. Sroge -- I can take you to the operative page,

16   Document Number 1 -- but do those entities have any value from

17   the debtor's perspective?

18         MR. SROGE:  I don't believe so.

19         MR. AGELAKOPOULOS:  You know, are there

20   (indiscernible) is there a domain cash (indiscernible) that's

21   part of (indiscernible) various domain names (indiscernible)

22   $500, thereby there is some value?

23         MR. SROGE:  Yes.

24         UNIDENTIFIED:  (Indiscernible).

25         MR. AGELAKOPOULOS:  Has there been any effort to

```
 1   appraise the debtor's interest in either of those -- of those

 2   assets?

 3            MR. SROGE:  No, there hasn't been.

 4            MR. VALENCIA:  This is Justin Valencia from the U.S.

 5   trustee's office.  Let me ask you something real quick,

 6   Mr. Agelakopoulos.  Do you -- do you want to do a continuance

 7   on this?

 8            MR. AGELAKOPOULOS:  I'm not trying to be difficult,

 9   and I understand that we have a tight timeline between here and

10   confirmation, but --

11            MR. VALENCIA:  So I --

12            MR. AGELAKOPOULOS:  -- because we have a tight

13   timeline between here and confirmation, I think another meeting

14   will be helpful.  But again, I understand that your office's

15   concerns with the many doings with which it is tasked and the

16   competing demands on its resources.  If you're asking for the

17   creditor's position, I would say yes, but I fully understand --

18   well, we understand the restraints as well.  So our request

19   would be yes, but we understand that that's (indiscernible) to

20   your office's discretion.

21            MR. VALENCIA:  You know what?  I actually agree with

22   you.  I am going to continue this out based on the line of

23   questioning and the amount of information that is still

24   outstanding that has come to light today.

25            So here are a couple options considering the
```

1  timelines here.  I have Monday, July 31, 2023, at 10 o'clock

2  available, or Thursday, August 3rd, at noon available.

3          MR. LARSEN:  I'm scheduled to be in deposition both

4  of those days.  Do you have anything the following week?

5          MR. VALENCIA:  I'm sorry.  Is this Mr. Larsen?

6          MR. LARSEN:  Yeah.  Yes.

7          MR. VALENCIA:  Okay.  The 7th at 11, August -- excuse

8  me -- August 7th at 11 a.m.

9          MR. LARSEN:  (Indiscernible) that would work for me.

10          Josh, does that work with your schedule?

11          MR. SROGE:  At 11 Pacific?

12          MR. VALENCIA:  Yes.

13          MR. SROGE:  Yeah.  That works.  And I mean, I'm happy

14  to (indiscernible) on the phone or exchange documents with you

15  or do whatever we can to try to streamline the process.  I

16  mean, we're not --

17          MR. AGELAKOPOULOS:  Of course.

18          MR. SROGE:  -- we're not trying to hide anything,

19  we're happy to share whatever information we can with you.  I

20  mean, if you just want to give me a call if you need any help

21  with whatever questions you have, we'll try to get you that

22  information you need as soon as possible so that, you know, we

23  don't have to spend a lot of time on --

24          MR. VALENCIA:  Okay.  So let me --

25          MR. AGELAKOPOULOS:  I appreciate that.  I mean, I

1    agree.  And just to be clear, (indiscernible) I am available on

2    Monday, August 7th, at 11 a.m.

3              MR. VALENCIA:  Okay.  Good.  So that's --

4              MR. SHAPIRO:  If I can just interject for a second.

5    This is Brian Shapiro.  I am actually not available, but I have

6    no objection to moving forward (indiscernible).  Just like a

7    (indiscernible).

8              MR. VALENCIA:  Got it.  Thank you.  I was just going

9    to ask about that.

10             So before I continue this, and I'll give you an email

11   as well, Mr. Larsen, so we need follow-up documents with

12   regards to that pre-petition bank account to show that it was

13   closed, and then we need the DIP account at Lexicon, we need

14   the evidence about that.

15             MR. LARSEN:  (Indiscernible).  The bank account you

16   reference, you're talking about the crypto currency app or

17   whatever that was --

18             MR. VALENCIA:  No.  No.  This is -- these are still

19   two documents that are still outstanding as of the IDI.

