Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Athanasios E. Agelakopoulos, Esq.
Nevada Bar. No. 14339
aagelakopoulos@nvfirm.com
Jason Thomas, Esq.
Nevada Bar No. 16148
jthomas@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, Nevada  89101
Telephone: (702) 385-5544
Facsimile: (702) 442-9887

*Attorneys for N9 Advisors, LLC*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 23-12378 |
| BANQ, INC, | Subchapter V, Chapter 11 |
| Debtor. | |

**DECLARATION OF PETAMBER PAHUJA IN SUPPORT OF OBJECTION TO DEBTOR'S FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION (SUBCHAPTER V)**

Petamber Pahuja, being duly sworn, deposes and says:

1.      I am over the age of 18, mentally competent and unless otherwise stated, I have personal knowledge of the facts set forth herein.

2.      I am a representative of N9 Advisors, LLC and I submit this declaration in support of the *Objection to Debtor's First Amended Chapter 11 Plan of Reorganization (Subchapter V)*(the "**Objection**") which is being filed contemporaneously with this Declaration.

3.      Attached as **Exhibit 1** hereto is a true and correct copy of the verified complaint filed by N9 in the circuit court for Broward County, Florida, Case No. 22-013341 (the "**Verified Complaint**"). The Verified Complaint is wholly incorporated into this declaration by reference.

1

4.    I have read the Verified Complaint in its entirety and can attest that the facts alleged therein are true and accurate to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED: August 8, 2023.

*Petamber Pahuja*

Petamber Pahuja

# EXHIBIT 1

Case Number: CACE-22-013341 Division: 02
Filing # 156956255 E-Filed 09/07/2022 10:09:44 PM

IN THE CIRCUIT COURT OF THE SEVENTEENTH
JUDICIAL CIRCUIT IN AND FOR BROWARD
COUNTY, FLORIDA

Case No. 22-_____ CA _____

N9 ADVISORS, LLC, on
its own behalf and on
behalf of Banq, Inc.,

        Plaintiffs,

v.

BANQ, INC., JON JILES,
and PRIME TRUST LLC.

        Defendants.

_____/

## COMPLAINT

Plaintiff N9 Advisors, LLC ("N9 Advisors") sues Defendants Banq, Inc. ("Banq") and Prime Trust LLC ("Prime Trust") and sues, on behalf of Banq, Inc., Defendant Jon Jiles ("Jiles") and Prime Trust.

### INTRODUCTION

1.    Defendant Jon Jiles, while wearing two conflicting hats, upturned Banq's business, leaving that company a shell of its former self. Because Jiles breached his fiduciary duties to Banq, N9 Advisors—an investor in Banq—brings this derivative lawsuit against Jiles for breaching his fiduciary duties and against Prime Trust for aiding and abetting Jiles's breaches. It also brings suit on its own behalf for collection on a promissory note signed by Banq and against Prime Trust for its tortious interference with N9 Advisors' investment relationship with Banq.

### JURISDICTION AND VENUE

2.     The Court has jurisdiction because this is an action at law in which the matter in controversy exceeds the sum of $30,000, exclusive of interest, costs, and attorney's fees.

3.     Venue is proper in Broward County under Florida Statutes § 47.011 because it is the county where Banq resides and is where the claims accrued and under § 47.061 because it is the county where the maker resides.

4.     The Court has personal jurisdiction over Banq under § 48.193(1)(b) because it is a Florida corporation that engages in substantial activity in Florida and under § 48.193(1)(a)7 for breaching a contract in Florida.

5.     The Court has personal jurisdiction over Prime Trust and Jiles under § 48.193(1)(a)2 because they committed tortious acts within Florida.

### THE CONVERTIBLE PROMISSORY NOTE

6.     Banq is a Florida corporation that in May of 2021 was a neobank—that is, it provided banking services to consumers through a mobile app and website.

7.     On July 16, 2021, N9 Advisors became an investor in Banq when Banq and N9 Advisors executed the Convertible Promissory Note ("Note"), which is attached as Exhibit 1.

8.     Under the Note, Banq promised to pay N9 Advisors $3,000,000 with an interest of 10% per annum, compounding annually.

9.     The Note matured in 2026, and it gave N9 Advisors the option of either receiving payment in dollars or converting the outstanding amount to shares of stock in Banq.

10.     Though the Note matured in 2026, it allowed N9 Advisors to accelerate payment if Banq defaulted under certain events, including "any material change in the nature of [Banq's] business."

