

_____
Honorable Natalie M. Cox
United States Bankruptcy Judge

Entered on Docket
October 08, 2024

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 23-12378-NMC |
| BANQ INC., | Chapter 11 |
| Debtor. | Subchapter V |
| | Hearing Date: June 20-21, 2024 |
| | Hearing Time: 9:30 AM PDT |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### REGARDING CONFIRMATION OF DEBTOR'S FOURTH AMENDED
### CHAPTER 11 PLAN OF REORGANIZATION (ECF NO. 251)[1]

On June 20-21, 2024 (collectively, the "**Confirmation Hearing**"), the Court held an evidentiary hearing on the Debtor's Fourth Amended Chapter 11 Plan of Reorganization[2] (the "**Fourth Amended Plan**") filed by Banq Inc. (the "**Debtor**"). Appearances were noted on the record, as reflected in the official transcripts on the docket.[3]

The Court enters the following findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52, made applicable herein pursuant to FED. R. BANKR. P. 7052 and 9014(c).[4] Pursuant to FED. R. EVID. 201(b), the Court also takes judicial notice of the bankruptcy and adversary dockets

_____

[1] All references to "ECF No." are to the documents filed in the above-captioned bankruptcy case. All references to "AECF No." are to the documents filed in associated adversary proceedings.

[2] ECF No. 251.

[3] ECF Nos. 259, 262.

[4] To the extent a finding of fact is a conclusion of law, it shall be deemed as such. To the extent a conclusion of law is a finding of fact, it shall be deemed as such.

1

1  in the above-captioned case.  The Court has reviewed and considered the witness testimony,

2  exhibits, and arguments submitted at the two-day contested Confirmation Hearing, as reflected in

3  the official transcripts filed on the docket.

4                                              **INTRODUCTION**

5          The Debtor failed to sustain its burden under, in pertinent part, Sections[5] 1129(a)(3), (a)(5),

6  (a)(7), and (a)(11).  Consequently, for the reasons discussed in more detail below, the Court denies

7  confirmation of the Fourth Amended Plan.

8                                           **FINDINGS OF FACT**

9  **I.       Pre-Petition Litigation Involving the Jiles Parties and the Purcell Parties.**

10         1.       Debtor commenced its bankruptcy case by filing a voluntary petition for relief with

11 the Court under Chapter 11, Subchapter V of the Bankruptcy Code on June 13, 2023 (the "**Petition**

12 **Date**").[6]

13         2.       Debtor's voluntary petition was accompanied by Debtor's schedules of assets and

14 liabilities (**"Schedule(s)"**) and statement of financial affairs (**"SOFA"**).[7]

15         3.       On June 27, 2023, Debtor filed amended version of the Schedules and an amended

16 SOFA.[8]

17         4.       Debtor's response to Part 3, Question 7 of the Amended SOFA disclosed the

18 existence of two (2) pending lawsuits: (1) *N9 Advisors, LLC v. Banq, Inc. et al.*, 0:22-cv-61688-RS,

19 pending in the U.S. District Court for the Southern District of Florida (the **"Florida Litigation"**);[9]

20 and (2) *Banq, Inc. v. Purcell, et al.*, 2:22:cv-00773-APG-VCF, pending in the U.S. District Court

21

22        [5] All references to "Section" are to 11 U.S.C. § 101 et seq.

23        [6] ECF No. 1.  As subsequently discussed, Debtor was a non-operational entity as of the
   Petition Date and remained one as of the Confirmation Hearing.  No party, however, challenged
24 Debtor's eligibility to file a Subchapter V petition based on its non-operational status.

        [7] Id.
25
        [8] ECF Nos. 43-44.

26        [9] The Court's review of the docket at 0:22-cv-61688-RS reflects that the Florida Litigation
   was removed by Jiles on September 9, 2022, from the Circuit Court of the Seventeenth Judicial
27 Circuit in and for Broward County, Florida, and subsequently remanded by an order entered on
   November 2, 2022.
28

for the District of Nevada (the **"Nevada Litigation"**).[10]

5. The Florida Litigation was commenced by N9 Advisors, LLC (**"N9"**) against Debtor, Jon P. Jiles, and Prime Trust, LLC (Prime Trust, LLC, and Jon P. Jiles collectively referred to as the **"Jiles Parties"**)[11] and alleged four causes of action:

> **Count I (against Debtor):** Breach of a convertible promissory note
>
> **Count II (against Prime Trust):** Tortious Interference
>
> **Count III (against Jiles):** Breach of Fiduciary Duty
>
> **Count IV (against Prime Trust):** Aiding and Abetting Breach of Fiduciary Duty.[12]

6. According to N9, the Florida Litigation was "dismissed without prejudice based on a finding that N9 … lacked standing to sue on Banq's behalf because it did not own stock in Banq."[13] N9 appealed that dismissal, and Debtor subsequently filed this Subchapter V case.[14]

7. On May 16, 2022, Debtor commenced the Nevada Litigation against Scott Purcell, George Georgiades, Kevin Lehtiniitty, Fortress NFT Group, Inc., and Planet NFT, Inc. (collectively referred to herein as the **"Purcell Parties"**).[15]

8. On January 17, 2023, the Honorable Andrew P. Gordon entered an order granting defendants' motion to compel arbitration and dismissing the Nevada Litigation (the **"Arbitration Order"**).[16]

9. On February 16, 2023, Debtor filed its notice of appeal of the Arbitration Order.[17]

---

[10] ECF No. 44.

[11] See *Direct Testimony Declaration of Jon Jiles in Support of Confirmation of Debtor's Chapter 11 Plan of Reorganization*, ECF No. 254, ¶ 4 ("Prior to the filing of this Chapter 11 case, I was also a member of the board of directors of Prime Trust, LLC….").

[12] ECF No. 229, Exhibit 1.

[13] See ECF No. 129, ¶ 41 & Exhibit 4 attached thereto. See also ECF No. 254, ¶ 44 (Jon P. Jiles attesting, under penalty of perjury, that the Florida Litigation was dismissed on May 11, 2023).

[14] See ECF No. 129, ¶ 42 & Exhibit 5 attached thereto.

[15] ECF No. 229, Exhibit 3.

[16] Id. at Exhibit 5.