20             MR. LARSEN:  We provided the closing documentation

21   for the -- of the defunct bank account.  That was in the

22   (indiscernible) each got a copy of it.

23             MR. VALENCIA:  All right.  So then also the new DIP

24   account at Lexicon.  Hopefully that gets up and running soon.

25             I recognize that debtor's representative is going to

 1  look into whether or not the debtor actually took out any PPP

 2  or IDI loans.  Would like to have confirmation of that in the

 3  next week.

 4          Then also it appears that you're going to have to

 5  amend the list of equity holders, and then statement of

 6  financial affairs Questions 18, 25 and 28.

 7          And then based on the recent line of questioning,

 8  there might be some amendment related to Questions 3 and 4.

 9          Then we are also talking about that transaction

10  history for that one virtual asset that was described and

11  offloaded on or around December of 2022, so we need some sort

12  of printout or documents to show that -- when that was

13  offloaded.

14          And then finally, and if you haven't provided it, and

15  I don't recall seeing it, the loan docs and security interest

16  docs related to that NVF LLC loan.

17          UNIDENTIFIED:  Okay.  (Indiscernible) provided

18  (indiscernible).

19          MR. VALENCIA:  Okay.  And if anybody here on the line

20  would like a copy of that, feel free to reach out to debtor's

21  counsel.

22          Other than that, I'll go ahead and continue today's

23  meeting of the creditors.  Everybody agrees it'll be continued

24  for -- from today to Monday, August 7, 2023, at 11 a.m.  I'm

25  going to use the same number and the passcode number that

1   everybody used to get in today's meeting of the creditors. I'm

2   sure everybody still has that information.  And if not, I'm

3   going to put it explicitly on the docket (indiscernible) here

4   in just a few minutes.

5           So thank you again, everyone, for your time.  I know

6   it was a long day.  Enjoy the rest of your afternoon.

7           We're off the record.

8       (Proceedings concluded)

9                               * * * * *

10

11

12

13

14

15                   **C E R T I F I C A T I O N**

16

17           I, Alicia Jarrett, court-approved transcriber, hereby

18   certify that the foregoing is a correct transcript from the

19   electronic sound recording provided to the best of my ability.

20

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428      DATE: July 26, 2023

25   ACCESS TRANSCRIPTS, LLC

# EXHIBIT 4

**THIS BALLOT IS TO BE USED BY HOLDERS OF**
**CLASS 2 - UNSECURED CLAIM OF N9 ADVISORS, LLC**

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT SO IT IS**
**ACTUALLY RECEIVED BY DEBTOR'S COUNSEL ON OR BEFORE**
**AUGUST 8, 2023 AT 5:00 P.M. (PACIFIC TIME)**

**VOTE ON CLASS 2 - UNSECURED CLAIM OF N9 ADVISORS, LLC**

ITEM 1.    **CLAIM AMOUNT FOR VOTING PURPOSES.** The undersigned certifies that, as of three (3) business days after the entry of the Procedures Order (the "Voting Record Date"), it held a Class 2 (Unsecured Claim of N9 Advisors, LLC) Claim against Debtor Banq Inc. in the below amount:

**General Unsecured Claim Amount:** _____$3,603,753.43_____

ITEM 2.    **VOTE ON THE PLAN.** The holder of the Class 2 (Unsecured Claim of N9 Advisors, LLC) Claim that relates to this Ballot votes:

**ACCEPT PLAN**                    **REJECT PLAN**

☐                                  ☒

ITEM 3.    **CERTIFICATION.** By signing this Ballot, the holder of the above Class 2 (Unsecured Claim of N9 Advisors, LLC) Claim certifies that:

1. It has been provided with a copy of the Plan and acknowledges that the vote set forth on this Ballot is subject to all the terms and conditions set forth in the Plan; and

2. It has cast no other Ballot with respect to the claim identified above or, if any other Ballot has been cast with respect to such claim, then any such Ballot dated earlier is hereby revoked.

Signature:_____
Name (Print):___N9 ADVISORS, LLC_____
Title:_____David L. Koche, Manager_____
If by Authorized Agent, Title of Agent:_____
Telephone No.: (813) 253-2020_____
Email Address: dkoche@barnettbolt.com_____
Address: 601 Bayshore Boulevard, Suite 700; Tampa, Florida 33606
Date Completed:_____August 4, 2023