11. Because N9 Advisors was not merely a note holder but also had the ability to convert its interest to ownership in Banq, Banq issued N9 Advisors the Side Letter, which is attached as Exhibit 2.

12. The Side Letter gave N9 Advisors many rights consummate with an ownership interest in Banq, like broad observer rights and the right to receive information, including confidential information from Banq.

## JILES'S BREACHES OF FIDUCIARY DUTIES

13. At all relevant times, Jiles was (and is) the chairperson of Banq's board of directors and thus owed Banq fiduciary duties.

14. At all relevant times, Jiles was also (and is also) the managing member of Prime Trust, a Nevada limited liability company that provides "fintech" and "digital asset" innovators with financial infrastructure.

15. To operate as a neobank, Banq relied on Prime Trust's infrastructure.

16. Jiles's position as chairperson of Banq and manager and owner of Prime Trust constitutes a conflict of interest under Florida Statutes § 607.0832 and raises serious questions about Jiles's fiduciary duties, especially his duty of loyalty, given that he headed two different entities, one of which relied heavily on the services of the other entity.

17. Jiles quickly showed that his loyalty belonged to Prime Trust, not Banq.

18. Despite being Banq's chairperson and thus owing Banq fiduciary duties, on information and belief, Jiles in July of 2021 threatened to use his family's controlling interest in Banq to terminate Banq's board of directors, assume control of Banq, and leave Banq with just a few months' worth of working capital.

19.     These threats, in themselves, are radical and breaches of Jiles's fiduciary duties to Banq, but they are more alarming because Jiles freely admitted that he wanted to undertake these actions so that Prime Trust would have leverage over Banq.

20.     Not done there, Jiles next sought to require an inexplicable non-compete agreement from Banq's then-CEO Scott Purcell.

21.     On information and belief, Jiles became adamant that Purcell must sign a non-compete agreement, but the non-compete agreement would not have barred Purcell from competing with Banq but, rather, would have barred Purcell from competing with Prime Trust.

22.     Jiles's insistence that Purcell sign the non-compete agreement highlights Jiles's foremost loyalty to Prime Trust and to his own personal interests at the expense of Banq.

23.     Jiles's insistence also propelled an irreconcilable conflict between Jiles and Banq's management team, including Purcell, Banq's general counsel, and Banq's CTO.

24.     From July to December of 2021, Jiles, despite his fiduciary duties to Banq, did not resolve an ever-increasing rift with Banq's management team as Jiles's conflict of interest and breach of duty of loyalty became more and more apparent and he began to increase his influence over Banq's other directors, and the relationship between Jiles and management became increasingly dysfunctional as Banq's business hopes became ever-more fraught.

### PRIME TRUST AND BANQ

25.     Eventually, and in contravention of his fiduciary obligations to Banq, Jiles began to plot Banq's downfall through his control of Prime Trust.

26.     Banq's reliance on Prime Trust's financial infrastructure cannot be understated: Without it or an alternative provider, Banq could not operate as a neobank.

27.    On information and belief, in late August or early September, Prime Trust required that Banq meet new "compliance requirements," and Prime Trust sent an on-boarding manual to Banq, even though Banq already used Prime Trust's services.

28.    The new requirements would take a large effort for an early stage company with limited resources, like Banq, to integrate to its code and Application Programming Interface ("API").

29.    To alter its code, Banq would have to blueprint the necessary changes, write new code, amend the old code, undertake quality control, and integrate all the moving pieces.

30.    On information and belief, on or about mid-October 2021, Banq's chief technology officer spoke with Prime Trust's chief compliance officer and chief information and security officer to request that they prioritize the various new demands made on Banq so that Banq could comply in a reasonable, workable manner and timeframe.

31.    Given the breadth of the newly imposed requirements by Prime Trust, the effort would likely have taken a month or two to fully comply, so Banq asked Prime Trust which changes it should prioritize.

32.    At this meeting, Prime Trust's chief compliance officer and chief information and security officer informed Banq that Prime Trust's Board of Managers—on which Jiles served as Chairman—demanded that Banq make all the necessary changes in a few days and informed Banq that the failure to make all the changes would be deemed noncompliance and lead to immediate termination of Prime Trust and Banq's relationship.

33.    The totality of Prime Trust's request was impossible to accomplish within that time period; Banq could not even blueprint or architect all the requested changes in ten business

5

days, and, at this meeting, Banq told Prime Trust that the deadline was impossible for Banq to meet.