[17] Nevada Litigation, Dkt. 80. The Court takes judicial notice that on September 12, 2024, the Ninth Circuit entered a Memorandum Decision (No. 23-15229, Dkt. 59) reversing the

**II.    Debtor's Bankruptcy Filing.**

10.    Debtor's four board of directors—Joshua Sroge, Jon P. Jiles, Christina Favilla, and Dirk O'Hara—authorized the filing of this Subchapter V case pursuant to an Omnibus Written Consent in Lieu of Meeting of the Board of Directors of Banq Inc, dated May 31, 2023.[18]

11.    When the Debtor commenced this bankruptcy case, it was not engaged in business operations.[19]

12.    Indeed, Debtor's response to Part 1, Question 1[20] of its Amended SOFA, did not disclose any gross revenue in calendar year 2022 or for the calendar year beginning January 1, 2023, through the Petition Date.[21]

13.    In response to Question 74[22] of its amended Schedule A/B, Debtor did not list any claims against the Jiles Parties but instead listed the following "Claims against former officers and related entities" with a listed value of $17.5 million.[23]

14.    Other than these claims with an alleged value of $17.5 million, Debtor identified the following assets in its amended Schedule A/B: $131,585.47 in a checking account, $2,191.68 in Aon D&O Insurance, a $52,137.50 retainer paid to bankruptcy counsel, a $40,000 litigation expense retainer paid to Diamond McCarthy LLP, stock interests with a currently unknown value, domain names with a currently unknown value, and software with a currently unknown value.[24]

15.    Debtor's initial Schedule D lists a sole secured debt incurred on March 15, 2023, and

_____

Arbitration Order.

[18] ECF No. 1.

[19] See *Direct Testimony Declaration of Joshua Sroge in Support of Confirmation of Debtor's Chapter 11 Plan of Reorganization*, ECF No. 253, ¶ 8 ("Due [to the Purcell Parties' alleged] misappropriation of Banq's assets and business records, it was not possible for Banq to resume normal business operations after December 2021."); *Direct Testimony Declaration of Jon Jiles in Support of Confirmation of Debtor's Chapter 11 Plan of Reorganization*, ECF No. 254, ¶ 34 (same).

[20] Asking for "Gross revenue from business."

[21] ECF No. 44.

[22] Asking for "Causes of action against third partes (whether or not a lawsuit has been filed)."

[23] ECF No. 43.

[24] Id.

4

owed to NVF, LLC for $225,000 collateralized by "All Personal Property" (the "**NVF Claim**").[25]

16.     NVF, LLC was formed by Jon P. Jiles on March 14, 2023, for the sole purpose of providing the loan comprising the NVF Claim to fund this Subchapter V case.[26]

17.     Debtor did not list the NVF Claim in Part 2, Question 3[27] or Part 2, Question 4[28] of its Amended SOFA.[29]

18.     A review of the Court's official docket reveals that Debtor's bankruptcy case is notable for the absence of any significant first-day motion practice (sale motions, cash collateral/debtor in possession financing, motions under Section 365, etc.).

19.     Indeed, the primary case administration motion practice in which Debtor has been engaged has revolved around the retention and employment of various professionals.[30]

20.     Debtor's monthly operating reports also disclose the absence of any business operations (other than, perhaps, de minimis matters) or any restructuring or reorganizational purposes being served by Debtor's bankruptcy case.

21.     For instance, Debtor's monthly operating report (**"MOR"**) for the reporting period ending June 30, 2023, lists $0.00 in cash receipts, no employees, and net cash flow of ($6,336.22).[31]

22.     Debtor's MOR for the reporting period ending July 31, 2023, lists $0.00 in cash receipts, no employees, and net cash flow of ($573.99).[32]

---

[25] ECF No. 1.

[26] June 20, 2024 Hearing Transcript, ECF No. 259 at 44:7-12; *Direct Testimony Declaration of Jon Jiles in Support of Confirmation of Debtor's Chapter 11 Plan of Reorganization*, ECF No. 254, ¶ 41 ("In order to fund the expenses of Banq's Chapter 11 case, I formed NVD, LLC …and caused it to make a secured loan in the amount of approximately $225,000 to Banq in exchange for which Banq granted NVF a security interest in substantially all of Banq's assets.").

[27] Asking for "Certain payments or transfers to creditors within 90 days before filing this case."

[28] Asking for "Payments or other transfers of property made within 1 year before filing this case that benefited any insider."

[29] ECF No. 44.

[30]  *See* ECF Nos. 10-12, 32-34, and 101-102.

[31] ECF No. 74.

[32] ECF No. 116.

23.     Debtor's MOR for the reporting period ending August 31, 2023, lists $0.00 in cash receipts, no employees, and net cash flow of ($21,485.70).[33]

24.     Debtor's MOR for the reporting period ending September 30, 2023, lists $0.09 in cash receipts, no employees, and net cash flow of ($2,542.72).[34]

25.     Debtor's MOR for the reporting period ending October 31, 2023, lists $0.00 in cash receipts, no employees, and net cash flow of ($222.75).[35]

26.     Debtor's MOR for the reporting period ending November 30, 2023, lists $0.00 in cash receipts, no employees, and net cash flow of ($2,295.17).[36]

27.     Debtor's MOR for the reporting period ending December 31, 2023, lists $0.00 in cash receipts, no employees, and net cash flow of ($244.92).[37]

28.     Debtor's MOR for the reporting period ending January 31, 2024, lists $0.00 in cash receipts, no employees, and net cash flow of ($2,251.82).[38]

29.     Debtor's MOR for the reporting period ending February 29, 2024, lists $0.00 in cash receipts, no employees, and net cash flow of ($448.92).[39]

30.     Debtor's MOR for the reporting period ending March 31, 2024, lists $223.33 in cash receipts, no employees, and net cash flow of ($12,948.76).[40]

31.     Debtor's MOR for the reporting period ending April 30, 2024, lists $0 in cash receipts, no employees, and net cash flow of ($565.10).[41]

32.     Although the commencement of Debtor's bankruptcy case was not accompanied by

---

[33] ECF No. 147.

[34] ECF No. 168.

[35] ECF No. 173.

[36] ECF No. 177.

[37] ECF No. 194.