34.    On information and belief, just three days later, Banq received a letter from Prime Trust's general counsel in which Prime Trust terminated its relationship with Banq.

35.    Prime Trust and its Board of Managers, led by Jiles, imposed this unattainable goal not for any rational or business reasons but specifically because Jiles wanted to upend Banq's business and knew Banq could not meet the technical goal within the allotted time.

36.    On information and belief, to increase pressure on Banq, Jiles also had Prime Trust send Banq a demand letter, asserting that Banq owed Prime Trust $300,000. Though Banq did owe Prime Trust some money, the money owed was nowhere near $300,000.

37.    The demand letter was simply another attempt by Jiles and Prime Trust to derail Banq's business.

38.    Having recognized the growing conflict of interest of Jiles and other Banq board members with interests and positions with Prime Trust, Banq's management team lined up an alternative banking partner to provide financial infrastructure in lieu of Prime Trust.

39.    When Banq's management reported to Banq's board of directors, Jiles was upset and surprised—not pleased—that Banq would continue its business with an alternative banking partner.

40.    On information and belief, a few days after management informed the Banq board that Banq would survive thanks to its new relationship with a new, alternative banking and financial infrastructure partner in lieu of Prime Trust, someone contacted that new partner and informed it that Prime Trust had allegedly terminated its relationship with Banq because of compliance issues.

41. On information and belief, this contact was from someone on behalf of Prime Trust and was caused by the management team's revelation of Banq's alternative to Prime Trust during Banq's board meeting, which demonstrated the sharing of Banq information to Prime Trust for the benefit of Prime Trust and to the detriment of Banq.

42. On information and belief, this contact directly led to the banking partner's terminating its relationship with Banq, leaving Banq without its planned alternative to Prime Trust.

43. Jiles admitted to previously disclosing confidential Banq information handed to him at Banq board meetings to Prime Trust directors and agents, and this event further highlighted his breaches of fiduciary duties to Banq in order for him to benefit personally and through his interests in Prime Trust.

44. After these events, Jiles decided that he should create a "special committee," selected by him alone, which would make the ultimate decision on whether Banq should sue Prime Trust for its actions that had devastated Banq.

45. In short, despite the clear conflict, Jiles wanted to decide whether the company he chaired (Banq) should sue the company that he managed and largely owned (Prime Trust).

46. By October of 2021, Banq was left without time or capital to pursue another infrastructure provider, which effectively ended Banq's business as a neobank.

47. To help end Jiles's fights with management and his use of Prime Trust to destroy Banq, N9 Advisors sought to purchase Jiles's shares in Banq.

48. Clearly aware of his improper actions, Jiles refused to sell unless, in part, Banq released him from any and all claims of any nature whatsoever whether based on contract, tort, including breach of fiduciary duties, or statute.

## BANQ'S RADICAL BUSINESS CHANGE

49.     Given Jiles's threats, Prime Trust's actions, and Jiles's fights with management, Banq's entire management team resigned, and Jiles appointed an acting CEO.

50.     The new CEO was given six weeks to create a new plan and goals for Banq.

51.     In February of 2022, Banq hosted a board meeting, at which N9 Advisors expected a business plan with new goals for Banq's business.

52.     Instead, Jiles brought a lawyer to the meeting and pressured the board—with repeated assertions that the board had a fiduciary duty to do so—to investigate the former management team with an eye toward future litigation.

53.     Notably, no meaningful action was taken against Prime Trust despite its interference with Banq's business operations.

54.     At no point during the February 2022 board meeting did Jiles or anyone else present a plan for the continuation of Banq as a viable business.

55.     Instead, just as Jiles had intended, Banq became a company with no active operations or revenue.

56.     When N9 Advisors justifiably expressed concern about the lack of plan, Banq barred N9 Advisors from appearing at any future board meetings in breach of section 5 of the Side Letter.

57.     Eventually, at Jiles's behest, Banq sued the former management team in United States District Court for the District of Nevada, *Banq, Inc. v. Purcell*, No. 22-cv-773 (D. Nev. May 15, 2022).

58.     As of today, Banq is not a neobank and has no discernable business model. Instead, it appears that Banq's true, sole purpose at this time is to sue the former management

team, which is burning through Banq's remaining cash reserves rather than being directed toward generating revenue.

59.     As a result, Banq's business today has materially changed in nature from Banq's business when N9 Advisors and Banq executed the Note.