[38] ECF No. 202.

[39] ECF No. 212.

[40] ECF No. 224.

[41] ECF No. 227.

any business operations or typical first-day motions, Debtor filed its initial Subchapter V plan[42] on the Petition Date (the **"Initial Plan"**).

33.    The Initial Plan provided releases to its board of directors (including Jon P. Jiles) as of the effective date; proposed a new $350,000 secured loan from NVF, LLC to pay administrative claims, fund business expenses[43], and create a reserve to pay claims under the Initial Plan.[44]  All these terms remain in the Fourth Amended Plan.

34.    Funding for the Initial Plan was proposed to come from the following sources:

> The funds necessary to satisfy the Reorganized Debtor's obligations and to ensure the Reorganized Debtor's continuing performance under the Plan after the Effective Date will be obtained from: (i) cash on hand, if any; (ii) the New Secured Loan; (iii) the net proceeds, if any, recovered by the Reorganized Debtor on account of the **Purcell Litigation Claims** or other Causes of Action; (iv) with the consent of the Secured Lender [i.e. NVF, LLC], which shall not be unreasonable withheld, any reserves established by the Debtor; and (v) other equity contributions or financing, if any, that the Debtor may obtain on or after the Effective Date.[45]

This remains unchanged in the Fourth Amended Plan.[46]

35.    The Initial Plan defined the "Purcell Litigation Claims" as follows:

> All Causes of Action held by the Debtor against Scott Purcell, Kevin Lehtiniitty, George Georgiades, Fortress NFT Group, Inc., Planet NFT, Inc., N9 Advisors, LLC, Ayon Capital, LLC, or any other Person or Entity arising out of or relating to the facts alleged in the complained (*sic*) filed by Debtor in the United States District Court for the District of Nevada on or about May 16, 2022 as Case No. 2:22-cv-00773-APG-VCF, including all claims for relief set forth therein.[47]

The definition of the Purcell Litigation Claims, which remains unchanged in Debtor's Fourth

---

[42] ECF No. 5.

[43] Since Debtor is non-operational, the Court is unclear what business expenses would need to be paid.

[44] ECF No. 5.

[45] ECF No. 5 at p. 27 of 43. (emphasis added).

[46]  ECF No. 251 at p. 27 of 43.

[47] ECF No. 5 at p. 11 of 43.

1    Amended Plan,[48] are similar and overlap with the causes of action in the Nevada Action.

2        36.    Debtor's discussion of its "Plan Projections" in the Initial Plan further reveals

3    Debtor's lack of revenue-generating business operations and its sole focus on pursuing the Purcell

4    Litigation Claims:

5            At this time, the Debtor has no regular, reoccurring source of revenue.
             Moreover, the Debtor believes it is unlikely that it will have any
6            regular, reoccurring source of revenue during the three-year term of
             the plan as Debtor's current business operations relate almost
7            exclusively to the pursuit of the Purcell Litigation Claims through
             which the Debtor seeks to recovery monetary damages and other
8            relief based on the misappropriation of Debtor's trade secrets,
             technology and business records by the Purcell Defendants as
9            generally alleged by the Debtor in connection with the Nevada
             Action.[49]
10
11   This explanation remains in the Fourth Amended Plan.[50]

12       37.    On June 19, 2024, at 4:52 p.m.—the eve of the confirmation hearing—Debtor filed

13   its Fourth Amended Plan.  The major change from prior versions of the plan is Debtor's inclusion

14   of the following provision:

15            **2.    Investigation of the Florida Litigation Claims.**

16            Upon the Effective Date, the Reorganized Debtor shall appoint the
             Subchapter V Trustee to conduct an independent investigation of the
17           Florida Litigation Claims and to make a recommendation to the
             Reorganized Debtor as to whether the Reorganized Debtor should
18           disregard, settle, or take action to prosecute the Florida Litigation
             Claims, taking into account their viability, the likelihood of recovery,
19           the costs likely to be incurred in connection with the Prosecution of
             the Florida Litigation Claims, and effects such prosecution might
20           have on the Reorganized Debtor's ability to carry out the objectives
             of this Plan. The Reorganized Debtor shall pay the Subchapter V
21           Trustee's reasonable fees and expenses incurred in connection with
             such investigation in an amount not to exceed $10,000.00. The
22           Reorganized Debtor shall thereafter disregard, settle, or take action to
             prosecute the Florida Litigation Claims in accordance with the
23           recommendations of and subsequent consultations with the
             Subchapter V Trustee.[51]
24

25   _____

26   [48] See ECF No. 251 at p. 11 of 43.

27   [49] ECF No. 5, p. 18 of 43.

28   [50] ECF No. 251 at p. 18 of 43.

     [51] ECF No. 251, pp. 27-28 of 43.

38.     Debtor's Fourth Amended Plan contains the following four classes:

Class 1:  Secured Claim of NVF, LLC

Class 2:   Unsecured Convertible Promissory Note Payable to N9 Advisors, LLC

Class 3:  General Unsecured Claims

Class 4:  Equity Interests in the Debtor

39.     Debtor's ballot summary, filed on August 15, 2023, reflects that N9's Class 2 rejected the Fourth Amended Plan, while the remaining 3 classes accepted the Fourth Amended Plan.  Indeed, N9 was also the only creditor and/or party-in-interest who opposed confirmation at the Confirmation Hearing.

**III.     Debtor's Adversary Proceeding.**

40.     On November 30, 2023, Debtor filed an adversary complaint, denominated Adv. No. 23-01150, against the same parties to which the Nevada Action is directed.[52]

41.     Aside from Debtor's inclusion of nominal bankruptcy claims, the claims and causes of action asserted by Debtor in the adversary complaint largely track the factual allegations, claims, and causes of action asserted by Debtor in the Nevada Action.[53]

## CONCLUSIONS OF LAW

1.     Section 1191(a) states:

> The court shall confirm a plan under this subchapter only if all of the requirements of section 1129(a), other than paragraph 15 of that section, of this title are met.

2.     Debtor carries the burden, by a preponderance of the evidence, to show that the Fourth Amended Plan complies with applicable statutory requirements.[54]

3.     Even in the absence of an opposition, the Court has an independent obligation to

---

[52] AECF No. 1.