60.     All conditions precedent to this action have occurred, have been performed, or have been waived.

### COUNT I: BREACH OF NOTE
### (BY N9 ADVISORS AGAINST BANQ)

61.     Plaintiff incorporates and adopts allegations 1 through 60 herein.

62.     The Note is a valid contract executed by Plaintiff and Banq.

63.     By materially changing the nature of its business and breaching the Side Letter, Banq breached the Note.

64.     Those breaches are material.

65.     Those breaches damaged Plaintiff.

WHEREFORE, Plaintiff N9 Advisors requests that judgment be entered in its favor and against Defendant Banq, Inc. for (a) compensatory damages, (b) interest on money owed, (c) attorneys' fees, costs, and all expenses to litigate this lawsuit under § 7.7 of the Note, and (d) any and all further relief this Court deems just.

### COUNT II: TORTIOUS INTERFERENCE
### (BY N9 ADVISORS AGAINST PRIME TRUST)

66.     Plaintiff incorporates and adopts allegations 1 through 60 herein.

67.     Banq and N9 Advisors had a business or contractual relationship under which N9 Advisors has legal rights.

68.     Prime Trust knew of the existence of that relationship.

9

69.    Prime Trust, with intent and without justification, interfered with that relationship by scheming with and aiding Jiles in ruining Banq's business, demanding that Banq meet compliance goals in impossible timeframes, and interfering with Banq's relationship with its alternative partner.

70.    N9 Advisors was damaged by Prime Trust's interference.

WHEREFORE, Plaintiff N9 Advisors requests that judgment be entered in its favor and against Defendant Prime Trust LLC for (a) compensatory damages, (b) interest, and (c) any and all further relief this Court deems just.

### COUNT III: BREACH OF FIDUCIARY DUTY
### (BY BANQ AGAINST JILES)

71.    Plaintiff incorporates and adopts allegations 1 through 60 herein.

72.    N9 Advisors is a shareholder or beneficial shareholder of Banq.

73.    Under § 607.0742, Florida Statutes, demanding action by the corporation would be futile given Jiles's control over the board of directors.

74.    As director of Banq, Jiles owed Banq certain duties, including fiduciary duties of loyalty and care.

75.    Jiles breached his fiduciary duties to Banq by acting in his best interest and in the interest of Prime Trust rather than in the interest of Banq, by scheming to upend Banq's business, by refusing to create a new business plan for Banq, by treating Banq as a mechanism to fund litigation against Banq's former management, and by using Banq's remaining reserves for litigation.

76.    Jiles's breaches allow him to derive an improper personal benefit by allowing him to aid Prime Trust, a company that he has an ownership interest in, that he is a manager of, and that he effectively controls.

10

77.     Jiles's actions were not fair, reasonable, or in the best interests of Banq and were not done in good faith.

78.     Jiles's breaches proximately caused damage to Banq.

WHEREFORE, Plaintiff, N9 Advisors, on behalf of Banq, requests that judgment be entered in its favor and against Defendant Jon Jiles for (a) damages, (b) attorneys' fees, costs, and all expenses to litigate this lawsuit under § 607.0746, Florida Statutes, and (c) any and all further relief this Court deems just.

### COUNT IV: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY BANQ AGAINST PRIME TRUST)

79.     Plaintiff incorporates and adopts allegations 1 through 60 herein.

80.     Jiles, as Banq's chairperson, owed Banq fiduciary duties.

81.     Jiles breached those fiduciary duties.

82.     Prime Trust knew about Jiles's breach of fiduciary duties.

83.     Prime Trust provided Jiles with substantial assistance or encouragement in the breach of fiduciary duties.

WHEREFORE, Plaintiff, N9 Advisors, on behalf of Banq, requests that judgment be entered in its favor and against Defendant Prime Trust LLC for (a) damages, (b) attorneys' fees, costs, and all expenses to litigate this lawsuit under § 607.0746, Florida Statutes, and (c) any and all further relief this Court deems just.

11

## VERIFICATION

As required by § 607.0742, Florida Statutes, I declare, under penalty of perjury, that I have read the foregoing, and the facts alleged therein are true and correct to the best of my knowledge and belief.

*Petamber Pahuja*

Petamber Pahuja

Dated: September 7, 2022

Respectfully Submitted,

TOTH FUNES PA

s/Freddy Funes
Brian W. Toth
Florida Bar No. 57708
btoth@tothfunes.com
Freddy Funes
Florida Bar No. 87932
ffunes@tothfunes.com
25 Southeast Second Avenue Suite 805
Miami, Florida 33131
Telephone: (305) 617-7850

*Counsel for Plaintiffs*

12