[53] Compare the Adversary Complaint with the Nevada Action Complaint filed with the U.S. District Court for the District of Nevada, Case #2-:22-cv-00773.

[54] In re Sagewood Manor Assocs. Ltd. P'ship, 223 B.R. 756, 761 (Bankr. D. Nev. 1998) (citations omitted).

9

1   determine that the Fourth Amended Plan complies with applicable statutory requirements.[55]   In

2   furtherance of its obligations, the court focuses on the following Section 1129 factors that warrant

3   denial of confirmation:

4   **I.       Section § 1129(a)(3)**

5       4.       Section 1129(a)(3) states that "[t]he court shall confirm a plan only if … (3) [t]he

6   Plan has been proposed in good faith and not by any means forbidden by law."

7       5.       As succinctly summarized by the Bankruptcy Appellate Panel of the Ninth Circuit,

8   > The "good faith" requirement of section 1129(a)(3) is determined on
9   > a case-by-case basis taking into account the totality of the
10  > circumstances of the case, with a view to whether the plan will fairly
    > achieve a result consistent with the objectives and purposes of the
11  > Bankruptcy Code.  *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re
    > Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074–75 (9th Cir.2002); *see also
12  > Sec. Farms v. Gen. Teamsters, Warehousemen & Helpers Union,
    > Local 890 (In re Gen. Teamsters, Warehousemen & Helpers Union,
    > Local 890)*, 265 F.3d 869, 877 (9th Cir.2001).  The bankruptcy judge
13  > is in the best position to assess the good faith of the parties' proposals.
    > *Pac. First Bank ex rel. RT Capital Corp. v. Boulders on the River (In
14  > re Boulders on the River)*, 164 B.R. 99, 104 (9th Cir.BAP1994); *see
    > also In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir.1984).
15  > Part of the good faith analysis is that the plan must deal with the
    > creditors in a fundamentally fair manner.  *In re Marshall*, 298 B.R.
16  > 670, 676 (Bankr.C.D.Cal.2003); *see, e.g., Jorgensen v. Fed. Land
    > Bank (In re Jorgensen)*, 66 B.R. 104, 108–09 (9th Cir.BAP1986).
17  > Essentially, the good faith analysis involves a sense that the debtor is
    > trying to maximize the return to the creditors within the confines of
18  > the rules.  *See Gen. Teamsters Warehousemen & Helpers Union,
    > Local 890*, 265 F.3d at 877.[56]
19

20      6.       Debtor has failed to satisfy its burden under Section 1129(a)(3) for the reasons stated

21  herein and in the Court's Findings of Fact and Conclusions of Law Regarding N9 Advisors, LLC's

22  Motion to Dismiss Debtor's Bankruptcy Case Under 11 U.S.C. § 1112(b), Fed. R. Bankr. P.

23

24  _____

25  [55] <u>Seaport Automotive Warehouse, Inc. v. Rohnert Park Auto Parts, Inc. (In re Rohnert Park
    Auto Parts, Inc.)</u>, 113 B.R. 610, 616-17 (B.A.P. 9th Cir. 1990); <u>In re Las Vegas Monorail Co.</u>, 462
26  B.R. 795, 798 (Bankr. D. Nev. 2011) <u>citing</u> 7 Collier on Bankruptcy ¶ 1129.05[1][e] (Henry Sommer
    & Alan Resnick, eds., 16th ed. 2011).

27  [56] <u>Rand v. Porsche Fin. Servs., Inc. (In re Rand)</u>, 2010 WL 6259960, at *8 (B.A.P. 9th Cir.
28  Dec. 7, 2010).

1017(f)(1) and 9014, and L.R. 9014 as a Bad Faith Filing, Impermissible Litigation Tactic, and Forum Shopping Designed to Orchestrate Pending Litigation [ECF No. 228], entered contemporaneously herewith and fully incorporated by reference.

7.      Pre-petition, Debtor was involved in both the Nevada Litigation (wherein Debtor asserted claims against the Purcell Parties) and the Florida Litigation (wherein N9 asserted claims against Debtor and the Jiles Parties).  Pre-petition, the Nevada Litigation did not go the way the Purcell Parties intended, having been dismissed and referred to arbitration pursuant to the Arbitration Order.[57]  Meanwhile, the Florida Litigation was dismissed without prejudice and subject to an appeal.

8.      On June 13, 2023, Debtor filed this Subchapter V case.  As Debtor conceded during opening arguments on June 20, 2024, this bankruptcy case was filed to protect the Nevada Litigation from any potential ill effects of the Florida Litigation:

> If not for the filing of the bankruptcy case, the Florida litigation against Banq on the breach of the promissory note could have derailed the Purcell litigation entirely and ensured no one else recovered anything.  The bankruptcy case was filed to prevent that.[58]

9.      In a sworn declaration filed on September 19, 2023, Christina Favilla—one of Debtor's four directors—attested, under penalty of perjury, as follows:

> 6.    I have reviewed and am familiar with the allegations asserted in the Complaint filed on September 7, 2022 by N9 Advisors, LLC … in Broward County, Florida against Banq, Jon Jiles, and Prime Trust.
>
> 7.    I personally participated in several meetings of Banq's board of directors in 2021 and in other communications between and among the officers and directors of Banq relating to the N9 loan transaction referenced in N9's Complaint as well as events relating to the resignation of Banq's prior management team in December 2021 and the subsequent winding down of Banq's ordinary business operations.
>
> 8.    Based on my personal experience as a member of Banq's

---

[57] As previously noted, the Ninth Circuit recently reversed the Arbitration Order.  See note 17, supra.  However, the factual circumstances as they existed on the petition date are relevant for purposes of analyzing the basis for Debtor's filing of this Subchapter V case.

[58] June 20, 2024, Hearing Transcript, ECF No. 259 at 20:20-24.

board of directors, I do not believe the allegations asserted against Jon Jiles regarding Banq in N9's Complaint to be accurate.  Further, I do not believe that Jon Jiles breached any fiduciary duty owed to Banq as alleged in N9's Complaint.  As such, I do not believe there to be any credible basis for Banq to pursue any such claim against Jon Jiles.[59]

10.    In a sworn declaration filed on September 19, 2023, Jon P. Jiles—one of Debtor's four directors, one of the defendants in the Florida Litigation, and the principal of NVF, LLC—attested, under penalty of perjury, as follows:

3.    I am a member of the board of directors of Banq and, together with members of my family, held/hold a controlling equity interest in Banq.

4.    I am also a member of the board of directors of Prime Trust, LLC … and, together with members of my family, once held a controlling interest in Prime Trust.

5.    Banq was organized in July 2019 as a wholly owned subsidiary of Prime Trust by Prime Trust's then-Chief Executive Office … Scott Purcell …, who was also a member of Prime Trust's board of directors and held a substantial equity interest in Prime Trust.

…

27.    A special meeting of Banq's board of directors was scheduled for December 20, 2021.  However, the day before the meeting, Purcell resigned as both Banq's CEO and director.

28.    The special meeting of Banq's board of directors was held on December 20, 2021… During the meeting, Purcell's actions in creating Fortress and PlanetNFT were discussed…  The special meeting also contemplated appointment of Joshua Sroge … as an interim CEO as well as the potential for Banq to continue business operations moving forward.

29.    Shortly after Sroge was appointed as Interim CEP, Banq discovered that Purcell, Georgiades, and Lehtiniitty, while still fiduciaries of Banq had secretly transferred the vast majority of Banq's employees, trade secrets, intellectual property, technology, business opportunities, employees and equipment (including Banq's electronic records and computer systems containing among other things, Banq's business and communication history, corporate documents, records, files, intellectual property and research and development efforts) to Fortress.

30.    I have reviewed and am familiar with the allegations

---

[59] ECF No. 143, ¶¶6-8.

12

asserted in the complaint filed on September 7, 2022 by N9 in Broward County, Florida against Banq, me, and Prime Trust.

31. I unequivocally deny that I breached any fiduciary duty owed to Banq at any time or otherwise acted against Banq's interests for the benefit of Prime Trust as alleged in N9's complaint.[60]

11.    Jiles testified consistently in a sworn declaration in support of confirmation filed on June 19, 2024, further adding, in pertinent part, the following:

37. Due to the harm inflicted on Banq by the wrongful acts of the Purcell Defendants, Banq lacked the financial resources to fully fund its pursuit of the Purcell Litigation Claims. As such, Banq attempted to obtain litigation financing from various sources, including Fortress Investment Group, LLC, LexShares, Inc. Finitive LLC, and Bench Walk Advisors, LLC among other potential lenders. Despite its efforts, Banq was unable to obtain litigation financing from any of these lenders.

38. On or about January 17, 2023, the District Court entered an order compelling Banq to arbitrate the issue of whether the Purcell Litigation Claims are subject to arbitration and dismissed the action filed by Banq without prejudice.

39. By January 2023, Banq's financial resources were largely exhausted. Banq was unable to obtain litigation financing from outside sources and was unable to pay the ongoing expenses associated with pursuing the Purcell Litigation Claims in addition to its ordinary operating expenses.

40. As such, Banq's board of directors determined that it was in Banq's best interests for Banq to file a Chapter 11 bankruptcy case to reorganize its business affairs and enable Banq to continue to pursue the Purcell Litigation Claims.

41. In order to fund the expenses of Banq's Chapter 11 case, I formed NVF, LLC … as a Nevada limited liability company and caused it to make a secured loan in the amount of approximately $225,000 to Banq in exchange for which Banq granted NVF a security interest in substantially all of Banq's assets.

42. Negotiation of the terms of that loan were handled by NVF's attorney, Dawn Cica, and Banq's attorney, Bart Larsen, but the final loan documents were approved by my on behalf of NVF and by Joshua Sroge on behalf of Banq.

43. Additionally, NVF has committed to loan [an] additional $350,000 to Banq following confirmation of the Plan to be used by Banq to fund payments required under the Plan and to pay costs

---

[60] ECF No. 142, ¶¶ 3-5, 27-31.

13

associated with Banq's continued pursuit of the Purcell Litigation Claims.

44.  I have reviewed and am familiar with the allegations asserted in the complaint filed on September 7, 2022 by N9 in Broward County, Florida against Banq, me, and Prime Trust, which was dismissed on or about May 11, 2023.

45.  I unequivocally deny that I breached any fiduciary duty owed to Banq at any time or otherwise acted against Banq's interests for the benefit of Prime Trust as alleged in N9's complaint.

46.  Further, and as noted in the proof of claim I filed in this action, Banq is required to indemnify me for claims brought against me pursuant to Article VII of Banq's Articles of Incorporation.

47.  In my service as a director and shareholder of Banq, I have sought to serve the best interests of Banq.  This includes acting as the "lender of last resort" in order to fund Banq's reorganization and its litigation against the Purcell Defendants, which represents the best path towards reacquiring the assets improperly diverted and recovering damages based on the harm caused by the Purcell Defendants.[61]

12.     In a sworn declaration filed in support of confirmation on June 19, 2024, Joshua Sroge—the Debtor's CEO and one of Debtor's four directors—attested, under penalty perjury, as follows:

2.  I am the Chief Executive Officer of Debtor Banq … and am a member of Debtor's board of directors.

…

6.  I became the CEO of Banq in December of 2021, after its CEO and other key managers resigned.  One of the first items I was tasked with was investigating the cause of Banq's then precarious position and identifying a path forward.

7.  I determined, and reported to the board, that Purcell, Georgiades, and Lehtiniitty, while still fiduciaries of Banq, had secretly transferred the vast majority of Banq's employees, trade secrets, intellectual property, technology, business opportunities, employees and equipment (including Banq's electronic records and computer systems containing among other things, Banq's business and communication history, business and marketing plans, corporate documents, records, files, intellectual property and research and development efforts) to Fortress.

8.  Due to this misappropriation of Banq's assets and business

---

[61] ECF No. 254, ¶¶ 37-47.

records, it was not possible for Banq to resume normal business operations after December 2021.

9. In an attempt to recover the assets and business records that were misappropriated by Purcell, Georgiades, and Lehtiniitty, Banq's board of directors determined that it was in Banq's best interest to initiate litigation against Purcell, Georgiades, and Lehtiniitty as well as their new entities, Fortress and PlantNFT (collectively, the "<u>Purcell Defendants</u>").

10. Accordingly, Banq filed a complaint against the Purcell Defendants in the United States District Court for the District of Nevada … on May 16, 2022 … in which it asserted various claims seeking to recover Banq's assets and business records and to recover damages against the Purcell Defendants (the "<u>Purcell Litigation Claims</u>").

11. Due to the harm inflicted on Banq by the wrongful acts of the Purcell Defendants, Banq lacked the financial resources to fully fund its pursuit of the Purcell Litigation Claims. As such, Banq attempted to obtain litigation financing from various sources, including Fortress Investment Group, LLC, LexShares, Inc. Finitive LLC, and Bench Walk Advisors, LLC among other potential lenders. Despite its efforts, Banq was unable to obtain litigation financing from any of those lenders.

12. Banq ultimately obtained secured financing from NVF, LLC, an entity formed by Jon Jiles for that purpose. The terms of that financing were negotiated between counsel for Banq and counsel for NVF, LLC, and ultimately approved and documents were signed by me on behalf of Banq. Such financing was absolutely necessary in order to preserve the assets of Banq, consisting largely of the Purcell Litigation Claims.

…

20. Debtor has prepared a projection of its disposable income for five (5) years following the anticipated Effective Date of the Plan … (the "<u>Projection</u>"). Because Debtor does not have any regular, ongoing business operations at this time, the Projection sets for the anticipated outcome of Debtor's pursuit of the Purcell Litigation Claims….

…

24. The Plan further proposes to pay the Secured Claim of NVF, LLC (Class 1) in accordance with the terms of the New Secured Loan Documents (as defined in the Plan) pursuant to which NVF, LLC has agreed to loan up to $350,000 (in addition to its prepetition secured loan of $225,000) to Debtor for the purposes of paying administrative and priority claims and paying litigation costs incurred in connection with Debtor's pursuit of the Purcell Litigation Claims.

15

25. The Plan further proposes that each holder of an allowed claim in Class 2 (Unsecured Claim of N9 Advisors, LLC) will be paid its pro rata share of the Litigation Proceeds Distribution (as defined in the Plan) or, in the event no Litigation Proceeds Distribution is available to be paid, its pro rata share of the Guaranteed Distribution (as defined in the Plan). Alternatively, each holder of an allowed claim in Class 2 shall have the option to convert such claim to an allowed Class 4 equity interest pursuant to the terms and conditions of its prepetition loan documents.

…

32. Article VIII, Section A of the Plan provides that Debtor's current board of directors, which consists of Jon P. Jiles, Joshua Sroge, Christina Favilla, and Dirk O'Hara, shall continue to serve in their respective positions as directors of the Reorganized Debtor. The Plan further discloses that Jon P. Jiles is a manager of and holds an ownership interest in secured creditor NVF, LLC, which has agreed to make the New Secured Loan to Debtor in connection with the funding of the Plan.[62]

13. There is no declaration in the record from Debtor's fourth board member, Dirk O'Hara. However, Dirk O'Hara's electronic signature appears with those of his three fellow board members on Debtor's Omnibus Written Consent in Lieu of Meeting of the Board of Directors of Banq Inc., dated May 31, 2023, authorizing, in pertinent part, the filing of this Subchapter V case.[63] Based on his electronic signature on this document and the absence of any further comment from Dirk O'Hara, the Court finds and concludes that Dirk O'Hara shares the same viewpoint as his colleagues regarding the filing of this Subchapter V case and the viability, or lack thereof, of the claims made in the Florida Litigation.

14. Despite affirmative sworn statements made by Christina Favilla and Joshua Sroge implying that Debtor undertook a good faith review of the claims made by N9 Advisors against Jon P. Jiles and determined them to be meritless, Joshua Sroge testified at the confirmation hearing that Debtor has not investigated the claims asserted in the Florida Litigation against the Jiles Parties.[64]

---

[62] ECF No. 253, ¶¶ 2, 6-12, 20, 24-25, and 32.

[63] ECF No. 1.

[64] June 20, 2024, Hearing Transcript, ECF No. 259 at 74:18-20 ("Q; You haven't investigated the Florida litigation claims, have you? … A. Investigated? No.").

16

15.    Debtor, via its board of directors, instead made the decision to preemptively dismiss as baseless, without investigation, allegations asserted against the Jiles Parties and pursue financing from NVF, LLC, i.e. a special purpose entity formed by Jon P. Jiles for the purpose of placing this insolvent and non-operational Debtor in Subchapter V in order to halt the Florida Litigation asserting claims against, in pertinent part, the Jiles Parties and instead pursue the Purcell Litigation Claims.

16.    Indeed, Debtor revealed its true motivation when it filed its initial plan[65] on June 13, 2023—the very day it filed this subchapter V petition.   The initial plan proposed to continue prosecuting the Purcell Litigation Claims via continued funding from Jiles' special purpose entity, while providing Debtor's board of directors with a full release.[66]   Debtor also expressed its disagreement with the Arbitration Order in its initial plan, stating that Judge Gordon's "order granting a motion to compel the Debtor to arbitrate its claims against the Purcell Defendants [was] based upon an alleged employment agreement that did not address any of the aforementioned claims or matters…."[67]

17.    On June 14, 2023—the day after filing this subchapter V case—Debtor filed an application to employ special litigation counsel (Diamond McCarthy LLP) to continue assisting Debtor with the prosecution of the Purcell Litigation Claims.[68]   According to the employment application, Debtor and Diamond McCarthy entered into a pre-petition contingency fee agreement, with Debtor agreeing to pay Diamond McCarthy's litigation expenses.   On November 30, 2023, Diamond McCarthy proceeded to file an adversary complaint on Debtor's behalf against the Purcell Parties that largely overlapped with the claims and causes of action that Judge Gordon dismissed and ordered to arbitration via his Arbitration Order.

18.    Although Debtor had sufficient resources to litigate the Purcell Litigation Claims prior to Judge Gordon's ruling, Debtor claimed in its initial plan that the Purcell Parties' bad actions

---

[65] ECF No. 5.

[66] See ECF No. 5, XII.B.3.

[67] ECF No. 5 at 10:2-4.

[68] ECF Nos. 10-11.

"left [Debtor] with insufficient resources … to adjudicate arbitrability under the alleged employment agreement or, to pursue its claims against the Defendants through arbitration following the dismissal of the Nevada Action."[69]  Debtor never explained to the Court's satisfaction how it suddenly had insufficient resources to prosecute the Purcell Litigation Claims, seemingly only after Judge Gordon's ruling, when it had already obtained the assistance of contingency counsel.  Debtor further never explained to the Court's satisfaction how a subchapter V bankruptcy case made any reorganizational sense or why Jon P. Jiles's entity (NVF, LLC) loaned pre-petition funds for the purpose of filing this subchapter V case as opposed to funding the continued prosecution of the Purcell Litigation Claims in arbitration as ordered by Judge Gordon.  Indeed, this subchapter V case purports to do nothing different from what Debtor could have done during the pre-petition period: maintain its non-operational and insolvent status while continuing to pursue the Purcell Litigation Claims.  The filing of this subchapter V case adds what appears to be another unnecessary layer of administrative expense (as reflected in Debtor's monthly operating reports) to an already cash-strapped Debtor.

19.    The only reasonable and logical conclusion the Court may reach, based on the facts of this case, is that this subchapter V case was funded by Jon P. Jiles' special purpose entity (NVF, LLC) to (i) provide Jon P. Jiles with a release, and (ii) overcome Judge Gordon's pre-petition Arbitration Order by instituting a new adversary proceeding.  In essence, this case appears to be filed as a litigation tactic to advance the self-interest of the Jiles Parties, and more specifically, Jon P. Jiles.

20.    In what the Court views as a transparent attempt to overcome similar allegations made by N9 in its opposition to confirmation, Debtor filed its Fourth Amended Plan on June 19, 2024, at 4:52 p.m., i.e. approximately 8 minutes prior to the close of business on the eve of the confirmation hearing, adding, in pertinent part, the following new provision:

> **2.    Investigation of the Florida Litigations Claims.**
> Upon the Effective Date, the Reorganized Debtor shall appoint the Subchapter V Trustee to conduct an independent investigation of the Florida Litigation Claims and to make a recommendation to the

---

[69] ECF No. 5 at 10:8-13.

Reorganized Debtor as to whether the Reorganized Debtor should disregard, settle, or take action to prosecute the Florida Litigation Claims, taking into account their viability, the likelihood of recovery, the costs likely to be incurred in connection with the Prosecution of the Florida Litigation Claims, and effects such prosecution might have on the Reorganized Debtor's ability to carry out the objectives of this Plan.  The Reorganized Debtor shall pay the Subchapter V Trustee's reasonable fees and expenses incurred in connection with such investigation in an amount not to exceed $10,000.00.  The Reorganized Debtor shall thereafter disregard, settle, or take action to prosecute the Florida Litigation Claims in accordance with the recommendations of and subsequent consultations with the Subchapter V Trustee.[70]

This new provision purports a good faith investigation of the claims against the Jiles Parties that Debtor previously dismissed as baseless sans investigation.  Ultimately, however, the same board of directors who previously dismissed these claims as baseless are the ones that will "disregard, settle, or take action" against the Jiles Parties.  While this new provision purports that the board of directors' decision will be made "in accordance with the recommendations of and subsequent consultations with the Subchapter V Trustee", such a consultation is likely illusory in reality.

Specifically, Debtor concedes that it currently generates no revenue, is not anticipated to generate revenue during the 5-year term of the Fourth Amended Plan, and is relying on prosecution of the Purcell Litigation Claims to fund distributions.[71]  Accordingly, even assuming Debtor's board of directors are persuaded that the claims against the Jiles Parties have merit, Debtor will have no funding with which to prosecute such claims.  While NVF, LLC has agreed to fund Debtor for purposes of prosecuting the Purcell Litigation Claims, Debtor has not made any showing that Jiles will also authorize NVF, LLC to fund litigation directed against him and his interests.  Indeed, the Court finds such a scenario unlikely.

Furthermore, under the proposed financing under the Fourth Amended Plan, Jon P. Jiles

---

[70] ECF No. 251, VIII.A.2.

[71] See Fourth Amended Plan, Article III.C.

19

entity (NVF, LLC) will have a first priority lien in any claims asserted against the Jiles Parties,[72] thereby further placing any actual prosecution of such claims beyond the realm of any possibly. Instead, the Fourth Amended Plan puts on the pretense of an independent investigation of the Jiles Claims—claims which have minimal likelihood of progressing past the investigation and consultation stages—to shadow the Fourth Amended Plan's ultimate purpose of shielding Jiles from further prosecution of such claims while continuing to pursue litigation against the Purcell Parties.

21.     For all these reasons, the Court finds and concludes that Debtor has failed to satisfy its burden under Section 1129(a)(3).

**II.     § 1129(a)(5)**

22.     Section 1129(a)(5) provides that a court shall confirm a plan only if:

> (5)
>    (A)
>        (i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and
>
>        (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and
>
>    (B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.[73]

23.     Section VIII.3 of Debtor's Fourth Amended Plan states, in pertinent part, the following:

> The Debtor's current board of directors, which consists of Jon P. Jiles, Joshua Sroge, Christina Favilla, and Dirk O'Hara, shall continue to serve in their respective positions as directors of the Reorganized Debtor.  Jon P. Jiles is a manager of and holds an ownership interest in the Secured Lender, NVF, LLC.

24.     For the reasons previously stated under Section 1129(a)(3) and throughout this

---

[72] See Conclusion of Law 30, *infra*.

[73] 11 U.S.C. § 1129(a)(5).

20

1    opinion, Debtor has failed to satisfy its burden under Section 1129(a)(5) to show that the

2    continuance of Debtor's board of directors "is consistent with the interests of creditors and equity

3    security holders and with public policy…."

4    **III.    § 1129(a)(7)**

5        25.    Section 1129(a)(7) states, in pertinent part:

6            The court shall confirm a plan only if—
            ...
7            (7) With respect to each impaired class of claims or interests—
            (A) each holder of a claim or interest of such class—
8            ...
            (ii) will receive or retain under the plan on account of such claim or
9            interest property of a value, as of the effective date of the plan, that is
            not less than the amount that such holder would so receive or retain if
10           the debtor were liquidated under chapter 7 of this title on such date.[74]

11       26.    The Fourth Amended Plan promises a pro rata distribution of no less than $45,000

12   (referred to in the Fourth Amended Plan as the "Guaranteed Distribution") notwithstanding a

13   liquidation analysis that projects $0.00 to unsecured creditors in a Chapter 7 liquidation.  In reaching

14   this conclusion, however, the liquidation analysis features extraordinary valuation swings of the

15   Purcell Litigation Claims based on the entity asserting such claims.  For instance, the Fourth

16   Amended Plan alleges that the Purcell Litigation Claims are valued at $17,500,000.00 if pursued by

17   the reorganized Debtor but only $150,000 if pursued by a Chapter 7 trustee.[75]  Debtor did not present

18   any credible evidence to support such a dramatic decrease in the value of the Purcell Litigation

19   Claims in the hands of a Chapter 7 trustee, especially since Debtor has the benefit of contingency

20   fee counsel.

21       27.    Debtor's unsupported swings in values do not meet the requirement that "'[t]he

22   hypothetical liquidation analysis must be based on evidence and not assumptions in order to meet

23   the best interests of creditors test….'"[76]  For its part, Debtor only speculates that, notwithstanding

24

25       [74] 11 U.S.C. § 1129(a)(7).

26       [75] ECF No. 251, Article III.B.

27       [76] Schoenmann v. Bank of the West (In re Tenderloin Health, FKA), 849 F.3d 1231, 1237
     (9th Cir. 2016) quoting COLLIER ON BANKRUPTCY ¶ 1129.02 n.98 (Alan N. Resnick & Henry J.
28   Sommer eds., 16th ed. 2016).

the Debtor's ability to obtain the assistance of special counsel on a contingency fee basis, a competent Chapter 7 trustee would not be able to obtain litigation financing and would not be able to enlist the Debtor's cooperation in pursuit of such claims.[77]  Debtor further appears to speculate, without explanation, that the current board of directors may not assist the Trustee during his or her investigation of the Purcell Litigation Claims:

> [T]he pursuit of such claims is likely to require the cooperation and assistance of various individuals associated with the Debtor without which it may not be feasible to pursue such claims.
>
> … Given the inherent uncertainty and expense of litigation and the difficulty a chapter 7 trustee would likely face in attempting to pursue such claims **with limited or no assistance from individuals associated with the Debtor**, the Debtor believes that $150,000 is a fair and reasonable estimate of the amount a chapter 7 trustee might ultimately recover from the pursuit of such claims.  However, it is possible that the pursuit of such claims could yield significantly more or significantly less than $150.000.[78]

28.    For these reasons, Debtor has failed to satisfy its burden under Section 1129(a)(7).

**IV.    § 1129(a)(11)**

29.    Section 1129(a)(11) states that

> [t]he court shall confirm a plan only if … (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[79]

30.    Feasibility of the Fourth Amended Plan turns on the availability of litigation financing, as even Debtor concedes:

> At this time, the Debtor has no regular, reoccurring source of revenue.  Moreover, the Debtor believes it is unlikely that it will have any regular, reoccurring source of revenue during the three-year term of the plan as Debtor's current business operations relate almost exclusively to the pursuit of the Purcell Litigation Claims through which the Debtor seeks to recovery monetary damages and other relief based on the misappropriation of Debtor's trade secrets,

---

[77] ECF No. 251, pg. 18 of 23, lines 3-13.

[78] ECF No. 251 at 13:6-13 (emphasis added).

[79] 11 U.S.C. § 1129(a)(11).

22

technology and business records by the Purcell Defendants as generally alleged by the Debtor in connection with the Nevada Action.

…

The Secured Lender [i.e. NVF, LLC] has agreed, consistent with the terms and conditions set forth in the New Secured Loan Documents and contingent upon the entry by the Bankruptcy Court of a final order confirming this Plan in a form reasonably acceptable to Secured Lender, to advance up to $350,000 in new secured financing to the Reorganized Debtor through the New Secured Loan, which shall be secured by a first-priority security interest in all of the personal property of the Reorganized Debtor, including the Purcell Litigation claims and all other Causes of Action. The Reorganized Debtor will use the New Secured Loan (i) to pay Administrative Claims and Priority Claims, (ii) to fund its business operations during the term of the Plan, including reimbursement of out-of-pocket expenses incurred by Litigation Counsel, and (iii) to create a reserve to provide for payment of the Guaranteed Distribution, if necessary, at the conclusion of the five-year term of the Plan. The Secured Lender may agree (but is not required) to advance additional funds to the Reorganized Debtor in connection with the New Secured Loan on terms that are mutually agreeable to the Secured Lender and the Reorganized Debtor following confirmation of the Plan.[80]

31.    "Many courts have found debtors' statements that funding is forthcoming to be insufficient in the absence of concrete evidence that the contributors are willing and capable of giving."[81]  Debtor presented no evidence at the confirmation hearing regarding NVF, LLC's capability to provide the promised financing for purposes of pursuing the Purcell Litigation Claim. Even assuming the initial $350,000 loan was forthcoming, the Fourth Amended Plan makes clear that additional financing is uncertain to fund the 5-year litigious term of the Fourth Amended Plan. Finally, as previously indicated, Debtor presented no evidence of a willingness or capability to fund the prosecution of the claims asserted in the Florida Litigation.

32.    "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can

---

[80] ECF No. 5, pp. 18-19 of 43.

[81] In re Las Vegas Monorail Co., 462 B.R. 795, 801 (Bankr. D. Nev. 2011) (internal quotation marks and citations omitted).

23

possibly attain after confirmation."[82]  Debtor has only presented a visionary scheme.

33.    For all these reasons, the Court finds and concludes that Debtor has failed to satisfy its burden under § 1129(a)(11).

**<u>CONCLUSION</u>**

For the reasons stated above, the Court denies confirmation of the Debtor's Fourth Amended Plan. The Court will enter an order consistent with these findings of fact and conclusions of law contemporaneously herewith.

Copies sent to all parties via BNC

###

---

[82] <u>In re Las Vegas Monorail Co.</u>, 462 B.R. at 801 (internal quotation marks and citations omitted).